In re Se. Eye Ctr. (Old Battleground v. CCSEA), 2019 NCBC 28.

STATE OF NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
15 CVS 1648

IN RE SOUTHEASTERN EYE
CENTER-PENDING MATTERS

ORDER AND OPINION ON MOTIONS
FOR SUMMARY JUDGMENT
(OLD BATTLEGROUND V. CCSEA)

1. **THIS MATTER** is before the Court upon (i) Douglas Harris's Motion for Summary Judgment as to Nivison Family Investment, LLC, Old Battleground Properties, and Arthur Nivison ("Doug Harris's Motion as to Plaintiffs' Claims"); (ii) the Castle McCulloch Defendants' Motion for Summary Judgment (the "Castle McCulloch Defendants' Motion"); (iii) Plaintiffs' Motion for Partial Summary Judgment as to Counts Fourteen, Fifteen, Sixteen, Twenty-Seven, Twenty-Eight, and Thirty of Amended Consolidated Complaint ("Plaintiffs' Motion for Partial Summary Judgment"); (iv) Plaintiffs' and Third Party Defendants' Motion for Partial Summary Judgment as to Counterclaims Filed Against Nivison Family Investments, LLC and as to Third Party Claims Filed Against Old Battleground Properties, Inc. and Arthur Nivison by Douglas S. Harris, Individually and as Trustee of JDPW Trust U/T/A Dated June 8, 2007 and JDPW Trust U/T/A Date June 8, 2007 ("Plaintiffs and Nivison's Motion as to Doug Harris's Claims"); (v) Douglas S. Harris's Motion for Summary Judgment as to Richard Harris, Historic Castle McCulloch, and Castle McCulloch, Inc. ("Doug Harris's Motion as to the Castle McCulloch Defendants' Crossclaims"); and (vi) Douglas S. Harris's Motion for Summary Judgment as to Gerald Jeutter's Cross Claims on Behalf of JDPW Trust, CCSEA, and DRE against

Douglas Harris ("Doug Harris's Motion as to the Receiver's Crossclaims") (collectively, the "Motions for Summary Judgment") in the above-captioned case.

2. For the reasons stated herein, the Court (i) **GRANTS** Doug Harris's Motion as to Plaintiffs' Claims; (ii) **GRANTS in part** and **DENIES in part** the Castle McCulloch Defendants' Motion; (iii) **DENIES** Plaintiffs' Motion for Partial Summary Judgment; (iv) **GRANTS in part** and **DENIES in part** Plaintiffs and Nivison's Motion as to Doug Harris's Claims; (v) **GRANTS** Doug Harris's Motion as to the Castle McCulloch Defendants' Crossclaims; and (vi) **GRANTS in part** and **DENIES in part** Doug Harris's Motion as to the Receiver's Crossclaims.

> *Smith Debnam, Attorneys at Law, by Byron L. Saintsing, for Plaintiffs Nivison Family Investments, LLC and Old Battleground Properties, Inc. and Third-Party Defendant Arthur Nivison.*
>
> *Oak City Law LLP, by Robert E. Fields, III, for Receiver Gerald A. Jeutter, Jr., as Receiver for the JDPW Trust, Central Carolina Surgical Eye Associates, P.A., HUTA Leasing LLC, Southeastern Eye Management, Inc., Southeastern Cataract Laser Center, PLLC, EMS Partners, LLC, KEPES Newco, LLC, and DRE Newco, LLC.*
>
> *Wyatt Early Harris Wheeler, LLP, by Scott F. Wyatt and Donavan J. Hylarides, for Defendants Richard A. Harris, Historic Castle McCulloch, LLC, and Castle McCulloch, Inc.*
>
> *Douglas S. Harris, Pro se.*

Bledsoe, Chief Judge.

I.

BACKGROUND

A.    Factual Background

3.    The Court does not make findings of fact when ruling on a motion for summary judgment, but "it is helpful to the parties and the courts for the trial judge to articulate a summary of the material facts which he considers are not at issue[.]" *Hyde Ins. Agency, Inc. v. Dixie Leasing Corp.*, 26 N.C. App. 138, 142, 215 S.E.2d 162, 165 (1975).

4.    This action is a piece of a larger group of cases that have found their way to the North Carolina Business Court and are consolidated into two files: *In re Southeastern Eye Center-Pending Matters* (15 CVS 1648, Wake County) and *In re Southeastern Eye Center-Judgments* (12 CVS 11322, Guilford County).  The litigation of these cases has concerned a wide variety of matters, including the appointment of a receiver over multiple entities, disputes over ownership interests in a collection of valuable artwork and chess sets, and appeals to the Supreme Court of North Carolina.

5.    Defendant Central Carolina Surgical Eye Associates, P.A. ("CCSEA") is a North Carolina medical services professional association located in Guilford County, North Carolina.  (Am. Consolidated Compl. ¶ 4, ECF No. 179.)  In September 2002, CCSEA leased a commercial premises in Greensboro, North Carolina (the "Battleground Property") from Battleground Real Estate Partners, LLC, a predecessor in interest to Plaintiff Old Battleground Properties, Inc. ("Old

Battleground"). (Am. Consolidated Compl. ¶ 21.) CCSEA executed amendments to this lease with Old Battleground in 2006 and 2010. (Am. Consolidated Comp. ¶ 22.)

6. By 2010, CCSEA was behind on its payments under the commercial lease with Old Battleground. CCSEA executed two promissory notes to evidence its debt to Old Battleground, each in the amount of $1,000,000 (the "2010 CCSEA Notes"). (Am. Consolidated Compl. Ex. A, ECF No. 180.) Both notes were signed by James Mark McDaniel, Jr. ("Mark McDaniel") as the CEO of CCSEA. (Am. Consolidated Compl. Ex. A.)

7. Two years later, two more promissory notes were executed in Old Battleground's favor. One was executed by CCSEA in the amount of $140,359.38. (Am. Consolidated Compl. Ex. D, ECF No. 180.) The other was executed by Dr. C. Richard Epes ("Dr. Epes"), an interest owner in CCSEA, to evidence Old Battleground's payment of CCSEA's property taxes. (Am. Consolidated Compl. ¶ 24; Am. Consolidated Compl. Ex. B, ECF No. 180.) This fourth note was in the amount of $118,182.05. (Am. Consolidated Compl. Ex. B.)

8. In March 2012, Old Battleground sold the Battleground Property to MMRE, LLC ("MMRE"), an entity affiliated with CCSEA. (Am. Consolidated Compl. ¶ 25.) Old Battleground financed this transaction, and in exchange MMRE executed a purchase-money note and deed of trust in favor of Investors Title Exchange Corp. as a qualified intermediary for Old Battleground. (Am. Consolidated Compl. ¶ 25; Am. Consolidated Compl. Ex. BB, at 1, ECF No. 187.) According to Plaintiffs, the

purchase-money note and deed of trust were later assigned to Plaintiff Nivison Family Investments, LLC ("NFI"). (Am. Consolidated Compl. ¶ 25.)

9. During the time CCSEA was leasing from and incurring debts with Old Battleground, it was also borrowing money from FNB Southeast, a predecessor in interest to NewBridge Bank (for clarity, the Court will refer to FNB and NewBridge Bank as "NewBridge"). (Am. Consolidated Compl. Exs. E, H, ECF Nos. 180–81.) In 2007, CCSEA engaged in two loan transactions with NewBridge, executing promissory notes in NewBridge's favor for each loan. (Am. Consolidated Compl. Exs. E, H.) To provide security for these loans, CCSEA and two affiliated entities—HUTA Leasing, LLC ("HUTA") and Southeastern Eye Management, Inc. ("SEM")—executed security agreements granting NewBridge security interests in certain personal property. (Am. Consolidated Compl. Exs. F, I, ECF Nos. 181–82.) Dr. Epes and Mark McDaniel also personally guaranteed both loans. (Am. Consolidated Compl. Exs. G, J, ECF Nos. 181–82.)

10. In 2008, CCSEA executed a third promissory note with NewBridge as part of a third loan transaction. (Am. Consolidated Compl. Ex. K, ECF No. 182.) To secure this loan, another security instrument was executed by CCSEA granting NewBridge a security interest in further collateral. (Am. Consolidated Compl. Ex. L, ECF No. 183.) Dr. Epes and Mark McDaniel guaranteed this third loan as well. (Am. Consolidated Compl. Ex. M, ECF No. 183.)

11. NewBridge Bank also entered into a loan agreement with several other entities that had ties to Dr. Epes or Mark McDaniel. Specifically, NewBridge lent

money (the "Castle McCulloch Loan") to Defendants Castle McCulloch, Inc. ("Castle McCulloch"), Historic Castle McCulloch, LLC ("Historic Castle McCulloch"), and NSITE Management, LLC ("NSITE"). (Am. Consolidated Compl. Ex. N, ECF No. 183.) Castle McCulloch is a North Carolina corporation whose officers included Mark McDaniel, Defendant Douglas Harris ("Doug Harris"), and Doug Harris's brother, Defendant Richard Harris. (Am. Consolidated Compl. ¶ 14.) Historic Castle McCulloch is a North Carolina LLC whose members included Mark McDaniel, Dr. Epes, and Richard Harris. (Am. Consolidated Compl. ¶ 15.)

12. The Castle McCulloch Loan was secured by various kinds of collateral (the "Castle McCulloch Collateral"), including a deed of trust from Historic Castle McCulloch in favor of NewBridge (the "Castle McCulloch Deed of Trust") and an assignment of leases and rents (the "Assignment of Rents and Profits") granted by Historic Castle McCulloch in NewBridge's favor. (Am. Consolidated Compl. Exs. T, UU, ECF Nos. 184, 191.) The loan was also guaranteed by EMS Partners, LLC ("EMS"), whose members included Dr. Epes and Mark McDaniel, (Am. Consolidated Compl. Ex. U, ECF No. 184), and Dr. Epes and Mark McDaniel personally, (Am. Consolidated Compl. Exs. V, W, ECF No. 184). Much of the present dispute stems from the Castle McCulloch Loan and its associated collateral.

13. By mid-2012, all three of NewBridge's loans to CCSEA (the "CCSEA Loans"), as well as the Castle McCulloch Loan, were in default. (Am. Consolidated Compl. Ex. X, at 2 [hereinafter "Settlement Agreement"], ECF No. 185.) The combined outstanding balance on the loans was $3,350,139.42. (Settlement

Agreement 2.) In an attempt to recover a portion of this balance, NewBridge agreed to a settlement agreement (the "Settlement Agreement") with Historic Castle McCulloch, Castle McCulloch, NSITE, CCSEA, HUTA, SEM, Mark McDaniel, and Dr. Epes (collectively, excluding NewBridge, the "Settlement Debtors"). (Settlement Agreement 5–6.) Under the terms of the Settlement Agreement, the Settlement Debtors represented that they had arranged for a third party to purchase the promissory notes, security agreements, and all other loan documents (collectively, the "Loan Documents") connected to the four outstanding loans for a discounted price of $2,026,834.35. (Settlement Agreement 2.) NewBridge agreed to sell the Loan Documents to this third-party buyer for this discounted amount. (Settlement Agreement 2.) Under the Settlement Agreement, if the purchase did not go through by a certain date, NewBridge would be permitted to file and enforce a confession of judgment in the amount of $2,026,834.09 executed by the Settlement Debtors (the "Confession of Judgment"). (Settlement Agreement 2–3.)

14. By a subsequent purchase and sale agreement between NewBridge and Defendant JDPW Trust U/T/A Dated June 8, 2007 ("JDPW"), it was agreed that JDPW would act as the Settlement Debtors' third-party buyer for the Loan Documents. (Am. Consolidated Compl. Ex. Z, at 1, ECF No. 186.) In furtherance of this agreement, JDPW made an initial deposit of $25,000 with NewBridge. (Am. Consolidated Compl. ¶ 47; Harris Dep. 382:9–383:12 [hereinafter Harris Dep. I], ECF No. 887.) Doug Harris was the trustee of JDPW. (Harris Dep. I, at 382:5–14.)

15. Around the same time or shortly after the Settlement Agreement was executed, Doug Harris and Mark McDaniel approached Third-Party Defendant Arthur Nivison about providing a loan to JDPW so JDPW could complete the purchase from NewBridge. (Castle McCulloch Defs.' Br. Opp'n Pls.' Mot. Partial Summ. J. Ex. 3 ¶ 11 [hereinafter "Nivison Aff."], ECF No. 879; Harris Dep. I, at 75:14–23, 79:11–25.) Arthur Nivison was the acting manager of Old Battleground and the manager of NFI. (Nivison Dep. 147:10–23 [hereinafter Nivison Dep. I], ECF No. 833.) Based on his discussions with Doug Harris and Mark McDaniel, Arthur Nivison understood the purpose of the loan was to "facilitate the purchase of the Castle McCulloch [L]oan and the CCSEA Loans." (Nivison Aff. ¶ 11.)

16. Eventually, it was agreed that either Old Battleground or NFI—the parties dispute which entity was supposed to be the lender—would provide JDPW with the funds required to complete the Settlement Agreement. However, before Old Battleground or NFI could lend JDPW any money, MMRE had to sell the Battleground Property and pay off the loan secured by the related 2012 deed of trust so that Old Battleground or NFI would have money to lend. (Am. Consolidated Compl. Ex. BB, at 1.)

17. Because the Battleground Property needed to sell before the purchase of the Loan Documents from NewBridge could be completed, the Settlement Debtors, JDPW, and NewBridge entered into agreements extending the date by which JDPW could make the purchase to September 21, 2012. (Am. Consolidated Compl. Exs. AA, at 9, BB, at 1–2, ECF No. 187.) As consideration for the extended closing date, the

Settlement Debtors agreed to pay NewBridge an additional $100,000. (Am. Consolidated Compl. Ex. BB, at 2.) Richard Harris paid this money to NewBridge in the form of sixty-two gold coins, which were then replaced by $100,000 in cash. (Am. Consolidated Compl. Ex. CC, ECF No. 187.)

18. On or about September 21, 2012, a flurry of activity occurred. The Battleground Property was sold, and the profits from that sale were used to pay off one of the 2010 CCSEA Notes in favor of Old Battleground and the note secured by the deed of trust held by NFI. (Nivison Aff. ¶ 9.) These funds were then wired to NewBridge, although the record is unclear as to whether the transfer of the funds to NewBridge occurred on September 21 or on September 24 (with interest paid by NFI for the additional three days).

19. In either event, NewBridge then assigned the Loan Documents to JDPW. (Am. Consolidated Compl. Exs. UU, VV, WW, ECF Nos. 191–92.) This was accomplished by three separate documents: (i) an "Assignment of Security Instruments" that conveyed the Castle McCulloch Deed of Trust and the Assignment of Rents and Profits, (ii) an "Allonge" that memorialized the sale of the promissory note for the Castle McCulloch Loan (the "Castle McCulloch Note") to JDPW, and (iii) a "Bill of Sale and Assignment of Loan Documents" that included the Loan Documents connected to the CCSEA Loans as well as the remainder of the Loan Documents connected to the Castle McCulloch Loan and Castle McCulloch Collateral (the "Castle McCulloch Loan Documents"). (Am. Consolidated Compl. Exs. UU, VV, WW.) Plaintiffs allege that they had no knowledge that JDPW would be purchasing

the Castle McCulloch Note, the Castle McCulloch Deed of Trust, the Assignment of Rents and Profits, or the other Castle McCulloch Loan Documents from NewBridge and contend that those facts were intentionally concealed from them. (Am. Consolidated Compl. ¶¶ 65–66.)

20. Also on or about September 21, 2012, Arthur Nivison and JDPW memorialized their own agreement in writing, but Plaintiffs and Doug Harris dispute the final terms of that agreement and the validity of certain documents purporting to set forth the parties' deal.

21. First, Plaintiffs allege that Doug Harris, as trustee for JDPW, executed a promissory note in favor of NFI in exchange for the approximately $2.1 million either Old Battleground or NFI would be lending to JDPW (the "JDPW Note"). (Am. Consolidated Compl. Ex. DD at 1, ECF No. 187.) Doug Harris denies executing this note.

22. Second, the parties executed a written agreement containing further terms for the loan to JDPW (the "Assignment Agreement"). (Pls.' Reply Br. Resp. Castle McCulloch Defs.' Br. Opp'n Pls.' Mot. Partial Summ. J. Corrected Ex. KK [hereinafter "Corrected Ex. KK"], ECF No. 908; *see also* Am. Consolidated Compl. Exs. QQ, TT, ECF No. 190.)[1] Plaintiffs and Doug Harris dispute which version of this document is controlling.

---

[1] In their reply brief in support of their Motion for Partial Summary Judgment, Plaintiffs represented that Exhibit KK to the Amended Consolidated Complaint inadvertently included the wrong set of documents. (Pls.' Reply Br. Resp. Castle McCulloch Defs.' Br. Opp'n Pls.' Mot. Partial Summ. J. 3 n.1, ECF No. 908.) Plaintiffs attached a corrected version of Exhibit KK to their reply brief.

23.     At around 1:02 PM on September 21, 2012, Doug Harris sent one version of the Assignment Agreement, bearing his signature, to an attorney acting for Arthur Nivison named Tom Harper. (Corrected Ex. KK.) Doug Harris alleges that this original version of the Assignment Agreement is valid and enforceable. Plaintiffs, however, allege that Tom Harper then circulated a second version of the Assignment Agreement with handwritten modifications. (Am. Consolidated Compl. Ex. QQ.) By 5:15 PM on September 21, 2012, Nivison signed this second agreement. (Am. Consolidated Compl. Exs. QQ.) Plaintiffs allege that Doug Harris returned an initialed copy of this version of the Assignment Agreement to Tom Harper by e-mail at 5:37 PM. (Am. Consolidated Compl. Ex. TT, ECF No. 190.) Doug Harris contends that his initials on this second version of the agreement are forged.

24.     The two versions of the Assignment Agreement differ in several respects. First, the original version stated that the money lent to JDPW would come from Old Battleground or would be wired to JDPW on Old Battleground's behalf, (Corrected Ex. KK), while the second version provided that the loan proceeds would be wired to JDPW by NFI or on NFI's behalf, (Am. Consolidated Compl. Ex. QQ). Second, the original version of the Assignment Agreement contained language indicating that additional security for the loan to JPDW would be tendered by Mark McDaniel and Dr. Epes; this language was crossed out in the later version. (Corrected Ex. KK; Am. Consolidated Compl. Exs. QQ, TT.)[2] Third, the original version of the agreement

_____

[2] The record contains an "Unconditional Guaranty of Payment" in favor of NFI bearing the signatures of Dr. Epes; his wife, Bessie Epes; Dr. Epes as president of CCSEA; and Mark McDaniel, (Am. Consolidated Compl. Ex. FF, ECF No. 187), and a "Pledge Agreement" that purported to secure NFI's loan with security interests in certain property owned by Dr. Epes

included a provision stating that JDPW's liability on default would be limited to forfeiture of the mentioned collateral and JDPW's interests in that collateral, (Corrected Ex. KK); the second version of the agreement crossed this term out as well, (Am. Consolidated Compl. Ex. QQ).

25.  All versions of the Assignment Agreement expressly set out the following:

> THIS AGREEMENT [is] made . . . for the purpose of transferring the security interest in the personal property of HUTA Leasing Company, Southeastern Eye Management, Inc., and Central Carolina Surgical Eye Associates, P.A., now held by NewBridge . . . to [either a legal entity designated by Old Battleground, or, in the second version of the agreement, NFI] in exchange for [a] $2,100,000.00 loan to JDPW . . . which loan will be used to purchase NewBridge Bank's security interest.

(Corrected Ex. KK; Am. Consolidated Compl. Exs. QQ, TT.)  The "personal property" referenced by the Assignment Agreement was detailed in the Assignment of Security Instruments that Doug Harris sent to Tom Harper with the draft of the Assignment Agreement.  (Corrected Ex. KK.)  The schedule attached to this document ("Schedule A" or "Attachment A") specifically listed which Loan Documents JDPW would be assigning to the agreed-upon recipient, with each piece of collateral listed under its corresponding loan.  (Corrected Ex. KK; *see* Am. Consolidated Compl. Ex. GGG, at 1–2 [hereinafter "Partial Summ. J. Order"], ECF No. 194.)  The Court hereafter refers to the property referenced in the Assignment Agreement and listed under the CCSEA Loans in Schedule A as the "CCSEA Collateral" or "CCSEA Loan Documents."

---

or Bessie Epes, (Am. Consolidated Compl. Ex. GG, ECF No. 188).  The validity of these documents has been disputed, and there is evidence appearing to show that neither Bessie Epes nor anyone with authority to sign on her behalf executed these documents.  *See Old Battleground Props. v. Cent. Carolina Surgical Eye Assocs., P.A.*, 2015 NCBC LEXIS 19, at *19–20 (N.C. Super. Ct. Feb. 25, 2015).

26.    Plaintiffs allege that the Schedule A sent to Tom Harper was nearly identical to the list of assigned collateral JDPW received from NewBridge as an attachment to the NewBridge-to-JDPW Bill of Sale and Assignment of Loan Documents, except that the version sent to Tom Harper did not include reference to the Castle McCulloch Loan and Castle McCulloch Loan Documents.  (Am. Consolidated Compl. ¶ 59; Mem. Law Opp'n Douglas S. Harris's Mot. Summ. J. Nivison Entities' Claims 10, ECF No. 883.)  Plaintiffs contend that Doug Harris intentionally omitted the Castle McCulloch Loan and Castle McCulloch Loan Documents from the Schedule A he sent Tom Harper to conceal the conveyance of the Castle McCulloch Loan Documents to JDPW.  (Mem. Law Opp'n Douglas S. Harris's Mot. Summ. J. Nivison Entities' Claims 14.)

27.    Problems arose after the September 21, 2012 transactions.  Despite the representations made in the Assignment Agreement, Doug Harris did not assign the CCSEA Loan Documents to NFI until compelled to do so by a court order.  (Partial Summ. J. Order 1–2.)  JDPW also failed to make payments on the allegedly valid JDPW Note.  (Partial Summ. J. Order 2.)

28.    Plaintiffs also allege that Doug Harris, acting as trustee for JDPW, assigned the Castle McCulloch Loan Documents to his brother, Richard Harris, or otherwise released the Castle McCulloch Collateral by other means, including by preparing a deed releasing the land encumbered by the Castle McCulloch Deed of Trust and the Assignment of Rents and Profits (the "Release Deed").  (Am. Consolidated Compl. Ex. YY, ECF No. 192; Harris Dep. I, at 866:19–868:25.)  Plaintiffs assert that they were

unaware that JDPW ever held the Castle McCulloch Loan Documents or interests in the Castle McCulloch Collateral and were further unaware that JDPW then released that collateral until after this litigation commenced. Richard Harris denies by affidavit that he, Castle McCulloch, or Historic Castle McCulloch (collectively, with Richard Harris, the "Castle McCulloch Defendants") ever received an assignment of the Castle McCulloch Loan Documents. (Def. Richard A. Harris's Am. Answer and Countercls. Ex. A ¶ 10, ECF No. 678.)

B.    Procedural Background

29.    As a result of the preceding facts, NFI filed an action against JDPW, Doug Harris, individually and as trustee of JPDW, and NewBridge on July 21, 2014. Several months later, Old Battleground and NFI filed an action against CCSEA, various CCSEA-affiliated entities, Dr. Epes, Bessie Epes, and Mark McDaniel and his wife, Patricia McDaniel.

30.    In the second lawsuit, upon the parties' joint request at a February 23, 2015 hearing, the Court appointed Gerald A. Jeutter, Jr. as a receiver (the "Receiver") for CCSEA and several of its related entities (the "Receivership Entities").[3]  *Old Battleground Props. v. Cent. Carolina Surgical Eye Assocs., P.A.*, 2015 NCBC LEXIS 19, at *24 (N.C. Super. Ct. Feb. 25, 2015). Following his appointment, the Receiver investigated and asserted claims and demands on behalf of the Receivership Entities against the Epeses. As the litigation of Plaintiffs' cases progressed, the number of

---

[3] These entities included the above-mentioned EMS as well as Southeastern Cataract Laser Center, PLLC, HUTA, and SEM. *Old Battleground Props.*, 2015 NCBC LEXIS 19, at *24.

entities in receivership and the larger universe of cases related to CCSEA and various other parties to these actions grew.

31.    On June 19, 2015, the Court ordered both of Plaintiffs' lawsuits consolidated with other cases pending before it and directed all subsequent filings be made in the Master File *In re Southeastern Eye Center-Pending Matters* (Wake 15 CVS 1648). (Order Mot. Consolidate 8–9, ECF No. 76.)  The Court then issued a case management order in this consolidated proceeding requiring all persons asserting claims against CCSEA or its affiliated entities to file their claims against those entities with the Receiver.  (Case Management Order 5–8, ECF No. 82.)

32.    Soon after consolidation, the Court approved a settlement between the Receiver and the Epeses.  (Order Approving Settlement Agreement and Appointing Receiver for Kepes Newco, LLC and DRE Newco LLC and Restraining Order 6 [hereinafter "Epes Settlement Order"], ECF No. 117.)  To facilitate this settlement, the Court placed two additional entities into receivership: Kepes Newco, LLC ("Kepes") and DRE Newco, LLC ("DRE") (both added to the "Receivership Entities").[4] (Epes Settlement Order 7.)  Kepes and DRE are limited liability companies created for the purpose of assuming and paying the debts of Dr. Epes and Bessie Epes and to which the Epeses have assigned a significant number of their assets.  (*See* Joint Mot. Approve Settlement Agreement and Release Ex. A-1, at 1, Ex. A-2, at 1, ECF No. 52.2;

---

[4]  In addition to DRE and Kepes, the Court also placed several other entities in which the Epeses owned controlling or materially dominant shares into receivership.  These entities included Surgical Eye Center, Inc., ME Greensboro, LLC, HUTA Leasing Company, and MEM of High Point, LLC.  (Epes Settlement Order 5–6.)

Joint Mot. Approve Settlement Agreement and Release Ex. B-1, at 1, Ex. B-2, at 1, ECF No. 52.1.)

33. In July and August 2015, Plaintiffs sought leave to amend their complaints in each of their lawsuits. Recognizing that common issues of fact and law were present in both of Plaintiffs' cases and that consolidation would avoid confusion, unnecessary costs, and potential delays, the Court ordered the two lawsuits further consolidated for future proceedings and directed Plaintiffs to file a single amended complaint consolidating their claims. (Order Pls.' Mots. Amend Compl. and Consolidation ¶¶ 6–7, ECF No. 168.) Plaintiffs filed their Amended Consolidated Complaint on September 17, 2015. (Am. Consolidated Compl. 50.) The Amended Consolidated Complaint added the Castle McCulloch Defendants to the case. (Am. Consolidated Compl. 1.)

34. On March 28, 2016, Plaintiffs voluntarily dismissed their claims against Mark McDaniel and Patricia McDaniel.

35. On April 28, 2016, upon Plaintiffs' motion, the Court placed JDPW into receivership by appointing the Receiver as receiver for JDPW. (Order Approving Pls.' Mot. Appointment Receiver for JDPW Trust 7, ECF No. 472.) The Court did so after finding and concluding for the limited purposes of Plaintiffs' motion (i) that Doug Harris had a conflict of interest in remaining in control of JDPW and making decisions on its behalf; (ii) that Doug Harris was unlikely to investigate and pursue possible claims JDPW may have against the Castle McCulloch Defendants; (iii) that the rights and interests of the parties would be adequately protected by the Receiver

taking fiscal and operational charge of JDPW; (iv) that there was no perceived conflict of interest in the receiver for the Receivership Entities serving as the receiver for JDPW, provided that NFI and JDPW, under the Receiver's direction, settled the claims against JDPW pursuant to a negotiated settlement agreement; and (v) that Plaintiffs had, on the record at that time, presented substantial evidence that they had an apparent right to property in an adverse party's possession and that JDPW, due to Doug Harris's involvement, was not investigating or pursing causes of action relating to the Deed of Trust and Assignment of Rents and Profits, which NFI asserted it had claims to in law and equity. (Order Approving Pls.' Mot. Appointment Receiver for JDPW Trust 5–7.) As a further part of its ruling, the Court enjoined Doug Harris from conducting further business as trustee of JDPW. (Order Approving Pls.' Mot. Appointment Receiver for JDPW Trust 17.)

36. Concurrent with the Court's order placing JDPW into receivership, the Court approved a settlement agreement between Plaintiffs, the Receivership Entities, and JDPW. The settlement allowed Plaintiffs a $4 million claim against CCSEA, DRE, and Kepes, subject to certain restrictions, and a $2.1 million claim against JDPW. (Order Approving Nivison Settlement and Related Transactions Including Release of CCSEA Sale Proceeds 8 [hereinafter "Order Approving Nivison Agreement"], ECF No. 471.) Both amounts represented a substantial reduction from the amount sought by Plaintiffs against JDPW or the Receivership Entities. (Order Approving Nivison Agreement 8.)

37.     Plaintiffs voluntarily dismissed their claims against the Epeses on June 27, 2016.  Several months later, Plaintiffs dismissed their claims against NewBridge.

38.     On February 28, 2017, Plaintiffs, Arthur Nivison, Doug Harris, and the Castle McCulloch Defendants filed the Motions for Summary Judgment.  Following these filings, however, the Court concluded that matters in this case should be stayed while the Supreme Court of North Carolina considered related issues on appeal.

39.     On March 2, 2018, the Supreme Court of North Carolina dismissed the appeals relating to this case pending before it after concluding that the appellants had failed to demonstrate grounds for appellate review.

40.     This Court held a hearing on the Motions for Summary Judgment on April 26, 2018, at which all parties with claims at issue were present.  Additional supplemental briefing ordered by the Court was completed on January 30, 2019.

41.     The Motions for Summary Judgment are ripe for resolution.[5]

II.

LEGAL STANDARD

42.     Under Rule 56 of the North Carolina Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

---

[5] On April 6, 2018, Mark McDaniel filed an untitled document that opposed Plaintiffs' Motion for Partial Summary Judgment.  Summary judgment filings in this case were due on February 28, 2017, and responses to those filings were due on April 3, 2017.  Given that Mark McDaniel's opposition was filed just over a year past this deadline, to the extent the opposition is not rendered moot by the Court's decisions herein, the Court will, in its discretion, refuse to consider the opposition's contents as untimely.

genuine issue as to any material fact and that any party is entitled to . . . judgment as a matter of law." *Craig v. New Hanover Cty. Bd. of Educ.*, 363 N.C. 334, 337, 678 S.E.2d 351, 353 (2009) (quoting N.C. R. Civ. P. 56(c)). A material fact is one that "would constitute or would irrevocably establish any material element of a claim or defense." *Abner Corp. v. City Roofing & Sheetmetal Co.*, 73 N.C. App. 470, 472, 326 S.E.2d 632, 633 (1985). A genuine issue is "one that can be maintained by substantial evidence." *Dobson v. Harris*, 352 N.C. 77, 83, 530 S.E.2d 829, 835 (2000). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and means more than a scintilla or a permissible inference." *DeWitt v. Eveready Battery Co.*, 355 N.C. 672, 681, 565 S.E.2d 140, 146 (2002) (internal quotation marks and citations omitted).

43. On a motion for summary judgment, the moving party bears the burden of showing that no genuine issues of material fact remain to be resolved. *Camalier v. Jeffries*, 340 N.C. 699, 706, 460 S.E.2d 133, 136 (1995). "Evidence presented by the parties is viewed in the light most favorable to the non-movant." *Summey v. Barker*, 357 N.C. 492, 496, 586 S.E.2d 247, 249 (2003). The trial court should grant summary judgment against an adverse party's claim only if the movant can prove "an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense" or can show "through discovery that the opposing party cannot produce evidence to support an essential element of [his or] her claim." *Dobson*, 352 N.C. at 83, 530 S.E.2d at 835. If the moving party meets its burden, "the burden shifts to the nonmoving party to produce a forecast of evidence

demonstrating specific facts, as opposed to allegations, showing that he can at least establish a *prima facie* case at trial." *Gaunt v. Pittaway*, 139 N.C. App. 778, 784–85, 534 S.E.2d 660, 664 (2000). The responding party may not "rest upon the . . . allegations or denials" within its pleading, but must put forward specific facts showing there is a genuine issue for trial. N.C. R. Civ. P. 56(e).

## III.

## ANALYSIS

44. The Court begins its analysis by addressing Doug Harris's Motion as to Plaintiffs' Claims.[6] The Court then turns to the Castle McCulloch Defendants' Motion, followed by Plaintiffs' Motion for Partial Summary Judgment, Plaintiffs and Nivison's Motion as to Doug Harris's Claims, Doug Harris's Motion as to the Castle McCulloch Defendants' Crossclaims, and finally Doug Harris's Motion as to the Receiver's Crossclaims.

A. Doug Harris's Motion as to Plaintiffs' Claims

45. Doug Harris moves for Summary Judgment as to Plaintiffs' claims against him: Count 6 (Legal Malpractice and Misrepresentation); Count 8 (Fraud); Count 31 (Unfair and Deceptive Trade Practices); and Count 32 (Punitive Damages). Doug Harris also argues for the dismissal of Plaintiffs' claims against him by contending

---

[6] The majority of the claims contained in Plaintiffs' Amended Consolidated Complaint allege injury to NFI and seek relief for NFI. Nevertheless, for ease of reference and because Plaintiffs jointly briefed the Motions for Summary Judgment, the Court will attribute arguments made by Old Battleground or NFI to "Plaintiffs."

that Plaintiffs' claims are barred due to Plaintiffs' election of remedies. The Court begins by addressing this latter argument.

### 1. Election of Remedies

46. Doug Harris argues that the Court should dismiss all claims jointly brought against himself, Dr. Epes, and Mark McDaniel because Plaintiffs have settled these claims as to Dr. Epes. He continues, "the Nivison entities have no right to settle the same claim . . . against Dr. Epes and then decide they are dissatisfied [with] the amount of the damages and go after Harris on the same claim." (Mem. Law Supp. Douglas S. Harris's Mot. Summ. J. Nivison Entities' Claims Against Harris 25, ECF No. 862.2.) This argument is mistaken.

47. Plaintiffs seek cumulative remedies. "Unless and until [a] plaintiff receives full satisfaction of a claim, settlement against [other] joint tortfeasors [will] not bar a claim against the remaining offender." *Swain v. Leahy*, 111 N.C. App. 884, 887, 433 S.E.2d 460, 462 (1993) (citing *Bowen v. Iowa Nat'l Mut. Ins. Co.*, 270 N.C. 486, 492, 155 S.E.2d 238, 243 (1967)). Accordingly, the claims against Doug Harris will not be dismissed on this ground.

### 2. Legal Malpractice and Misrepresentation

48. Plaintiffs' sixth count alleges that Doug Harris, as a licensed North Carolina attorney, provided legal advice to NFI by advising Arthur Nivison and represented NFI leading up to and during the September 21, 2012 transactions between NFI, JDPW, and NewBridge Bank. (Am. Consolidated Compl. ¶ 137.) Plaintiffs contend that Doug Harris breached his fiduciary duties as an attorney to NFI by intentionally

concealing from NFI both the Castle McCulloch Collateral and an alleged deal between the Settlement Debtors to release the Castle McCulloch Collateral, by failing to assign the Castle McCulloch Collateral to NFI, and by providing legal services to NFI despite a clear conflict of interest. (Am. Consolidated Compl. ¶¶ 136–48.)

a. Legal Malpractice

49. Doug Harris moves for summary judgment on Plaintiffs' sixth count and argues that NFI, following discovery, cannot support an essential element of its claim because no reasonable factfinder could conclude on the record before the Court that an attorney-client relationship existed between Doug Harris and Plaintiffs or Arthur Nivison.

50. Plaintiffs counter that NFI's claim for legal malpractice is supported by "Plaintiffs' original verified Complaint, affidavits, subpoena responses, Doug Harris's deposition, and other materials in support of Plaintiffs' Motions for Summary Judgment[.]" (Mem. Law Opp'n Douglas S. Harris's Mot. Summ. J. Nivison Entities' Claims 2.) At summary judgment, however, the Court is interested in specific facts, not general statements of support. *See* N.C. R. Civ. P. 56(e). Indeed, after reviewing the record and the parties' arguments, the Court concludes that summary judgment is appropriate on this claim.

51. While in limited circumstances North Carolina courts have extended an attorney's liability to certain nonclient third parties harmed in the course of an employment contract for another, *see, e.g.*, *United Leasing Corp. v. Miller*, 45 N.C. App. 400, 405–06, 263 S.E.2d 313, 317 (1980) (stating "we have recognized a cause of

action in negligence arising from the negligent breach of a common law duty of care flowing from the parties' working relationship," and "a party not in direct privity of contract with an attorney [can] recover if he [can] show that he was a third-party beneficiary of the attorney-client employment contract"), the general rule in North Carolina remains that an attorney-client relationship must exist before liability for attorney malpractice can be established, *see Rorrer v. Cooke*, 313 N.C. 338, 355, 329 S.E.2d 355, 365–366 (1985) ("In a professional malpractice case predicated upon a theory of an attorney's negligence, the plaintiff has the burden of proving by the greater weight of the evidence: (1) that the attorney breached the duties owed *to his client*, as set forth by *Hodges*, 239 N.C. 517, 80 S.E. 2d 144, and that this negligence (2) proximately caused (3) damage to the plaintiff." (emphasis added)); *Moore v. Jordan*, 816 S.E.2d 218, 220 (N.C. Ct. App. 2018) (restating the rule of *Rorrer*); *Chicago Title Ins. Co. v. Holt*, 36 N.C. App. 284, 288, 244 S.E.2d 177, 180 (1978) (affirming dismissal of legal malpractice claim where plaintiff was not in attorney-client relationship with the attorney).

52.     Whether an attorney-client relationship exists is generally a question of fact. *Cornelius v. Helms*, 120 N.C. App. 172, 175, 461 S.E.2d 338, 339 (1995). The existence of such a relationship can be "implied from the conduct of the parties, and is not dependent on the payment of a fee, nor upon the execution of a formal contract." *N.C. State Bar v. Sheffield*, 73 N.C. App. 349, 358, 326 S.E.2d 320, 325 (1985). Rather, the "dispositive question" is "whether [a] defendant's conduct was such that an attorney-client relationship could reasonably be inferred." *Id.* "An important factor

in determining the existence of the relationship is the client's subjective belief." *Kingsdown, Inc. v. Hinshaw*, 2015 NCBC LEXIS 33, at *18 (N.C. Super. Ct. Mar. 25, 2015) (quoting *Flick Mortg. Inv'rs v. Epiphany Mortg.*, 2006 NCBC LEXIS 2, at *3–4 (N.C. Super. Ct. Feb. 1, 2006)).

53. Here, NFI's claim against Doug Harris for legal malpractice is premised upon allegations of an attorney-client relationship, (Am. Consolidated Compl. ¶ 137 ("As such, [Doug Harris] represented Plaintiff NFI in said transaction and had a fiduciary duty to Plaintiff NFI.")), and breaches of the fiduciary duties arising from that relationship, (*see, e.g.*, Am. Consolidated Compl. ¶¶ 137, 141, 146).[7] NFI's claim fails because NFI cannot forecast substantial evidence of such an attorney-client relationship.

54. While the exact number and the form of Doug Harris and Arthur Nivison's interactions is disputed, the record does not present a genuine issue of material fact about the general nature of those interactions. Most importantly, the record reflects that no genuine issue of material fact remains as to whether Nivison himself believed

---

[7] Plaintiffs also argue in briefing that the transaction between NFI and JDPW "did not take place within the context of a standard lender/debtor relationship," that "[a]s an attorney, Doug Harris had a fiduciary obligation to Arthur Nivison to engage in arms-length transactions," and that "a fiduciary relationship can exist under a variety of circumstances and is not limited to those persons who stand in some recognized legal relationship to another, such as attorney and client." (Mem. Law Opp'n Douglas S. Harris's Mot. Summ. J. Nivison Entities' Claims 12.) Here, however, Plaintiffs have made extensive allegations that an attorney-client relationship existed between Doug Harris and NFI due to Doug Harris's interactions with Arthur Nivison and have argued as much in briefing and at oral argument. Plaintiffs have not presented an argument that Doug Harris owed NFI some other duty, aside from that owed by an attorney to his or her client, sufficient to allow NFI to sue Doug Harris for malpractice.

that an attorney-client relationship existed between himself or NFI and Doug Harris—he did not. That point is evidenced by Nivison's deposition testimony:

Q:  I just want to know if you believe that [Doug Harris] was your attorney[.]

. . . .

Q:  You can answer, if you know[.]

A:  As far as I am concerned, I have not had a contract with [Doug Harris] as an attorney.

Q:  Would that be ever?

A:  According to my memory, which is faulty.

Q:  Well, I understand. And would it follow if you didn't have a contract, the next question would be, do you ever recall retaining [Doug Harris] or paying [Doug Harris] money as an attorney even without a contract?

A:  I do not.

(Nivison Dep. I, at 34:2–14.)

55.     Plaintiffs contend that these statements do not defeat NFI's claim because neither a formal contract nor the payment of a fee are necessary prerequisites to the formation of an attorney-client relationship. While that statement of law is true, *Sheffield*, 73 N.C. App. at 358, 326 S.E.2d at 325, Arthur Nivison's answers clearly show that he did not recall paying or retaining Doug Harris as an attorney, either for himself or NFI, and Plaintiffs point to no evidence suggesting that Arthur Nivison otherwise believed Doug Harris was, in fact, serving as his attorney.

56.     To the contrary, Arthur Nivison testified numerous times at his deposition that he retained his own attorney for the transaction with JDPW, that he relied on

that attorney's advice, and that when he said "his attorney" he was referring to Tom Harper.

A: This is a document I would have referred to my attorney. At his instruction, I would have -- my reliance was dependent upon his instruction.

Q: So you relied upon your attorney and you're referring to Tom Harper?

A: Yes.

Q: And you're not referring to [Doug Harris] as your attorney, are you?

A: No. I am not.

(Nivison Dep. I, at 71:1–9.)

A: I signed the document before sending it to Mr. Harper.

Q: And Mr. Harper is an attorney?

A: He is an attorney.

Q: Was he your attorney with regard to this transaction?

A: He was.

(Nivison Dep. I, at 107:20–108:1.)

57. Arthur Nivison also testified that he was under the impression that Doug Harris was acting as an attorney for Mark McDaniel, an adverse party, when the three individuals met to discuss a possible transaction between Arthur Nivison's entities and JDPW:

Q: I heard you say vaguely but do you remember that the purpose of that meeting was to discuss the possibility of JDPW Trust getting a note from NewBridge Bank and you financing it? Do you remember that much?

. . . .

A: That was probably part of the discussions. My recollection of the meeting was, or is, more that Mark was using it as a vehicle to introduce me to an attorney of his named Doug Harris.

Q: You believe that [Doug Harris] was representing Mark McDaniel at that meeting?

A: [He] seemed to be. What the exact relationship was, we did not inquire into.

. . . .

A: I believed that [Doug Harris] had some sort of attorney relationship with Mark McDaniel. Whether [he was] actually representing him in that meeting or not, I cannot say.

(Nivison Dep. I, at 28:25–29:12, 35:11–13.) Furthermore, in stark contrast to the position Plaintiffs take now, Arthur Nivison's testimony appears to demonstrate a lack of concern as to Doug Harris's role in the transactions between his entities and JDPW:

Q: At what point did you become aware that [Doug Harris] was the trustee of a trust known as the JDPW trust -- at what point?

A: In September, probably the closing date.

Q: You say you did not know that before September 21st?

A: I really didn't pay any attention to it up until that point.

(Nivison Dep. I, at 29:13–18.)

58. In the face of this evidence, Plaintiffs are unable to create a genuine issue of material fact on which NFI's claim can proceed. The most specific assertion Plaintiffs make in opposition to Doug Harris's motion is that "Doug Harris was giving legal advice to Arthur Nivison and preparing documents for Arthur Nivison to review and asking Arthur Nivison to prepare letters to send to NewBridge Bank." (Mem.

Law Opp'n Douglas S. Harris's Mot. Summ. J. Nivison Entities' Claims 5.) To support this assertion, Plaintiffs cite pages from Doug Harris's deposition (pages 79–84, 95, and 130). Plaintiffs do not point the Court to specific lines or quotes, so the Court examines Doug Harris's testimony itself, viewing the contents in the light most favorable to NFI.

59. In the first excerpt cited, Plaintiffs appear to refer to Doug Harris's testimony that he, Arthur Nivison, and Mark McDaniel met to negotiate the terms of the deal between Arthur Nivison's entities and JDPW at a restaurant; that he and Mark McDaniel discussed the deal further with Arthur Nivison over the telephone; and that during these conversations he explained the proposed deal to Arthur Nivison and explained why JDPW was involved. (Harris Dep. I, at 79:5–81:4, 82:1–20.) Doug Harris also testified that he brought a folder of materials to the initial restaurant meeting for Arthur Nivison to review and that these materials were meant to reassure Arthur Nivison and explain the deal. (Harris Dep. I, at 81:11–25.)

60. The second deposition excerpt Plaintiffs cite is a single page that appears to refer to the aforementioned letter Doug Harris asked Arthur Nivison to prepare and send to NewBridge. The first part of the relevant line of questioning is cut off from the excerpt provided to the Court, but Doug Harris appears to testify that he told Arthur Nivison "in the most general terms" what to include in the letter. (Harris Dep. I, at 95:1–3.)

61. The final cited portion of Doug Harris's deposition appears to discuss an opinion letter Doug Harris prepared and sent to Arthur Nivison regarding the

transactions between Arthur Nivison's entities, JDPW, and NewBridge. (Harris Dep. I, at 130:2–11.)

62. Reviewing this testimony, the Court concludes that a reasonable factfinder could not find this evidence indicative of an attorney-client relationship. First, Doug Harris's meeting with Arthur Nivison and Mark McDaniel, explaining the terms of the transaction Mark McDaniel had proposed to Arthur Nivison, and providing documents to Arthur Nivison is not substantial evidence of an attorney-client relationship, even considering that Arthur Nivison had not yet retained his own counsel. Indeed, the Rules of Professional Conduct contemplate attorneys meeting, negotiating, and discussing legal matters with unrepresented adverse parties. Rev. R. Prof. Conduct 4.3 cmt. 2 (stating, in interacting with an unrepresented adverse party, a lawyer may inform that person of the terms on which the lawyer's client will enter an agreement, prepare documents that require that person's signature, and explain the lawyer's own view on the meaning of the documents or the lawyer's view of the underlying legal obligations). Plaintiffs present no evidence that Doug Harris's interactions with Arthur Nivison extended beyond such acts.

63. Further, while an attorney meeting with an unrepresented party must disclose that they are representing an adverse party to adhere to ethical standards, Rev. R. Prof. Conduct 4.3 cmt. 2, the record is clear here that Arthur Nivison was under no impression that Doug Harris was acting as his attorney. Instead, he believed Doug Harris was representing Mark McDaniel.[8] Considering that belief and

---

[8] The Court notes that while Plaintiffs argue that Doug Harris has violated several of the Revised Rules of Professional Conduct governing attorney behavior in North Carolina, "a

the arm's-length nature of the interactions between Doug Harris and Arthur Nivison, no reasonable factfinder could conclude that an attorney-client relationship was formed when Doug Harris and Mark McDaniel sat down with, or subsequently called, Arthur Nivison to negotiate the proposed deal with JDPW.

64. The Court draws a similar conclusion about the second deposition excerpt Plaintiffs cite. A reasonable factfinder could not conclude that Arthur Nivison and Doug Harris's discussion concerning what NewBridge would be expecting in a letter from JDPW's lender created an attorney-client relationship between the two men, particularly in light of Arthur Nivison's lack of belief that such a relationship existed.

65. Finally, with regard to the opinion letter referenced in Plaintiffs' last page of cited deposition testimony, the Court finds it sufficient to note that the record indicates that Doug Harris sent this letter to Tom Harper, (Corrected Ex. KK), who Arthur Nivison stated was his attorney during the September 21, 2012 transaction with JDPW and upon whose advice Arthur Nivison indicated he relied, (Nivison Dep. I, at 71:1–9, 107:20–108:1). No reasonable factfinder could conclude that Doug Harris created an attorney-client relationship with NFI or Arthur Nivison by drafting documents and sending those documents to an attorney representing Arthur Nivison with respect to the September 21, 2012 transactions. Thus, this evidence, like the

---

breach of a provision of the Code of Professional Responsibility is not 'in and of itself . . . a basis for civil liability." *Baars v. Campbell Univ., Inc.*, 148 N.C. App. 408, 421, 558 S.E.2d 871, 879 (2002) (quoting *Webster v. Powell*, 98 N.C. App. 432, 439, 391 S.E.2d 204, 208 (1990), *aff'd*, 328 N.C. 88, 399 S.E.2d 113 (1991)). The Court makes no conclusion about whether Doug Harris's conduct violated the Rules of Professional Conduct, as that issue is not now before the Court.

rest of the testimony Plaintiffs cite, fails to create a genuine issue of material fact in NFI's favor.

66. Plaintiffs contend that the Court may not resolve whether an attorney-client relationship existed between NFI and Doug Harris on this record, citing *Broyhill v. Aycock & Spence*, 102 N.C. App. 382, 402 S.E.2d 167, *aff'd*, 330 N.C. 438, 410 S.E.2d 392 (1991), and *Ives v. Real-Venture, Inc.*, 97 N.C. App. 391, 388 S.E.2d 573 (1990). In both of those cases, however, the party alleging the existence of an attorney-client relationship presented affidavit testimony or other evidence purporting to show that the attorney in question had been retained or engaged. *Broyhill*, 102 N.C. App. at 390, 402 S.E.2d at 172; *Ives*, 97 N.C. App. at 399, 388 S.E.2d at 578. In contrast, there is no indication here that Arthur Nivison was under any illusion that Doug Harris was acting as his or NFI's attorney, and Plaintiffs offer no sworn testimony supporting NFI's claim.

67. Plaintiffs' reliance upon their initial verified Complaint (the "Verified Complaint") is also unavailing. On the issue of representation, the Verified Complaint contains only an allegation that begins, "Harris served as the closing attorney for the loan from [NFI] to Defendant JDPW," and concludes "as such, [Harris] represented [NFI] in said transaction and had a fiduciary duty to [NFI]." (Compl. ¶ 28 (Wake 14 CVS 9564), ECF No. 1.) Plaintiffs cannot use this allegation to create a genuine issue of material fact at summary judgment.

68. A trial court may treat a verified complaint "as an affidavit if it (1) is made on personal knowledge, (2) sets forth such facts as would be admissible in evidence,

and (3) shows affirmatively that the affiant is competent to testify to the matters stated therein." *Page v. Sloan*, 281 N.C. 697, 705, 190 S.E.2d 189, 194 (1972).

69.     Examining the Verified Complaint, the Court first concludes that the second portion of the above-quoted statement—"as such, [Harris] represented [NFI] in said transaction and had a fiduciary duty to [NFI]"—cannot be considered facts admissible in evidence or a statement based on the personal knowledge of Arthur Nivison, the individual who verified the Complaint.  Rather, this portion of the statement is a legal conclusion.  *See Singleton v. Steward*, 280 N.C. 460, 467, 186 S.E.2d 400, 405 (1972) (concluding that affiant's legal conclusions are not facts to be considered under Rule 56(e)).  The Verified Complaint also alleges no facts supporting the presence of an attorney-client relationship besides those the Court has already concluded cannot support the existence of such a relationship.  Consequently, this conclusory statement cannot itself create a genuine issue of material fact.  *See United Cmty. Bank (Ga.) v. Wolfe*, 369 N.C. 555, 559–60, 799 S.E.2d 269, 272 (2017) (holding that a conclusory statement in defendants' affidavit, without specific supporting facts, did not create a genuine issue of material fact); *S.C. Telcoms. Grp. Holdings v. Miller Pipeline LLC*, 248 N.C. App. 243, 248, 788 S.E.2d 634, 638 (2016) (holding that conclusory statements that "photographs and video" showed fiber optic cables were clearly marked did not provide specific facts for summary judgment or indicate the affiant possessed personal knowledge of the issue).

70.     Turning to the first part of the statement in the Verified Complaint, the allegation that Doug Harris served as the "closing attorney" on the loan from NFI to

JDPW appears to reference a situation most commonly found in real estate transactions where a "closing attorney" represents multiple parties. *See, e.g.*, *Johnson v. Schultz*, 364 N.C. 90, 94, 691 S.E.2d 701, 704 (2010). This verified allegation fails to create a genuine issue of material fact with regard to the existence of an attorney-client relationship for two reasons.

71. First, in real estate transactions involving a "closing attorney," the multiple parties with which the closing attorney maintains an attorney-client relationship are typically those allied on one side of the transaction. *Id.* (noting, with regard to real estate closings, that "the most common practice is for the closing attorney to represent the purchaser and lender while performing limited functions for the seller (such as the preparation of the deed)" (quoting Patrick K. Hetrick et al., *North Carolina Real Estate Manual* 508 (2008–2009 ed.))). In fact, this State's Supreme Court has "stress[ed] that it is the buyer alone in most residential real estate transactions who is legally deemed to repose confidence in the closing attorney through the existence of [an] attorney-client relationship," not both sides. *Id.* at 96, 691 S.E.2d at 706.

72. Exceptions to this general rule exist only in rare cases. For example, in *Johnson*, cited above, the Supreme Court of North Carolina held that there was a question as to whether an attorney represented both the buyer and the seller in a real estate transaction. *Id.* The Supreme Court made clear, however, that a possible relationship existed only because of a prior relationship between the seller and the attorney. *Id.* Thus, NFI's allegation here that Doug Harris served as a "closing

attorney" does not *ipso facto* establish an attorney-client relationship between Doug Harris and NFI.

73. Second, as the Court has stressed, the undisputed facts show that NFI's manager, Arthur Nivison, did not believe he had retained Doug Harris as an attorney; he believed Doug Harris was acting as an attorney for another party involved in the proposed deal. Further, on the day of the closing, NFI was represented by a different attorney. The undisputed facts show that attorney Tom Harper handled the closing for Arthur Nivison and NFI on September 21, 2012, reviewed documents for Arthur Nivison and NFI, and circulated the changes to the Assignment Agreement that Plaintiffs contend are enforceable. Arthur Nivison also stated that he relied on Tom Harper's instructions that day with regard to the transaction. (Nivison Dep. I, at 71:1–9.) The record thus overwhelmingly refutes any attempt by Plaintiffs to create an attorney-client relationship between NFI and Doug Harris through the use of the term "closing attorney."

74. A genuine issue is "one that can be maintained by substantial evidence." *Dobson*, 352 N.C. at 83, 530 S.E.2d at 835. Proving that a genuine issue of material fact exists requires a party to present "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and that "means more than a scintilla or a permissible inference." *DeWitt*, 355 N.C. at 681, 565 S.E.2d at 146. For the reasons stated herein, the Court concludes that NFI cannot produce substantial evidence to support an essential element of its claim for legal malpractice. No reasonable factfinder could examine the record before the Court and conclude that an

attorney-client relationship existed such that NFI can maintain its legal malpractice claim against Doug Harris. Accordingly, the Court grants Doug Harris's motion as to NFI's claim for legal malpractice and will dismiss this claim.

b. Misrepresentation

75. To the extent the reference to "Misrepresentation" in Plaintiffs' Count 6 attempts to assert a claim for negligent misrepresentation against Doug Harris, the Court grants summary judgment on that cause of action as well.

76. A claim for negligent misrepresentation cannot be based upon a concealment or failure to disclose; a plaintiff must allege and prove an "actual, affirmative representation." *USA Trouser, S.A. de C.V. v. Williams*, 2016 NCBC LEXIS 58, at *40 (N.C. Super. Ct. July 21, 2016), *aff'd*, 812 S.E.2d 373 (N.C. Ct. App.), *disc. rev. denied*, 371 N.C. 448 (2018). The majority of the conduct NFI pleads in connection with its claim for "Legal Malpractice and Misrepresentation" concerns Doug Harris's failure to disclose certain information. (*See, e.g.*, Am. Consolidated Compl. ¶¶ 136, 140, 142.) These allegations do not support a claim for negligent misrepresentation.

77. The remaining allegations can be broken into two categories. The first set alleges intentional concealment of the Castle McCulloch Collateral, and is thus (i) a restatement of NFI's below-discussed fraud claim and (ii) allegations of concealment, which cannot form the basis for a negligent misrepresentation claim. (*See, e.g.*, Am. Consolidated Compl. ¶ 139 (alleging that Doug Harris's failure to disclose the Castle McCulloch Collateral "was not inadvertent" but "intentional").) The second set of

allegations relates to Doug Harris's representations in prepared documents that JDPW would assign the CCSEA Collateral to NFI and Doug Harris's subsequent failure to do so. (*See, e.g.*, Am. Consolidated Compl. ¶ 144.) This group of allegations does not take issue with the care with which Doug Harris prepared these documents; rather, NFI alleges it suffered damages because Doug Harris did not perform under the Assignment Agreement. (*See* Am. Consolidated Compl. ¶ 145.) A breach of a contractual duty cannot provide the basis for an independent claim of negligent misrepresentation. *Supplee v. Miller-Motte Bus. Coll., Inc.*, 239 N.C. App. 208, 233, 768 S.E.2d 582, 600 (2015). Thus, although Doug Harris failed to assign interests in the CCSEA Collateral to NFI and may not have disclosed certain facts to NFI, NFI's allegations do not support a claim for negligent misrepresentation.

78. For these reasons, the Court concludes that Doug Harris's Motion for Summary Judgment as to Plaintiffs' Claims should be granted with regard to Count 6 of Plaintiffs' Amended Consolidated Complaint.

### 3. Fraud

79. Doug Harris next moves for summary judgment on Count 8 of Plaintiffs' Amended Consolidated Complaint, a claim by NFI against Doug Harris labeled "Fraud – Castle McCulloch Collateral." (Am. Consolidated Compl. 23.) Doug Harris argues that summary judgment should be granted in his favor because NFI has failed to plead fraud with the specificity required by Rule of Civil Procedure 9(b) and because the record following discovery shows an absence of facts sufficient to support this claim.

80. "The essential elements of actionable fraud are: '(1) false representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party.'" *RD&J Props. v. Lauralea-Dilton Enters., LLC*, 165 N.C. App. 737, 744, 600 S.E.2d 492, 498 (2004) (quoting *Becker v. Graber Builders, Inc.*, 149 N.C. App. 787, 794, 561 S.E.2d 905, 910 (2002)). Additionally, the claimant's "reliance on alleged false representations must be reasonable." *Sullivan v. Mebane Packaging Grp., Inc.*, 158 N.C. App. 19, 26, 581 S.E.2d 452, 458 (2003). "Whether each of the elements of actual fraud and reasonable reliance are met are ordinarily questions for the jury 'unless the facts are so clear that they support only one conclusion.'" *Head v. Gould Killian CPA Grp., P.A.*, 371 N.C. 2, 9, 812 S.E.2d 831, 837 (2018) (quoting *Forbis v. Neal*, 361 N.C. 519, 527, 649 S.E.2d 382, 387 (2007)).

81. In response to Doug Harris's motion, Plaintiffs lay out three main categories of fraudulent conduct by Doug Harris that they contend are supported by the record. First, Plaintiffs assert that Doug Harris misrepresented the value of the CCSEA Collateral that NFI would be assigned under the Assignment Agreement. (Mem. Law Opp'n Douglas S. Harris's Mot. Summ. J. Nivison Entities' Claims 13.) Second, Plaintiffs argue that Doug Harris represented that Dr. Epes would pledge certain property to secure NFI's loan despite knowing that Dr. Epes transferred his interest in this property to his wife in 2006. (Mem. Law Opp'n Douglas S. Harris's Mot. Summ. J. Nivison Entities' Claims 13, 15.) Finally, Plaintiffs contend that Doug Harris misrepresented to NFI that the Castle McCulloch Loan Documents and

interests in the Castle McCulloch Collateral would be assigned to NFI as part of the deal with JDPW and concealed JDPW's receipt of that collateral. (Mem. Law Opp'n Douglas S. Harris's Mot. Summ. J. Nivison Entities' Claims 14.) The Court begins by addressing the first two categories of allegations.

a. Requirements of Rule 9(b)

82. Doug Harris argues that NFI's claim for fraud should be dismissed at summary judgment because the allegations in the Amended Consolidated Complaint are not pleaded with sufficient particularity under Rule 9(b). Rule 9(b) requires that a complaint alleging "circumstances constituting fraud" state its allegations "with particularity" (with the exception of intent, which must be alleged but can be averred generally). N.C. R. Civ. P. 9(b). The Supreme Court of North Carolina has held that this requirement is met if a pleading alleges the "time, place and content of the fraudulent representation," the "identity of the person making the representation," and "what was obtained as a result of the fraudulent acts or representations." *Terry v. Terry*, 302 N.C. 77, 85, 273 S.E.2d 674, 678 (1981). Recognizing that it may be difficult to satisfy Rule 9(b) when alleging fraud by omission or concealment, this Court has previously held that a litigant pleading fraud by omission or concealment does so with particularity by specifically alleging:

> (1) the relationship between plaintiff and defendant giving rise to the duty to speak; (2) the event that triggered the duty to speak or the general time period over which the relationship arose and the fraud occurred; (3) the general content of the information that was withheld and the reason for its materiality; (4) the identity of those under a duty who failed to make such disclosures; (5) what the defendant gained from withholding the information; (6) why the plaintiff's reliance on the omission was reasonable and detrimental; and (7) the damages the fraud caused the plaintiff.

*Tillery Envtl. LLC v. A&D Holdings, Inc.*, 2018 NCBC LEXIS 13, at *21–22 (N.C. Super. Ct. Feb. 9, 2018); *Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 2015 NCBC LEXIS 64, at *13–14 (N.C. Super. Ct. June 19, 2015), *aff'd*, 370 N.C. 1, 802 S.E.2d 888 (2017); *Island Beyond, LLC v. Prime Capital Grp., LLC*, 2013 NCBC LEXIS 48, at *19 (N.C. Super. Ct. Oct. 30, 2013); *Lawrence v. UMLIC-Five Corp.*, 2007 NCBC LEXIS 20, at *10 (N.C. Super. Ct. June 18, 2007); *see also Breeden v. Richmond Cmty. Coll.*, 171 F.R.D. 189, 195 (M.D.N.C. 1997).

83. Although parties often seek to attack a fraud claim under Rule 9(b) at the early stages of a proceeding, the North Carolina Court of Appeals has held that summary judgment is appropriate in cases where a plaintiff has failed to plead fraud with particularity. *Hardin v. KCS Int'l, Inc.*, 199 N.C. App. 687, 702, 682 S.E.2d 726, 737 (2009) ("This Court has held that when a complaint against a corporation fails to allege, as required by Rule 9(b), the time and occasion of the misrepresentation and the individual who made the misrepresentation, then summary judgment was proper for failure to allege the essential elements of fraud with particularity." (internal quotation marks omitted)); *Trull v. Cent. Carolina Bank & Tr. Co.*, 117 N.C. App. 220, 224, 450 S.E.2d 542, 545 (1994) ("Rule 9(b) . . . requires that a complaint charging fraud allege [the elements of fraud] with particularity. If it does not, summary judgment is proper." (citations omitted)); *Leake v. Sunbelt, Ltd. of Raleigh*, 93 N.C. App. 199, 205, 377 S.E.2d 285, 289 (1989).

84. As Doug Harris has challenged NFI's fraud claim on particularity grounds, the Court examines the contents of the Amended Consolidated Complaint. Doing so,

the Court concludes that NFI has not pleaded its contentions as to the value of the CCSEA Collateral and the ownership of Dr. Epes's property with sufficient particularity to base its claim for fraud on those facts now.

85. First, the Amended Consolidated Complaint contains no allegation of a misrepresentation regarding the value of the CCSEA Collateral. The representation that Plaintiffs take issue with—that the 2012 tax value of the CCSEA Collateral was $4,582,222.00—is included in every version of the Assignment Agreement and several other documents attached to the Amended Consolidated Complaint, (*see, e.g.*, Am. Consolidated Compl. Ex. TT), but Plaintiffs' pleading contains no allegation that this representation was false, that Doug Harris intended it to be false, or that NFI relied on this statement of tax value to its detriment. NFI pleads fraud and intent only as to the concealment of the Castle McCulloch Collateral, the Settlement Agreement, and the documents by which NewBridge assigned interests in the Castle McCulloch Collateral to JDPW. NFI does not allege that any statement regarding the tax value of the CCSEA Collateral was fraudulent or was intended to deceive. Consequently, the Court must conclude that NFI did not particularly plead a claim for fraud against Doug Harris based on representations of the CCSEA Collateral's value, and Plaintiffs cannot now argue that NFI's claim should survive summary judgment on this basis. *See Trull*, 117 N.C. App. at 224, 450 S.E.2d at 545; *see also United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d 724, 731 (4th Cir. 2010) (holding nonmovant could not avoid summary judgment by asserting new grounds for fraud claim which had not been particularly pleaded); *Dongelewicz v. PNC Bank*

*Nat'l Ass'n*, 104 Fed. App'x 811, 819 n.4 (3d Cir. 2004) (refusing, after affirming dismissal of common law fraud claim, to consider additional theories of fraud offered in summary judgment brief on the reasoning that "a contention in a brief . . . may not be used to substitute for an allegation in a complaint, especially in the context of a fraud claim, which must be pled with particularity" (citation and internal quotation marks omitted)).

86.     Second, with regard to Plaintiffs' argument concerning Doug Harris's representations about Dr. Epes's property, the Court notes that the Amended Consolidated Complaint contains allegations of misrepresentations about this collateral, but those allegations are pleaded only against the Epeses.  (Am. Consolidated Compl. ¶¶ 55, 149–167 (alleging the Epeses concealed the fraudulent conveyance of Dr. Epes's property from NFI and bringing a claim against the Epeses for fraud on creditors and fraudulent transfer of assets).)  Doug Harris's name appears in these allegations only in reference to deposition testimony he gave prior to the Amended Consolidated Complaint in which he stated Dr. Epes continued to control the personal property in question and did not abide by the terms of the assignment agreement between him and his spouse.  (Am. Consolidated Compl. ¶ 158.)

87.     To properly bring a claim for fraud, a claimant's pleading must state the specific individual who made the allegedly fraudulent misrepresentations, *Hardin*, 199 N.C. App. at 702, 682 S.E.2d at 737, or, in cases of concealment, must allege "the identity of those under a duty who failed to make . . . disclosures," *Tillery Envtl. LLC.*,

2018 NCBC LEXIS 13, at *21–22. Because the Amended Consolidated Complaint contains no allegations that Doug Harris made a false representation about or concealed the transfer of Dr. Epes's property to Bessie Epes, NFI cannot now attempt to assert a claim for fraud on this basis. *See Trull*, 117 N.C. App. at 224, 450 S.E.2d at 545; *see also Owens*, 612 F.3d at 731; *Dongelewicz*, 104 Fed. App'x at 819 n.4.

b. Fraud Concerning the Castle McCulloch Collateral

88. The Court next turns to Plaintiffs' contentions concerning Doug Harris's concealment of the Castle McCulloch Collateral and Doug Harris's argument that NFI cannot produce a sufficient forecast of certain elements of its fraud claim following discovery. To prevail, Doug Harris need not "negate every element of fraud," but may succeed if he "effectively refutes even one element" of NFI's claim. *RD&J Props.*, 165 N.C. App. at 745, 600 S.E.2d at 498 (quoting *Ramsey v. Keever's Used Cars*, 92 N.C. App. 187, 191, 374 S.E.2d 135, 137 (1988)).

89. At the outset, the Court notes that NFI's allegations of fraud and Plaintiffs' arguments in support of this claim appear, at times, inconsistent. In certain parts of its pleading, NFI appears to assert that Doug Harris made express misrepresentations that the Castle McCulloch Collateral would be part of NFI's deal with JDPW. (*See, e.g.*, Am. Consolidated Compl. ¶ 174.) At other points, NFI claims ignorance of the existence of the Castle McCulloch Collateral and alleges that Doug Harris concealed it from Arthur Nivison, NFI, and their attorney. (*See, e.g.*, Am. Consolidated Compl. ¶ 59.) Finally, NFI also seems to put forward the theory that Doug Harris made general representations to Arthur Nivison and NFI that caused

them to believe that NFI would be receiving everything NewBridge held as security on the CCSEA and Castle McCulloch Loans, that Nivison and NFI were not aware that this collateral included the Castle McCulloch Collateral or Loan Documents, and that Doug Harris concealed the existence of that collateral from NFI. (*See, e.g.*, Am. Consolidated Compl. ¶ 178 ("Doug Harris, Mark McDaniel, and Richard Epes never disclosed to Plaintiff NFI exactly what collateral had been assigned to Defendant JDPW Trust from Defendant NewBridge Bank.").) Examining each apparent theory, the Court concludes that none supports NFI's fraud claim on the record at summary judgment.

90. First, to the extent NFI alleges that Doug Harris made affirmative misrepresentations that the Castle McCulloch Collateral would be transferred from JDPW to NFI—assuming for this discussion that such statements could sustain a claim for fraud[9]—the record demonstrates no such representation. To the contrary, the record contains evidence that implicitly and explicitly refutes such an allegation. This evidence includes Arthur Nivison's signed memos that demonstrate he was aware that NFI's loan would be used to pay off the Castle McCulloch Loan, (Am. Consolidated Compl. Ex. DDD, ECF No. 193); the fact the Castle McCulloch Collateral was not part of the specifically described collateral assigned under the Assignment Agreement (Corrected Ex. KK; Am. Consolidated Compl. Exs. QQ, TT); and Arthur Nivison testifying at his deposition that he could not recall any

---

[9] Promises of future intent, as opposed to statements relating to past or existing facts, will not generally support a claim for fraud unless made with the intent to deceive and with no intent to comply with the stated promise or representation. *Potts v. KEL, LLC*, 2018 NCBC LEXIS 24, at *8–9 (N.C. Super. Ct. Mar. 27, 2018) (citing North Carolina cases).

misleading, deceptive, or false statements made by Doug Harris personally or as a representative of JDPW, (Castle McCulloch Defs.' Br. Opp'n Pls.' Mot. Partial Summ. J. Ex. 10, at 92:3–7 [hereinafter "Nivison Dep. II"], ECF No. 880). In sum, any allegation that Doug Harris made affirmative misrepresentations that expressly dealt with the Castle McCulloch Collateral finds no support in the evidence before the Court.

91. The second apparent theory of fraud NFI pursues, that of concealment, encounters a similar issue. The record overwhelmingly supports Doug Harris's contention that Plaintiffs and Arthur Nivison were aware of the Castle McCulloch Loan and Loan Documents or Collateral. Arthur Nivison himself testified that he had the impression that a Castle McCulloch entity would somehow serve as security for his loan, (Nivison Dep. II, at 89:4–22), and his signed memos indicate he was aware of the Castle McCulloch Loan, (Am. Consolidated Compl. Ex. DDD). Further, before Plaintiffs allege Doug Harris signed the amended version of the Assignment Agreement, NFI's attorney received an e-mail from NewBridge's counsel reading, "Upon [receipt] of $2,001,834.09 newbridge will transfer all ccsae [sic] and *castle mcculloch loan documents* to jdpw trust." (Am. Consolidated Compl. Ex. RR, ECF No. 190 (emphasis added).) If Doug Harris made an attempt to conceal the Castle McCulloch Loan, Loan Documents, or Collateral from Arthur Nivison and NFI, the undisputed record shows that effort was not successful.

92. Further, as to Plaintiffs' assertion that Doug Harris concealed aspects of the deals between the Settlement Debtors and NewBridge or JDPW and NewBridge, a

claim for fraud may only be based on concealment of a material fact where one party owed the other a duty of disclosure. *Hardin*, 199 N.C. App. at 696, 682 S.E.2d at 733.

> A duty to disclose arises where: (1) "a fiduciary relationship exists between the parties to the transaction"; (2) there is no fiduciary relationship and "a party has taken affirmative steps to conceal material facts from the other"; [or] (3) there is no fiduciary relationship and "one party has knowledge of a latent defect in the subject matter of the negotiations about which the other party is both ignorant and unable to discover through reasonable diligence."

*Id.* (quoting *Sidden v. Mailman*, 137 N.C. App. 669, 675, 529 S.E.2d 266, 270–71 (2000)). Plaintiffs' arguments to the contrary notwithstanding, the Court has determined that Doug Harris did not have an attorney-client relationship with NFI, and Plaintiffs have not argued or successfully shown the existence of some other fiduciary relationship. Plaintiffs have also not argued, and the facts of this case do not fit, a scenario in which a latent defect existed in the subject matter of a transaction. Thus, the remaining question is whether Doug Harris took affirmative steps to conceal information from NFI about the dealings between the Settlement Debtors, NewBridge, and JDPW. Contrary to Plaintiffs' assertions, the Court concludes that the record does not contain sufficient facts of such an affirmative step to sustain NFI's fraud claim.

93. The final theory on which NFI's fraud claim appears to be based is that Doug Harris made nonspecific misrepresentations to Arthur Nivison that NFI would receive everything NewBridge held as collateral on the loans JDPW was purchasing, did not disclose that NewBridge held the Castle McCulloch Loan Documents or interests in the Castle McCulloch Collateral, and thus made a fraudulent representation to NFI about the general nature of the assets it would be receiving.

In short, this argument asserts that Doug Harris is liable to NFI for fraud because he led NFI to believe that it would get whatever NewBridge held, and the specifics of that collateral were never discussed or accurately disclosed to NFI. This theory of fraud also finds little, if any, support in the evidentiary record.

94. Just as there is no evidence in the record of any fraudulent representation mentioning the Castle McCulloch Collateral or Loan Documents specifically, the record is also devoid of any express representation that NFI would receive any and all collateral held by NewBridge for the CCSEA and Castle McCulloch Loans. The numerous e-mails that Plaintiffs cite between Doug Harris and other parties involved in the September 21, 2012 transactions do not show that Doug Harris represented that NFI, Old Battleground, or Arthur Nivison would be receiving anything and everything held by NewBridge. Where these e-mails do mention an assignment to Plaintiffs or Arthur Nivison, they merely state that JDPW would be making an unspecified assignment. For example, one e-mail on which Plaintiffs rely is from Doug Harris to an individual named Desmond Sheridan which indicated that Doug Harris would pick up "the assignment papers" and would "then re-assign the security interest to Art Niverson [sic]." (Am. Consolidated Compl. Ex. SS, ECF No. 190.) The e-mail does not identify which assignment papers or security interests are referenced. Reading Doug Harris's nonspecific mention of security interests in this e-mail, or similar mentions of security interests in other e-mails Plaintiffs cite, to include interests in the Castle McCulloch Collateral requires the factfinder to assume the conclusion that Plaintiffs seek to prove by citing the e-mails. This final theory is also,

again, rebutted by Arthur Nivison's testimony that he could not recall any false or misleading statements by Doug Harris that induced him to enter the transaction with JDPW. (Nivison Dep. II, at 92:3–7.)

95. Plaintiffs point repeatedly to a September 21, 2012 e-mail from Doug Harris to NFI's attorney as evidence of a fraudulent misrepresentation or an affirmative act of concealment. In that e-mail, Doug Harris indicated that he was attaching an "assignment of security interest which [he] basically copied from that of [NewBridge] as well as their attachment A." (Corrected Ex. KK.) The referenced "Attachment A" was the Schedule A to the drafted Assignment of Security Instruments document that was sent to NFI's attorney. (*See* Corrected Ex. KK.) NFI contends that the Schedule A it received was nearly identical to the one JDPW received from NewBridge, but that the version sent to NFI's attorney omitted the Castle McCulloch Loan and Castle McCulloch Loan Documents, which had been included in the version sent to JDPW. (Mem. Law Opp'n Douglas S. Harris's Mot. Summ. J. Nivison Entities' Claims 14.)

96. Upon review, the Court cannot conclude that the September 21, 2012 e-mail from Doug Harris presents substantial evidence raising a genuine issue of material fact about whether a fraudulent representation was made. NFI's reading of this e-mail is only possible if the factfinder already assumes that NFI was promised all of the collateral in NewBridge's possession and that the document supplied by Doug Harris should have contained the entirety of the collateral that was to be exchanged between NewBridge and JDPW. There is no evidence in the present record to justify such an assumption, and a reasonable factfinder could not conclude that this e-mail,

on its own, reflects a misrepresentation or a concealment of material facts that Doug Harris had a duty to disclose.

97. The Court has also examined Plaintiffs' submitted Second Affidavit of Arthur Nivison (the "Second Affidavit") and the allegations of promises and representations by Doug Harris made therein. After doing so, the Court concludes NFI may not rely on these statements to create a genuine issue of material fact at summary judgment.

98. In his Second Affidavit, Arthur Nivison affirms:

[I]t was agreed that the Castle McCulloch Loan and the CCSEA Loans would be assigned to me. . . .

. . . Doug Harris had represented both to me and to my attorney that NewBridge Bank would assign all of the loan documents associated with the Castle McCulloch Loan and the CCSEA Loans to JDPW . . . and that JDPW Trust would re-assign those same documents to NFI at closing.

(Nivison Aff. ¶¶ 17–18.) These statements are not only at variance with Plaintiffs' verified allegations that NFI was not aware JDPW would be purchasing the Castle McCulloch Loan or Loan Documents, but also contradict Arthur Nivison's previous deposition testimony.

99. When asked at his deposition whether he had "any belief that [H]istoric Castle McCulloch, LLC was intended to be part of [the security for his loan]," Arthur Nivison did not answer directly but responded, "There were a number of mentions of Castle McCulloch and the fact that it was included in verbal discussions." (Nivison Dep. I, at 71:16–20.) When pressed on this point several minutes later, Arthur Nivison further testified that he could not identify any statements made prior to the

deal with JDPW that were deceptive or misleading, stated that he could not explain the absence of the Castle McCulloch Collateral from the Assignment Agreement, and described his understanding that such collateral was part of the agreement as an "impression":

> Q: All right. I heard you say in the morning that it had at least crossed your mind, at least somebody had mentioned to you that Historic Castle McCulloch, LLC might be part of the security for your loan. Did you understand that? Was that your understanding or did you think it was not part of your security?
>
> . . . .
>
> A: I had the impression it was.
>
> Q: If that was your impression, how is it that in neither agreement, not in the one you signed by mistake, nor the one that you and your attorney went over, how is it that Castle McCulloch -- Historic Castle McCulloch, LLC is not mentioned at all? Can you explain that if you thought it was supposed to be in there?
>
> A: I cannot.
>
> Q: All right. Was that another mistake on your part?
>
> . . . .
>
> A: In light of the current situation, it probably was but that is not -- I'm not -- no, that's it.
>
> . . . .
>
> Q: All right. Can you point to any specific statement made by [Doug Harris], either personally or as a representative of JDPW Trust, that induced you to enter this deal that was misleading or deceptive or outright false?
>
> A: I cannot recall.

(Nivison Dep. II, at 89:4–22, 92:3–7.)

100. The assertions in Arthur Nivison's Second Affidavit concerning Doug Harris's representations and the parties' agreement are incompatible with and contradict Arthur Nivison's deposition testimony. The Second Affidavit describes two statements or promises: (i) a promise that Arthur Nivison would be assigned the Castle McCulloch Loan—a promise only Doug Harris would have the power to make on behalf of JPDW—and (ii) a representation by Doug Harris that JDPW would assign all of the Loan Documents associated with the CCSEA Loans and the Castle McCulloch Loans to NFI. (Nivison Aff. ¶ 17.) Under Plaintiffs' theory of the case, such promises and representations were false, misleading, or deceptive, and made with no intent of performance. As shown above, however, Arthur Nivison previously testified that he could not recall any false or deceptive statements made by Doug Harris that induced him to enter the deal with JDPW. (Nivison Dep. II, at 92:3–7.) Moreover, Arthur Nivison testified that he could not explain his "impression" that the Castle McCulloch Collateral would be assigned to NFI and the absence of any written deal to that effect. (Nivison Dep. II, at 89:4–22.)

101. The affidavit Plaintiffs now submit attempts to do what Arthur Nivison's deposition testimony could not—create a genuine issue of material fact at summary judgment—with statements concerning previously unmentioned promises or representations that are at odds with the earlier deposition testimony. Plaintiffs may not survive summary judgment by this tactic. *See Pinczkowski v. Norfolk S. R.R. Co.*, 153 N.C. App. 435, 440–41, 571 S.E.2d 4, 7 (2002) (holding plaintiff could not create an issue of fact at summary judgment by submitting an affidavit in which he, for the

first time, testified about statements made by his doctor that he did not mention at his deposition and which contradicted his deposition testimony "as a whole"); *see also Yeager v. Bowlin*, 693 F.3d 1076, 1080–81 (9th Cir. 2012) (holding trial court properly disregarded a declaration containing facts a witness previously testified he could not recall where the newly remembered facts were not accompanied by a reasonable explanation for the witness's sudden recollection); *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 854–55 (10th Cir. 1999) (concluding that an affidavit from a witness that "more clearly recalled discussions and meetings" that the witness could not remember at deposition "arguably contradicted his deposition" and represented "an attempt to create a sham issue of fact"); *Barringer v. Wake Forest Univ. Baptist Med. Ctr.*, 197 N.C. App. 238, 257–58, 677 S.E.2d 465, 478 (2009) (noting that no genuine issue of fact was created at summary judgment by plaintiff's expert providing a new, additional allegation concerning defendants' breach of the standard of care in an affidavit). A "genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct." *Rohrbough v. Wyeth Labs., Inc.*, 916 F.2d 970, 975 (4th Cir. 1990) (quoting *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984)). The Court thus concludes that NFI cannot rely on Arthur Nivison's Second Affidavit to create a genuine issue of material fact at summary judgment with regard to representations or promises concerning the Castle McCulloch Collateral.

102. For these reasons, after a careful review of the evidentiary record viewed in the light most favorable to Plaintiffs, the Court concludes NFI has not forecast

substantial evidence of a fraudulent misrepresentation or concealment by Doug Harris sufficient to show a genuine issue of material fact on this claim at summary judgment and has not demonstrated its ability to establish a *prima facie* case of fraud at trial.

103. The above analysis notwithstanding, the Court also notes that NFI faces another hurdle in proving its fraud claim—NFI's reliance must have been reasonable. A plaintiff's reliance will not be deemed "reasonable where the plaintiff could have discovered the truth of the matter through reasonable diligence, but failed to investigate." *Sullivan*, 158 N.C. App. at 26, 581 S.E.2d at 458.

104. Assuming that some statement in the record could be considered evidence of a false representation by Doug Harris that NFI would be assigned the Castle McCulloch Collateral or all of the collateral NewBridge held, or that evidence existed tending to show a concealment of material facts, the uncontested facts before the Court show no effort by NFI to exercise reasonable diligence to determine what collateral NewBridge held, what collateral JDPW would be receiving, or what collateral NFI could expect to get as the result of the transactions between the three entities.

105. In particular, the record contains no evidence suggesting that NFI, Arthur Nivison, or their counsel engaged in any due diligence to ascertain or confirm what collateral NewBridge held to secure the loans that NFI's funds would be used to purchase. There is no evidence Plaintiffs or Arthur Nivison inquired into this matter with NewBridge Bank or any other party besides JDPW. There is also no evidence

that Plaintiffs or Arthur Nivison made any attempt to confirm their alleged understanding of the agreement with JDPW or Doug Harris when faced with, at best, vague statements of what collateral would be involved in the transaction and, at worst, statements which detailed what collateral NFI could expect and made no mention of the Castle McCulloch Loan, Loan Documents, or Collateral.

106. Particularly, assuming that Doug Harris's e-mail to NFI's counsel contained the version of the Schedule A omitting the Castle McCulloch Collateral, that document clearly classified each piece of collateral listed and placed it under one of three listed loans to CCSEA. (Am. Consolidated Compl. Ex. NN, ECF No. 189; *see also* Corrected Ex. KK.) It did not mention the Castle McCulloch Loan and did not indicate that any listed collateral secured the unmentioned Castle McCulloch Loan. (Am. Consolidated Compl. Ex. NN.) Despite this, the record contains no evidence that NFI—whose manager had signed a memo acknowledging that NFI's funds would, in part, be used to purchase or pay off the Castle McCulloch Loan and had the impression that NFI was going to be secured by collateral related to a Castle McCulloch entity—made any inquiries concerning the omission of the Castle McCulloch Loan or related collateral from the received Schedule A.

107. Instead, after an opportunity to consult with counsel, Arthur Nivison signed the agreement with JDPW which promised to convey an interest in equipment and personal property specifically owned by HUTA, SEM, and CCSEA. (*See, e.g.*, Am. Consolidated Compl. Ex. QQ.) This provision of the agreement remained the same even after NFI's attorney received the e-mail from NewBridge's counsel notifying NFI

that NewBridge was transferring the CCSEA and Castle McCulloch Loan Documents to JDPW, (Am. Consolidated Compl. Ex. RR), and after, according to Plaintiffs, the Assignment Agreement was amended, (*see* Am. Consolidated Compl. Ex. TT).

108. Thus, even assuming that the record supported Plaintiffs' contentions of misrepresentation and concealment sufficient to instill in NFI some belief it would be getting the Castle McCulloch Collateral, or everything NewBridge held, the record also establishes that NFI never made any reasonable attempt to confirm this belief, ignored repeated signs that there was an inconsistency between the assignment JDPW was agreeing to in writing and the deal NFI believed it had, and lent $2.1 million to JDPW after signing an agreement that clearly did not conform to the deal NFI envisioned. There is no evidence, or even an allegation from NFI, that Doug Harris prevented NFI from making reasonable inquiries or conducting its own due diligence. "When . . . parties deal at arm['s] length and [one party] has full opportunity to make inquiry but neglects to do so and the [other party] resorted to no artifice which was reasonably calculated to induce the [first] to forego investigation[,] action in deceit will not lie." *Hardin*, 199 N.C. App. at 697, 682 S.E.2d at 734 (quoting *Olivetti Corp. v. Ames Bus. Sys., Inc.*, 319 N.C. 534, 543, 356 S.E.2d 578, 583 (1987)).

109. Based on the above, and as an additional basis for the Court's decision at summary judgment, the Court concludes that NFI has failed to forecast sufficient evidence of its own reasonable reliance to proceed to trial on its fraud claim. *See McDonald's Corp. v. Five Stars, Inc.*, No. COA10-346, 2010 N.C. App. LEXIS 2097, at *9–10 (N.C. Ct. App. Nov. 16, 2010) (holding defendant's allegations that he was

fraudulently tricked under an "excess lease" agreement into paying two thirds of his and plaintiff's rent to landlord when he believed each party agreed to pay half did not show reasonable reliance when defendant did not contact the landlord, did not obtain a copy of plaintiff's lease with the landlord, did not request any form of confirmation for plaintiff's representations, and signed a contract that did not incorporate the allegedly material terms of the negotiations between the parties); *RD&J Props.*, 165 N.C. App. at 748, 600 S.E.2d at 500 (affirming dismissal of fraud claim at summary judgment where plaintiff forecast insufficient evidence of reasonable reliance); *Spartan Leasing, Inc. v. Pollard*, 101 N.C. App. 450, 456, 400 S.E.2d 476, 479–80 (1991) (reliance not reasonable as a matter of law as to fraud in the inducement allegations where individual in an arm's-length transaction signed a short document with clear terms and was in no way prevented from reading the document); *Crockett Capital Corp. v. Inland Am. Winston Hotels, Inc.*, 2011 NCBC LEXIS 7, at \*71–72 (N.C. Super. Ct. Feb. 28, 2011) (due diligence required inspection of documents delivered to claimant, which would have revealed need for further action); *Staton v. Brame*, 2001 NCBC LEXIS 2, at \*73–74 (N.C. Super. Ct. May 31, 2001) (holding fraud claimant did not exercise reasonable diligence where claimant failed to request relevant documents or make inquiries to relevant parties); *see also Broussard v. Meineke Disc. Muffler Shops*, 155 F.3d 331, 341 (4th Cir. 1998) (noting North Carolina courts recognize that reliance is not reasonable "if a plaintiff had an alternative source for the information that is alleged to have been concealed from or misrepresented to him"); *Area Landscaping, L.L.C. v. Glaxo-Wellcome, Inc.*, 160 N.C.

App. 520, 527, 586 S.E.2d 507, 512 (2003) (holding that a party's assumption about the terms of an agreement that directly conflicted with the express terms of written communications between the parties did not constitute reasonable reliance "that would support a cause of action based upon fraud").

110. The Court thus concludes that summary judgment is appropriate in Doug Harris's favor on NFI's claim for fraud. As a result, the Court will dismiss Count 8 of Plaintiffs' Amended Consolidated Complaint as against Doug Harris at summary judgment.

4. Unfair or Deceptive Trade Practices

111. Doug Harris also moves for summary judgment on Plaintiffs' Count 31, a claim against him for unfair or deceptive trade practices, arguing that the acts this claim is premised upon constitute the rendering of professional services and are thus excluded from actionable conduct under the North Carolina Unfair and Deceptive Trade Practices Act (the "UDTPA").

112. A claim for unfair or deceptive trade practices requires a plaintiff to show (1) that the "defendant committed an unfair or deceptive act or practice," (2) that the act or practice "was in or affecting commerce," and (3) that "the act proximately caused injury to the plaintiff." *Dalton v. Camp*, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001). Under the UDTPA, "'commerce' includes all business activities, however denominated, but does not include professional services rendered by a member of a learned profession." N.C. Gen. Stat. § 75-1.1. This so-called "learned profession exception" (also termed an "exemption" or "exclusion" by courts) applies to attorneys

or law firms "acting within the scope of the traditional attorney-client role." *Reid v. Ayers*, 138 N.C. App. 261, 267, 531 S.E.2d 231, 236 (2000).

113. On this claim, Plaintiffs assert that a genuine issue of material fact exists as to whether Doug Harris was acting as an attorney in his and JDPW's dealings with Arthur Nivison and Plaintiffs or whether he was acting as the trustee of JDPW. Plaintiffs argue in their opposition brief that Doug Harris, in his own deposition testimony, "consistently maintained that he conducted . . . negotiations solely in his capacity as Trustee of JDPW Trust, and not in his professional capacity as an attorney." (Mem. Law Opp'n Douglas S. Harris's Mot. Summ. J. Nivison Entities' Claims 18.) To support this contention, Plaintiffs cite the following excerpt from Doug Harris's deposition: "I was advancing JDPW Trust's interest . . . and I was making representations, which I fully knew that if they were false representations I could be sued for." (Mem. Law Opp'n Douglas S. Harris's Mot. Summ. J. Nivison Entities' Claims 18.) Plaintiffs' arguments suffer from two inaccuracies, one factual, and one legal.

114. First, an examination of the cited page of Doug Harris's deposition reveals a quite different statement than the snippet Plaintiffs have placed before the Court. The entirety of Plaintiffs' quoted sentence reads, "So to me, I was advancing JDPW Trust's interest, which I did represent, so I was acting as -- *as their attorney* trying to make the thing close, and I was making representations, which I fully knew that if they were false representations I could be sued for, you know, false representations." (Harris Dep. I, at 384:10–15 (emphasis added).) Three lines down, Doug Harris again

undercuts Plaintiffs' representation that he was not acting as an attorney: "I did. I intended for people to rely upon it. *And I was speaking as the attorney for JDPW Trust*, and I expected them to rely upon it. Yes, I did." (Harris Dep. I, at 384:18–20 (emphasis added).) In fact, reviewing the surrounding pages of Doug Harris's deposition, the Court is unable to locate a single instance in which Doug Harris stated he was acting solely as the trustee for JDPW and not as an attorney. Plaintiffs' representation to the Court and the evidence Plaintiffs rely upon to support that representation thus appear diametrically opposed.

115. Second, Plaintiffs are mistaken in arguing that whether Doug Harris's conduct falls under the learned profession exception is a question of fact. With regard to unfair or deceptive trade practice claims, the jury determines the facts underlying the plaintiff's claim, "and based on the jury's finding[s], the court . . . [determines] as a matter of law whether the defendant engaged in unfair or deceptive acts or practices in the conduct of trade or commerce." *Hardy v. Toler*, 288 N.C. 303, 310, 218 S.E.2d 342, 346–47 (1975). Thus, a question of fact could exist as to the events underlying Plaintiffs' unfair or deceptive trade practices claim, but whether Doug Harris's acts fall outside the UDTPA's definition of commerce due to the learned profession exception is a question of law. *See id.*; *see also Wheeless v. Maria Parham Med. Ctr., Inc.*, 237 N.C. App. 584, 589–91, 768 S.E.2d 119, 123–24 (2014).

116. North Carolina courts assessing unfair or deceptive trade practices claims are frequently asked to determine whether acts fall within the learned profession exception. Although a bright line is not easily drawn, an act will be considered falling

under the learned profession exception when (1) the person or entity performing the act is a member of a learned profession and (2) the act is a rendering of professional services. *Wheeless*, 237 N.C. App. at 589; 768 S.E.2d at 123; *Reid*, 138 N.C. App. at 266, 531 S.E.2d at 235. What constitutes a rendering of professional services can be a difficult question to answer, especially in cases where a learned professional's conduct "admits of two motives." *Battleground Veterinary Hosp., P.C. v. McGeough*, 2007 NCBC LEXIS 33, at *52 (N.C. Super. Ct. Oct. 19, 2007).

117. Plaintiffs acknowledge that Doug Harris is an attorney licensed in the State of North Carolina. Thus, whether Doug Harris's acts fall within the learned profession exception turns solely on whether those acts were a rendering of professional services.

118. When answering this question, courts have applied the learned profession exception broadly. For example, matters affecting the professional services rendered by members of a learned profession have been deemed to fall outside commerce, even where the actor possessed ulterior motives. *Wheeless*, 237 N.C. App. at 589–91, 768 S.E.2d at 123–24 (holding statements made to a licensing board about another professional not did not constitute unfair or deceptive trade practices, even where there were allegations that the information communicated was obtained illegally and was reported out of malice or a chance for financial gain). Defamatory statements made by one professional about another's work have also been exempted. *Gaunt v. Pittaway*, 139 N.C. App. 778, 784, 534 S.E.2d 660, 664 (2000) ("[I]t clearly does not follow that a statement by a medical professional, criminal or otherwise, is governed

by [N.C. Gen. Stat. § 75-1.1(a)].").  Further, that an act might be illegal or unethical does not prevent it from falling within the learned profession exception for purposes of assessing a section 75-1.1 claim.  *Alamance Family Practice, P.A. v. Lindley*, 2018 NCBC LEXIS 83, at *24 (N.C. Super. Ct. Aug. 14, 2018) ("In considering whether a defendant's conduct is exempt from the UDTPA's definition of commerce, the Court is not concerned with whether the conduct runs afoul of other legal or ethical standards, but only whether the conduct affects the professional services rendered by members of a learned profession." (first citing *Burgess v. Busby*, 142 N.C. App. 393, 406–07, 544 S.E.2d 4, 11–12 (2001); and then citing *Gaunt*, 139 N.C. App. at 784, 534 S.E.2d at 664)).

119.  In the context of the legal profession, the North Carolina Court of Appeals has provided specific guidance for analyzing the acts of attorneys under section 75-1.1.  In particular, the court has drawn a distinction between nonessential and "entrepreneurial aspects" of legal practice, such as advertising, to which the exception does not apply, and acts "within the scope of the traditional attorney-client role," to which the exception does apply.  *Reid*, 138 N.C. App. at 267–68, 531 S.E.2d at 236. Thus, when an attorney acts in representing a client, his or her conduct will generally not give rise to an unfair or deceptive trade practices claim.  *See Moch v. A.M. Pappas & Assocs., LLC*, 251 N.C. App. 198, 208–09, 794 S.E.2d 898, 904 (2016) (concluding plaintiff could not bring a claim against defendants based upon letters sent by defendants' counsel); *Davis Lake Cmty. Ass'n v. Feldmann*, 138 N.C. App. 292, 297, 530 S.E.2d 865, 869 (2000) (emphasizing that defendants did not have a claim against

plaintiff's counsel because "[a]ny acts engaged in by plaintiff's counsel, even if cloaked in terms of a principal-agent relationship, [fell] within the learned profession exemption[.]"). The exception extends beyond work such as drafting pleadings, negotiating settlements, and preparing contracts, and includes those acts that are a necessary part of the legal services provided to the client. *See Reid,* 138 N.C. App. at 266–67, 531 S.E.2d at 235–36 ("Plaintiffs attempt to distinguish debt collection from other aspects of an attorney's work, such as drafting pleadings, negotiating settlements, and preparing contracts, arguing that only the latter should fall within the exemption. We disagree. . . . Debt collection, along with the collection of any attorney's fees incurred as a penalty, is a necessary part of the practice of debtor-creditor law.").

120. In the present case, although there are disputes as to how many times, when, and where Doug Harris and Arthur Nivison met and exactly what was said, it does not appear to be disputed that Plaintiffs allege Doug Harris negotiated the loan to JDPW with Arthur Nivison and drafted certain documents that were provided to Plaintiffs and other parties, including an opinion letter. It also appears beyond dispute, Plaintiffs' arguments notwithstanding, that Doug Harris was acting as an attorney for JDPW during his interactions with Plaintiffs and NewBridge.

121. That Doug Harris's acts may have been motivated by self-serving goals, or that Doug Harris may have run afoul of ethical and legal standards, does not matter for the Court's purposes here. *See Wheeless*, 237 N.C. App. at 589–91, 768 S.E.2d at 123–24; *Alamance Family Practice, P.A.*, 2018 NCBC LEXIS 83, at *24. The sole

question for the Court is whether Doug Harris's conduct constituted the rendering of professional services for purposes of N.C. Gen. Stat. § 75-1.1(b). Given the above, the Court concludes the answer to that question must be yes. *See Reid*, 138 N.C. App. at 267–68, 531 S.E.21 at 236; *cf.* N.C. Gen. Stat. § 84-2.1(a) ("The phrase 'practice law' as used in this Chapter is defined to be performing any legal service for any other person, specifically including . . . assisting by advice, counsel, or otherwise in any legal work; and to advise or give opinion upon the legal rights of any person, firm or corporation[.]"); N.C. Gen. Stat. § 84-4 (making it unlawful for persons except active members of the State Bar to prepare legal documents for another person, firm, or corporation); *State v. Pledger*, 257 N.C. 634, 636, 127 S.E.2d 337, 339 (1962) ("Practice of law embraces the preparation of legal documents and contracts by which legal rights are secured.").

122. Because Doug Harris's complained of conduct falls outside of section 75-1.1's definition of commerce, no genuine issue of material fact remains as to Plaintiffs' claim against Doug Harris for unfair or deceptive trade practices. Consequently, the Court will grant Doug Harris's motion and dismiss that claim.

### 5. Punitive Damages

123. Finally, Doug Harris moves to dismiss Plaintiffs' claim against him for punitive damages, contending that there is no basis for such an award.

124. A party cannot "have a cause of action for punitive damages by itself." *Oestreicher v. Am. Nat'l Stores, Inc.*, 290 N.C. 118, 134, 225 S.E.2d 797, 808 (1976); *see also* N.C. Gen. Stat. § 1D-15. As the Court has concluded that Plaintiffs' other,

substantive claims against Doug Harris should be dismissed at summary judgment, the Court further concludes that Plaintiffs' claim for punitive damages must be dismissed as well. *Horne v. Cumberland Cty. Hosp. Sys.*, 228 N.C. App. 142, 150–51, 746 S.E.2d 13, 20 (2013) (affirming dismissal of punitive damages claim where all of plaintiff's substantive claims were dismissed). The Court therefore grants Doug Harris's motion as to Plaintiffs' claim against him for punitive damages.

B.    The Castle McCulloch Defendants' Motion

125.    The Court next turns to the Castle McCulloch Defendants' Motion, which requests summary judgment on all of Plaintiffs' claims that the Castle McCulloch Defendants contend are directed against them.

1. Fraud

126.    The Castle McCulloch Defendants contend that they are subject to Count 8 of the Amended Consolidated Complaint, NFI's fraud claim against Doug Harris, or that the claim at least involves the Castle McCulloch Collateral. (Br. Supp. Castle McCulloch Defs.' Mot. Summ. J. 8, ECF No. 834.) As such, the Castle McCulloch Defendants move for summary judgment seeking dismissal of Count 8. In support of their motion, the Castle McCulloch Defendants make various arguments contending that Plaintiffs and Arthur Nivison had knowledge of the Castle McCulloch Collateral, that the Castle McCulloch Collateral was not concealed from Plaintiffs or Arthur Nivison, and that the Castle McCulloch Collateral was never meant to secure NFI's loan.

127. Plaintiffs oppose the Castle McCulloch Defendants' Motion and argue that NFI has a proper fraud claim against the Castle McCulloch Defendants due to those Defendants' agency relationship with Doug Harris. Specifically, Plaintiffs contend Doug Harris was acting on behalf of the Castle McCulloch Defendants when he committed the acts giving rise to NFI's fraud claim.

128. The parties' arguments, however, presuppose that NFI has pleaded a fraud claim against the Castle McCulloch Defendants. The Court's review of the Amended Consolidated Complaint reveals that NFI brought no such claim. In particular, and contrary to the parties' competing contentions, NFI's fraud claim was not pleaded against the Castle McCulloch Defendants directly or indirectly through agency principles. Reading Plaintiffs' pleading, Count 8 is asserted only against Doug Harris, Dr. Epes, and Mark McDaniel and includes no allegation of an agency relationship between Doug Harris and the Castle McCulloch Defendants, (Am. Consolidated Compl. ¶¶ 168–81), even considering the minimal pleading standards agency allegations must meet, *Fox v. Killian*, 102 N.C. App. 819, 821, 403 S.E.2d 546, 547 (1991) (noting that agency allegations must meet Rule 8(a)(1)'s requirements). Consequently, the Court concludes that NFI has not brought a fraud or vicarious liability claim against the Castle McCulloch Defendants.

129. Because NFI does not maintain a fraud or vicarious liability claim against the Castle McCulloch Defendants, the Court cannot grant summary judgment in the Castle McCulloch Defendants' favor on any such claim. The Court therefore denies the Castle McCulloch Defendants' Motion as moot to the extent it requests summary

judgment on Count 8 of the Amended Consolidated Complaint. The Court further notes, however, that this ruling precludes NFI from contending at trial that it has asserted a fraud or vicarious liability claim against the Castle McCulloch Defendants.[10]

2. <u>Plaintiffs' Request for a Constructive Trust on the Confession of Judgment</u>

130. The Castle McCulloch Defendants move for summary judgment on Plaintiffs' Count 14, which asks the Court to impose a constructive trust in favor of NFI upon the Confession of Judgment, arguing that the Confession of Judgment is void by its own terms.

131. In response, and in connection with their own motion for partial summary judgment, Plaintiffs contend that the Court should now determine only whether NFI is equitably entitled to possession of the Confession of Judgment, leaving any arguments about its validity until later. As to possession, Plaintiffs argue that NFI is entitled to have a constructive trust imposed on the Confession of Judgment because the Confession of Judgment secured all four loans held by NewBridge, and NFI provided money to satisfy the Settlement Agreement between NewBridge and the Settlement Debtors. Plaintiffs further argue, however, that should the Court wish to reach the issue of validity, the Confession of Judgment may still be

---

[10] Had NFI pleaded a fraud claim against the Castle McCulloch Defendants based on Doug Harris's alleged fraud, or should the Supreme Court disagree with the Court's reading of the Amended Consolidated Complaint on appeal, the Court notes that its dismissal of NFI's fraud claim against Doug Harris likewise requires dismissal of any fraud claim based on vicarious liability resulting from Doug Harris's allegedly fraudulent conduct. *Draughon v. Harnett Cty. Bd. of Educ.*, 166 N.C. App. 464, 469–70, 602 S.E.2d 721, 726 (2004) ("The general rule in North Carolina is that judgment on the merits in favor of the agent precludes any action against the principal where, as here, the principal's liability is purely derivative.").

enforceable because a question of fact remains as to whether performance under the Settlement Agreement was proper. Plaintiffs appear to believe that the Confession of Judgment may still have some value because, according to Plaintiffs, NewBridge actually received NFI's $2.1 million payment on September 24, 2012—three days after the September 21, 2012 deadline for payment in the Settlement Agreement—with NFI paying interest on the additional days. (Mem. Law Opp'n Castle McCulloch Defs.' Mot. Summ. J. 3, ECF No. 884.) Plaintiffs contend that this question of fact precludes summary judgment on the enforceability of the Confession of Judgment.

132. "A constructive trust 'arises when one obtains the legal title to property in violation of a duty he owes to another.'" *Day v. Rasmussen*, 177 N.C. App. 759, 762, 629 S.E.2d 912, 914 (2006) (quoting *Fulp v. Fulp*, 264 N.C. 20, 22, 140 S.E.2d 708, 711 (1965)).

> A constructive trust is a fiction of equity, brought into operation to prevent unjust enrichment through the breach of some duty or other wrongdoing. It is an obligation or relationship imposed irrespective of the intent with which such party acquired the property, and in a well-nigh unlimited variety of situations.

*Cury v. Mitchell*, 202 N.C. App. 558, 560, 688 S.E.2d 825, 827 (2010) (quoting *Roper v. Edwards*, 323 N.C. 461, 464, 373 S.E.2d 423, 425 (1988)). The common, "indispensable element" of scenarios meriting a constructive trust is "some fraud, breach of duty or other wrongdoing by the holder of the property, or by one under whom he claims[.]" *Id.* By the fiction of the constructive trust, a plaintiff who has been deprived of its property by such wrongdoing "wins an *in personam* order that requires the defendant," the constructive trustee, "to transfer specific property in

some form to the plaintiff." *Roper*, 323 N.C. at 464, 373 S.E.2d at 425 (quoting Dan B. Dobbs, *Remedies* § 4.3, at 241 (1973)). The plaintiff may also be "entitled to any new form his property takes by way of exchange for other assets." Dobbs, *supra* § 9.4, at 628.

133. "[T]he ultimate decision whether to impose a constructive trust as an equitable remedy . . . rest[s] in the discretion of the trial court." *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 531, 723 S.E.2d 744, 752 (2012).

134. After a review of the record and the parties' arguments, the Court concludes Plaintiffs are correct that the Court need not resolve issues with respect to the Confession of Judgment's enforceability at summary judgment. This is because, on the issue of possession, Plaintiffs are not entitled to the constructive trust they seek.

135. First, Plaintiffs no longer maintain a claim for fraud or breach of fiduciary duty that concerns the Confession of Judgment, and a request for a constructive trust may not stand on its own absent a cause of action for which it is an appropriate remedy. *Azure Dolphin, LLC v. Barton*, 2017 NCBC LEXIS 90, at *29 (N.C. Super. Ct. Oct. 2, 2017) (dismissing plaintiffs request for a constructive trust because a constructive trust is a remedy, not a cause of action, and plaintiffs' underlying causes of action had been dismissed), *aff'd*, 371 N.C. 579, 821 S.E.2d 711 (2018); *see also Weatherford v. Keenan*, 128 N.C. App. 178, 179, 493 S.E.2d 812, 813 (1997) ("Defendant errs when he suggests that a constructive trust is a cause of action rather

than a remedy."). This alone gives the Court sufficient reason to grant the Castle McCulloch Defendants' Motion.

136. However, as an additional reason for denying Plaintiffs their requested relief, the Court further concludes that the undisputed facts of this case do not create a situation meriting the imposition of a constructive trust over the Confession of Judgment under applicable law.

137. The Confession of Judgment was executed as consideration for the Settlement Agreement and served as a failsafe for NewBridge in the event the Settlement Agreement was not performed. (Am. Consolidated Compl. Ex. Y ¶ 12 [hereinafter "Confession J."], ECF No. 185.) The Settlement Debtors authorized NewBridge to file the Confession of Judgment "[i]n the event, and only in the event, the [Settlement Debtors] fail[ed] to make a payment to [NewBridge] as set forth in the Settlement Agreement." (Confession J. ¶ 12.) The undisputed evidence shows that NewBridge received NFI's funds and thereafter assigned the Loan Documents to JDPW. (Am. Consolidated Compl. Exs. UU, VV, WW.) JDPW did not receive an interest in, or possession of, the Confession of Judgment, nor did any of the Settlement Debtors.

138. Instead, NewBridge retained the Confession of Judgment until its successor moved the Court for permission to transfer possession of that document to the Receiver. (Order Yadkin Bank's Mot. Transfer Possession Confession J. ¶ 7, ECF No. 663.) NewBridge's successor, Yadkin Bank, represented to the Court that it believed it had no authority to file the Confession of Judgment due to the parties' compliance

with the terms of the Settlement Agreement. (Order Yadkin Bank's Mot. Transfer Possession Confession J. ¶ 3.) Yadkin Bank's employee assigned to the relevant loan file stated in affidavit testimony that the typical practice in such a situation would be to return a confession of judgment to the debtor or destroy the document. (Cassidy Aff. ¶ 4, ECF No. 377.) The employee stated she was "unable to determine why the Confession of Judgment at issue in this lawsuit was not destroyed or returned to the persons signing it." (Cassidy Aff. ¶ 4.)

139. The Confession of Judgment was not part of the bargain between JDPW and NFI and was never obtained by any party through some change in form of the $2.1 million NFI lent. Thus, neither the Receiver nor NewBridge/Yadkin Bank became holders of the Confession of Judgment as the result of "some fraud, breach of duty or other wrongdoing[.]" *See Cury*, 202 N.C. App. at 561, 688 S.E.2d at 827 (quoting *Roper*, 323 N.C. at 464, 373 S.E.2d at 425). Because such fraud, breach of duty, or other wrongdoing is the "indispensable element" common to situations where a constructive trust may be imposed, the absence of such wrongdoing leads the Court to conclude that a constructive trust in NFI's favor is not available on the undisputed record here. *See Roper*, 323 N.C. at 464, 373 S.E.2d at 425.

140. The case Plaintiffs cite as their primary support for imposing an equitable trust over the Confession of Judgment is *Hoffman v. Mozeley*, 247 N.C. 121, 100 S.E.2d 243 (1957). (Mem. Law Supp. Pls.' Mot. Partial Summ. J. as to Counts 14, 15, 16, 27, 28, and 30, at 5 [hereinafter "Pls.' Partial Summ. J. Br."], ECF No. 827.) The equitable trust referenced in this case is not a constructive trust but a purchase-

money resulting trust. *Hoffman*, 247 N.C. at 123, 100 S.E.2d at 245 ("This action is to compel conveyance of the remaining portion upon the ground that a resulting trust in the property existed in favor of the plaintiffs by reason of their having furnished the purchase money."). NFI is not entitled to possession of the Confession of Judgment under this equitable remedy either.

141. "A resulting trust arises when a person becomes invested with the title to . . . property under circumstances which in equity obligate him to hold the title and to exercise his ownership for the benefit of another." *Dillingham v. Dillingham*, 202 N.C. App. 196, 201, 688 S.E.2d 499, 504 (2010) (quoting *Mims v. Mims*, 305 N.C. 41, 46, 286 S.E.2d 779, 783 (1982)). "The classic example of a resulting trust is the purchase-money resulting trust," i.e., a resulting trust imposed where the plaintiff supplied the purchase money used by defendant to acquire property. *Mims*, 305 N.C. at 46, 286 S.E.2d at 784 (quoting *Cline v. Cline*, 297 N.C. 336, 344, 255 S.E.2d 399, 404 (1979)). "The trust is created in order to effectuate what the law presumes to have been the intention of the parties in these circumstances—that the person to whom the land was conveyed hold[s] it as trustee for the person who supplied the purchase money." *Id.* While often discussed in the context of real property, our Supreme Court has previously stated that "[t]he principle of resulting trusts applies alike to transactions relating to both real and personal property." *Bullman v. Edney*, 232 N.C. 465, 468, 61 S.E.2d 338, 340 (1950) (citing 54 Am. Jur. Trusts § 203).

142. Like with Plaintiffs' request for a constructive trust, the facts of record here do not permit the imposition of a resulting trust. The undisputed facts show that no

party obtained title to the Confession of Judgment using the purchase money NFI lent. The Court thus concludes that a resulting trust cannot be imposed on the Confession of Judgment as a matter of law on the undisputed facts.

143. For each of these reasons, the Court will grant the Castle McCulloch Defendants' Motion to the extent it requests summary judgment on Count 14 of Plaintiffs' Amended Consolidated Complaint.

3. Equitable Subrogation and Possession of the Castle McCulloch Collateral

144. The Castle McCulloch Defendants next move for summary judgment on Plaintiffs' Counts 16, 26, 27, 28, and 30.[11] Plaintiffs' arguments supporting these claims draw upon the same equitable theory of relief, and the Court discusses them together.

145. Plaintiffs' Count 16 seeks a declaratory judgment holding that NFI has a valid and enforceable ownership interest in the Castle McCulloch Collateral listed in the Bill of Sale and Assignment of Loan Documents executed by NewBridge in favor of JDPW. Plaintiffs' Counts 26 and 27 asks the Court to enter a temporary restraining order, a preliminary injunction, and a permanent injunction restraining and enjoining Defendants from "encumbering, disposing of, pledging, assigning, using, conveying, selling, moving, transporting, or otherwise impairing any of the

---

[11] In their brief, the Castle McCulloch Defendants state that their motion requests summary judgment on "Count Twenty-Nine – Judicial Assignment." (Br. Supp. Castle McCulloch Defs.' Mot. Summ. J. 9.) The twenty-ninth count of Plaintiffs' Amended Consolidated Complaint deals with a request to pierce the corporate veils of CCSEA and other CCSEA-related entities. (Am. Consolidated Compl. ¶ 362.) Count 30 contains Plaintiffs' judicial assignment claim. (Am. Consolidated Compl. ¶ 366.)

Castle McCulloch Collateral[.]" (Am. Consolidated Compl. ¶ 340; *see* Am. Consolidated Compl. ¶ 335.) Plaintiffs' Count 28 seeks a judgment declaring that NFI shall be deemed the owner of all collateral previously held by NewBridge for the CCSEA and Castle McCulloch Loans and that NFI holds the right to enforce the Confession of Judgment, the Castle McCulloch Deed of Trust, and the Assignment of Rents and Profits. (Am. Consolidated Compl. ¶ 352.) Plaintiffs' Count 30 seeks "a judicial assignment of all of the NewBridge Bank Collateral not already assigned to [NFI], as well as the Confession of Judgment[.]"[12] (Am. Consolidated Compl. ¶ 366.) Plaintiffs rely on the doctrine of equitable subrogation as the basis for all five of these claims. (Am. Consolidated Compl. ¶¶ 252, 342; Pls.' Partial Summ. J. Br. 11, 13, 18–19.)

146. The Castle McCulloch Defendants assert multiple arguments against Plaintiffs' equitable-subrogation-based claims. Among these, the Castle McCulloch Defendants claim that NFI is not equitably subrogated to NewBridge's rights to the Castle McCulloch Collateral because the parties never intended for the Castle McCulloch Collateral to serve as security for NFI's loan to JDPW. The Castle

---

[12] Plaintiffs' Counts 28 and 30 seek relief concerning the ownership of both the CCSEA Collateral and the Castle McCulloch Collateral. (Am. Consolidated Compl. ¶¶ 343, 366.) However, on January 9, 2015, prior to this case being assigned to the undersigned and the consolidation of Plaintiffs' lawsuits, the Honorable Howard E. Manning, Jr. entered partial summary judgment in favor of NFI and awarded NFI possession of the CCSEA Collateral based on the terms of the Assignment Agreement. (*See* Partial Summ. J. Order 1–6.) The issue of the rightful ownership of the CCSEA Collateral is therefore settled, *see Smithwick v. Crutchfield*, 87 N.C. App. 374, 376, 361 S.E.2d 111, 113 (1987) ("[O]rdinarily one judge may not modify, overrule, or change the judgment of another Superior Court judge previously made in the same action." (quoting *Calloway v. Ford Motor Co.*, 281 N.C. 496, 501, 189 S.E.2d 484, 488 (1972))), and the Court denies the Castle McCulloch Defendants' Motion as moot to the extent it seeks a ruling on that issue.

McCulloch Defendants argue that the parties intended only the CCSEA Collateral to secure NFI's loan and that NFI agreed to lend its money to JDPW knowing that its money would also be used to purchase the Castle McCulloch Loan and Loan Documents. The Castle McCulloch Defendants therefore characterize Plaintiffs' appeal to equity as a clandestine attempt to "re-write what [Plaintiffs] recognize now as a bad business deal." (Br. Supp. Castle McCulloch Defs.' Mot. Summ. J. 11.)

147. Plaintiffs argue, both in response to the Castle McCulloch Defendants' Motion and as part of their own motion for partial summary judgment, that their claims based upon equitable subrogation are proper because NFI advanced the funds necessary for JDPW to complete the transaction contemplated in the Settlement Agreement and purchase the Castle McCulloch Loan Documents from NewBridge. Plaintiffs contend that there was an understanding that the money furnished would be applied to the CCSEA Loans and Castle McCulloch Loan held by NewBridge and that NFI lent the money to JDPW in order to protect its own interests in the Battleground Property. Particularly, Plaintiffs assert that if the Confession of Judgment was filed by NewBridge against the Settlement Debtors, NFI would likely not have recovered on the deed of trust and purchase money note executed by MMRE on the Battleground Property. Under these circumstances, Plaintiffs contend NFI should be equitably subrogated to the rights of NewBridge in all of the collateral securing the CCSEA and Castle McCulloch Loans.

148. Within the last several years, the North Carolina Court of Appeals has restated the general principles underlying the doctrine of equitable subrogation in North Carolina:

> Equitable subrogation is a general rule [that] one who furnishes money for the purpose of paying off an encumbrance on real or personal property, at the instance either of the owner of the property or of the holder of the encumbrance, either upon the express understanding or under circumstances from which an understanding will be implied, that the advance made is to be secured by a first lien on the property, will be subrogated to the rights of the prior lienholder as against the holder of an intervening lien, of which the lender was excusably ignorant.

*Bank of N.Y. Mellon v. Withers*, 240 N.C. App. 300, 302, 771 S.E.2d 762, 764 (2015) (quoting *Peek v. Wachovia Bank & Tr. Co.*, 242 N.C. 1, 15, 86 S.E.2d 745, 755 (1955)). The doctrine requires "both that the money should have been advanced for the purpose of discharging the prior encumbrance, and that [the money] should have actually been so applied." *Id.* at 302–03, 771 S.E.2d at 764–65 (quoting *Peek*, 242 N.C. at 15–16, 86 S.E.2d at 756).

149. Equitable subrogation seeks to do "complete, essential, and perfect justice between . . . parties without regard to form, and its object is the prevention of injustice. *Id.* at 302, 771 S.E.2d at 764 (quoting *Journal Publ'g Co. v. Barber*, 165 N.C. 478, 487–88, 81 S.E. 694, 698 (1914)). "When the equities of a case favor equitable subrogation, the party in whose favor [the right of subrogation] exists is entitled to all of the remedies and security which the creditor had against the person whose debt was paid." *Am. Gen. Fin. Servs., Inc. v. Barnes*, 175 N.C. App. 406, 409, 623 S.E.2d 617, 619 (2006) (internal quotation marks omitted).

150. After careful consideration, the Court concludes that the remedy of equitable subrogation is not available on the undisputed facts of record here. As the Supreme Court of North Carolina has noted, circumstances favoring equitable subrogation arise when a party "furnishes money for the purpose of paying off an encumbrance on real or personal property . . . either upon the *express understanding or under circumstances from which an understanding will be implied*, that the advance made is to be secured by a first lien on the property[.]" *Peek*, 242 N.C. at 15, 86 S.E.2d at 755 (emphasis added). At summary judgment, Plaintiffs have not forecast evidence establishing a genuine issue of material fact as to the existence of such an express understanding or circumstances from which such an understanding can be implied.

151. To begin with, there is no evidence of an express understanding that NFI would be secured by a lien on the Castle McCulloch Collateral. It appears beyond dispute that NFI's money was used to fulfill the Settlement Agreement with NewBridge and facilitate JDPW's purchase of the CCSEA and Castle McCulloch Loans and Loan Documents. The record further demonstrates, despite Plaintiffs' arguments to the contrary, that Arthur Nivison and NFI were aware that JDPW would be purchasing the Castle McCulloch Loan with NFI's $2.1 million loan and that the written agreement with JDPW did not contemplate the assignment of any assets or debts linked to the Castle McCulloch Defendants.

152. Plaintiffs may allege that they were unaware that NFI's funds would be used to satisfy the Castle McCulloch Loan, (*see* Am. Consolidated Compl. ¶ 59 ("None

of these documents made any disclosure to Tom Harper . . . that Plaintiff NFI's funds were going to satisfy the Castle McCulloch Loan[.]"), but that allegation is directly contradicted by the undisputed record, including certain exhibits to Plaintiffs' Amended Consolidated Complaint.[13]  For example, on August 17, 2012 and August 22, 2012, Arthur Nivison signed memos indicating that he was aware that NFI was lending JDPW $2.1 million "to enable them to pay off the loan from NewBridge Bank to *Castle McCulloch*, Central Carolina Surgical Eye Associates, et al."  (Am. Consolidated Compl. Ex. DDD (emphasis added); *see also* Am. Consolidated Compl. Ex. CCC, ECF No. 193.)

153.  Plaintiffs also assert that JDPW's purchase of the Castle McCulloch Loan Documents or interests in the Castle McCulloch Collateral was concealed from Plaintiffs, (*see* Am. Consolidated Compl. ¶ 178 ("Until this lawsuit was filed and discovery conducted . . . Plaintiff NFI was unaware that [NewBridge] had assigned the Castle McCulloch Loan Documents to [JDPW]."); *see* Pls.' Partial Summ. J. Br. 10), but that allegation is also contradicted by the undisputed record and Plaintiffs' own statement of facts at summary judgment.  Specifically, on September 21, 2012, before Plaintiffs contend the enforceable version of the Assignment Agreement was finalized, NFI's counsel, Tom Harper, received an e-mail informing him that "all ccsea and *castle mcculloch* loan documents" would be transferred to JDPW once NewBridge was paid.  (Am. Consolidated Compl. Ex. RR (emphasis added).)  Plaintiffs admit this

---

[13]  That allegation is also at odds with Plaintiffs' own arguments in favor of their equitable subrogation claims now.  (Mem. Law Opp'n Castle McCulloch Defs.' Mot. Summ. J. 7 ("[T]he evidence reflects that there was an understanding that the money was furnished by NFI for the purpose of being applied to *all four loans*." (emphasis added).)

fact in their own brief supporting their motion for partial summary judgment. (Pls.' Partial Summ. J. Br. 4 ("On the date of closing, counsel for NewBridge Bank advised counsel for the Plaintiffs that upon receipt of $2,001,834.09, NewBridge Bank would transfer all CCSEA and Castle McCulloch loan documents to JDPW Trust.").)

154. Strikingly, despite this evidence that Arthur Nivison and Plaintiffs were aware that JDPW would be purchasing the Castle McCulloch Loan and Loan Documents with NFI's funds, the documents before the Court concerning the agreement with JDPW make no reference to the Castle McCulloch Collateral or Loan Documents. Regardless of which version of the agreement the Court examines, the language agreed to by the parties clearly states that JDPW would assign all "right, title, and interest to the security interest in equipment and personal property" mentioned in the agreement to NFI. (Corrected Ex. KK; Am. Consolidated Compl. Exs. QQ, TT.) This "equipment" and "personal property" is identified as "all the equipment and other personal property owned by HUTA Leasing Company, Southeastern Eye Management, Inc., and Central Carolina Surgical Eye Associates, P.A." (Corrected Ex. KK; Am. Consolidated Compl. Exs. QQ, TT.) This statement, in combination with the Assignment of Security Instruments Doug Harris forwarded to Tom Harper, identified the collateral that JDPW would assign to NFI in exchange for the $2.1 million loan. (Corrected Ex. KK; Partial Summ. J. Order 1–2.) Documents related to interests in real property or the other Castle McCulloch Collateral were not among the collateral mentioned in the Assignment Agreement or listed in the Assignment of Security Instruments. This is true even of the amended version of the

Assignment Agreement Plaintiffs present. (Am. Consolidated Compl. Ex. LL, ECF No. 189.)

155. In short, even when viewed in the light most favorable to Plaintiffs, the undisputed evidence presented at summary judgment shows that Plaintiffs and Arthur Nivison were aware that JDPW planned to purchase the Castle McCulloch Loan, the Loan Documents securing that loan, and other interests in the Castle McCulloch Collateral from NewBridge with NFI's funds. The undisputed record also shows that the security for this loan set out in the parties' negotiated agreement did not include the Castle McCulloch Loan Documents or Collateral.

156. Plaintiffs have also presented no evidence of any other written or oral agreement by JDPW to assign an interest in the Castle McCulloch Collateral to NFI in exchange for the $2.1 million loan. At most, Plaintiffs point to vague statements concerning the deal to support their arguments—for example, Arthur Nivison's own memo stating "It is acknowledged that the security for the loan is being purchased by JDPW Trust and JDPW Trust has agreed to sign all documents necessary to convey a first lien security interest in said property in favor of the [NFI]," (Am. Consolidated Compl. Ex. DDD)—but these statements do not mention the Castle McCulloch Collateral or support Plaintiffs' argument by implication. Instead, such statements simply note the origin of whatever collateral would serve as security for NFI's loan.[14]

---

[14] As with NFI's fraud claim, Plaintiffs also cite multiple e-mails and other documents that Doug Harris exchanged with third parties and contend that these documents demonstrate that Doug Harris led counsel for other parties to believe that JDPW Trust would be assigning all interests in the Castle McCulloch Collateral to NFI. The Court has reviewed these documents and concludes that no such inference can be reasonably drawn from them.

Here again, to read these statements as Plaintiffs do, a factfinder must first assume the conclusion Plaintiffs seek to prove: that the Castle McCulloch Collateral was part of the "security for the loan." Plaintiffs have not presented evidence supporting that assumption.

157. Plaintiffs further attempt to create an issue of fact concerning an oral agreement to secure the $2.1 million loan with the Castle McCulloch Collateral by the submission of Arthur Nivison's Second Affidavit. (Nivison Aff. ¶ 17 ("Doug Harris had represented both to me and to my attorney that NewBridge Bank would assign all of the loan documents associated with the Castle McCulloch Loan and the CCSEA Loans to JDPW . . . and that JDPW Trust would re-assign those same documents to NFI at closing.").) However, for the reasons already explained in connection with the Court's ruling on NFI's fraud claim, the Court concludes Plaintiffs cannot rely on this post-deposition affidavit to create a genuine issue of material fact about such representations, agreements, or promises. *See Pinczkowski*, 153 N.C. App. at 440–41, 571 S.E.2d at 7.

158. In sum, Plaintiffs have not forecast substantial evidence from which a reasonable factfinder could infer that JDPW and NFI had a mutual understanding that NFI's loan was made in exchange for a lien on the Castle McCulloch Collateral. The entirety of the evidence demonstrates that NFI knew which notes and collateral JDPW was purchasing with NFI's loan and agreed to make the loan in exchange for security interests in "equipment and other personal property owned by HUTA Leasing Company, Southeastern Eye Management, Inc., and Central Carolina

Surgical Eye Associates, P.A." (Corrected Ex. KK; Am. Consolidated Compl. Exs. QQ, TT.) The Castle McCulloch Loan Documents and Collateral were simply not part of the agreed-upon security.

159. Furthermore, the Court concludes that the record does not demonstrate "circumstances from which an understanding" that NFI's loan would be secured by a lien on the Castle McCulloch Collateral should "be implied." *Peek*, 242 N.C. at 15, 86 S.E.2d at 755. Instead, the undisputed record shows that NFI was given a full opportunity to negotiate an agreement with JDPW for security for its $2.1 million loan and that NFI did in fact obtain security for that loan.

160. The parties have not provided, and the Court's research has not uncovered, any controlling or persuasive case law discussing the interaction between express agreements among parties and equitable subrogation in the circumstances presented here. On the one hand, the broad equitable power recognized in the doctrine of equitable subrogation is well established, and, as Plaintiffs note, the doctrine is meant to operate independent of contractual principles. *See N.C. Ins. Guar. Ass'n v. Century Indem. Co.*, 115 N.C. App. 175, 190, 444 S.E.2d 464, 473 (1994). On the other hand, allowing NFI to step into the shoes of NewBridge in these circumstances to obtain the same secured position previously held by NewBridge with regard to the Castle McCulloch Collateral seems akin to adding terms to the contract negotiated between Plaintiffs and JDPW. This State's strong support for a party's constitutional right to contract cautions against such an endeavor. *Hlasnick v. Federated Mut. Ins. Co.*, 353 N.C. 240, 243, 539 S.E.2d 274, 276 (2000) ("[O]ur state's legal landscape

recognizes that, unless contrary to public policy or prohibited by statute, freedom of contract is a fundamental constitutional right."). In this case, a review of the principles underlying the doctrine of equitable subrogation and the undisputed facts leads the Court to conclude that it should not apply the doctrine to alter the outcome of the parties' express agreement.

161. As the Washington Court of Appeals recently articulated, equitable subrogation is intended to prevent a windfall to the debtor and provide a path to security for a third party who pays a lender:

> The doctrine allows an outside party to step into the lender's shoes and receive the benefit of the outstanding debt, without an agreement or assignment of rights among the outside party, the lender, or the debtor. In other words, if a third party pays the debtor's outstanding loan to the lender without any formal agreement among the parties, then equity may permit the third party to take over the lender's interest and receive the debtor's payments. The rationale for subrogation is to prevent the unearned windfall that would otherwise accrue to the debtor, who could deny the obligation to make further payments on the debt because it has been satisfied by another to whom the debtor owed no obligation by reason of assignment of rights or other agreement.

*City of Kent v. Bel Air & Briney*, 358 P.3d 1249, 1252 (Wash. App. Ct. 2015) (citations omitted). The doctrine also stands to prevent the third-party lender, having paid the prior lender, from losing his investment to "the holder of an intervening lien, of which the [third-party] lender was excusably ignorant." *Bank of N.Y. Mellon*, 240 N.C. App. at 302, 771 S.E.2d at 764 (quoting *Peek*, 242 N.C. at 15, 86S.E.2d at 755).

162. The goal of equitable subrogation is to do "complete, essential, and perfect justice between . . . parties," *Bank of N.Y. Mellon*, 240 N.C. App. at 302, 771 S.E.2d at 764 (quoting *Journal Publ'g Co.*, 165 N.C. at 487–88, 81 S.E. at 698), not give

parties a do-over when they feel they did not negotiate a favorable deal, (*see* Nivison Dep. II, at 89:9–22 (Q: Was that another mistake on your part? A: In light of the current situation, it probably was[.]”).) Indeed, courts of this State have long recognized that “equity will not afford relief to those . . . whose condition is traceable to that want of diligence which may fairly be expected from a reasonable and prudent man,” *Butler v. Butler*, 239 N.C. App. 1, 7–8, 768 S.E.2d 332, 337 (2015), and this rule is applicable to the doctrine of equitable subrogation in particular, *Wallace v. Benner*, 200 N.C. 124, 132, 156 S.E. 795, 799 (1931) (stating that equitable subrogation is not available where “the party claiming relief is guilty of culpable negligence”).

163. Viewing the evidence in the light most favorable to Plaintiffs, the undisputed record before the Court shows that NFI, through Arthur Nivison, was aware that it would be lending funds to allow for the purchase of the Castle McCulloch Loan and the CCSEA Loans and that NFI negotiated the terms of the Assignment Agreement with that knowledge. The Assignment Agreement provided that NFI's loan would be secured by an assignment of interests in certain collateral that did not include the Castle McCulloch Collateral. The record contains no evidence that NFI was in any way obstructed from conducting its own due diligence on the collateral held by NewBridge for these loans. This is not a situation in which NFI lent money without receiving an agreement or assignment of rights to secure its loan or where NFI is threatened by an intervening lien of which it was excusably ignorant.

164. As such, the Court concludes that the Castle McCulloch Defendants' Motion should be granted as to Counts 16, 26, 27, 28, and 30 to the extent those claims seek

to obtain rights in the Castle McCulloch Collateral through the doctrine of equitable subrogation.[15]  For these same reasons, the Court also concludes that the Castle McCulloch Defendants' Motion should be granted as to Counts 16, 26, 27, 28, and 30 to the extent those claims seek relief concerning the Confession of Judgment.

4. <u>Breach of Contract and Constructive Trust as to the Castle McCulloch Collateral</u>

165. The Castle McCulloch Defendants next move for summary judgment on Count 13 of Plaintiffs' Amended Consolidated Complaint, a claim titled "Possession of Castle McCulloch Collateral Breach of Contract and Constructive Trust."  (Am. Consolidated Compl. 29.)  This claim alleges that Doug Harris and JDPW breached their agreement with NFI by failing to deliver the Castle McCulloch Collateral to NFI.  NFI appears to request specific performance to remedy the alleged breach.  (Am. Consolidated Compl. ¶ 235 ("In order to obtain the benefit of its bargain, Plaintiff is entitled to possession of all of the Castle McCulloch Collateral.").)  In the alternative, Count 13 asserts that NFI is entitled to have a constructive trust imposed upon the Castle McCulloch Collateral in NFI's favor.  (Am. Consolidated Compl. ¶ 235.)

166. In support of their motion, the Castle McCulloch Defendants argue that the Assignment Agreement did not concern the Castle McCulloch Collateral and that NFI's request for a constructive trust is not supported by the undisputed facts of this case.  The Court agrees.

---

[15] The Court's ruling herein is addressed solely to the undisputed facts of this case and does not endorse a broader rule that equitable subrogation is not available due to the existence of a contract between the parties.

167. As previously explained, Plaintiffs have put forward no evidence at summary judgment of an agreement to assign any interests in the Castle McCulloch Collateral to NFI. The Assignment Agreement did not cover interests in real property or mention any other form of collateral owned by the Castle McCulloch Defendants. (*See, e.g.*, Amended Consolidated Compl. Ex. TT.) Instead, the agreement expressly noted three entities whose equipment and personal property would serve as security for the $2.1 million loan to JDPW. (*See, e.g.*, Amended Consolidated Compl. Ex. TT.) None of these entities was a Castle McCulloch Defendant. Thus, no genuine issue of material fact remains as to NFI's breach of contract claim contained in Count 13, and summary judgment in the Castle McCulloch Defendants' favor is appropriate as a matter of law.

168. Further, as to NFI's request that the Court impose a constructive trust upon the Castle McCulloch Collateral, the Court concludes that such a remedy is inapposite here. Plaintiffs have no remaining fraud claim or claim for breach of fiduciary duty that relates to the Castle McCulloch Collateral, and thus no remaining cause of action for which a constructive trust would prove an appropriate remedy. *See Weatherford*, 128 N.C. App. at 179, 493 S.E.2d at 813; *Azure Dolphin, LLC*, 2017 NCBC LEXIS 90, at *29. Accordingly, the Court concludes that no genuine issue of material fact remains as to this aspect of Plaintiffs' Count 13 and that summary judgment in the Castle McCulloch Defendants' favor is appropriate on NFI's request for a constructive trust on the Castle McCulloch Collateral.

5.  Plaintiffs' Claim for Unjust Enrichment

169.  The Castle McCulloch Defendants also move for summary judgment on Count 33 of the Amended Consolidated Complaint, NFI's claim for unjust enrichment.  In support of their motion, the Castle McCulloch Defendants argue that NFI's claim for unjust enrichment against them should be dismissed because NFI lent the funds necessary for JDPW to buy the Castle McCulloch Loan and Loan Documents under a contract, i.e., the Assignment Agreement.  Because any benefit to the Castle McCulloch Defendants resulted from JDPW's use of money lent under a contract, and because NFI has already pursued and been assigned the CCSEA Collateral under that contract, the Castle McCulloch Defendants argue that NFI cannot continue to pursue an unjust enrichment claim against them.

170.  Plaintiffs counter by arguing that the Castle McCulloch Defendants received a benefit from NFI's loan to JDPW because that loan allowed JDPW to purchase the Castle McCulloch Defendants' debt from NewBridge and allowed Doug Harris to effectively release the Castle McCulloch Defendants from that debt at some point thereafter.  Plaintiffs also argue that NFI's decision to pursue JDPW for defaulting on NFI's loan and the pre-lawsuit-consolidation award of the CCSEA Collateral to NFI under the Assignment Agreement do not preclude NFI from bringing a claim for unjust enrichment against the Castle McCulloch Defendants, citing Rule 8(e)(1)'s authorization of alternative claims.  (Mem. Law Opp'n Castle McCulloch Defs.' Mot. Summ. J. 15.)

171. "The doctrine of unjust enrichment was devised by equity to exact the return of, or payment for, benefits received under circumstances where it would be unfair for the recipient to retain them without the contributor being repaid or compensated." *Bandy v. Gibson*, 2017 NCBC LEXIS 66, at *9 (N.C. Super. Ct. July 26, 2017) (quoting *Collins v. Davis*, 68 N.C. App. 588, 591, 315 S.E.2d 759, 761 (1984)). A claim for unjust enrichment may stand where a plaintiff confers property or benefits on a defendant "under circumstances which give rise to a legal or equitable obligation on the part of the defendant to account for the benefits received," and the defendant fails to make restitution for the property or benefits. *Norman v. Nash Johnson & Sons' Farms, Inc.*, 140 N.C. App. 390, 417, 537 S.E.2d 248, 266 (2000) (citing *Adams v. Moore*, 96 N.C. App. 359, 362, 385 S.E.2d 799, 801 (1989)). The claim "is neither in tort nor contract but is described as a claim in quasi contract or a contract implied in law." *Booe v. Shadrick*, 322 N.C. 567, 570, 369 S.E.2d 554, 556 (1988). Where there is a contract between the parties, however, the contract governs a plaintiff's remedies, "and the law will not imply a contract." *Id.* (citing *Vetco Concrete Co. v. Troy Lumber Co.*, 256 N.C. 709, 124 S.E.2d 905 (1962)).

172. As an initial point, the Court notes that a claim for unjust enrichment in North Carolina does not require the conveyance of a direct benefit. *Bandy*, 2017 NCBC LEXIS 66, at *14–16 (citing *Embree Constr. Grp., Inc. v. Rafcor, Inc.*, 330 N.C. 487, 495–97, 411 S.E.2d 916, 922–23 (1992)). Thus, the success or failure of NFI's claim does not turn on whether any benefit to the Castle McCulloch Defendants should be classified as indirect rather than direct.

173. The Court also notes that Plaintiffs' argument about pleading in the alternative under the North Carolina Rules of Civil Procedure is correct. In general, alternative claims may be asserted in the same action, including claims for breach of contract and unjust enrichment. *James River Equip., Inc. v. Mecklenburg Utils., Inc.*, 179 N.C. App. 414, 419, 634 S.E.2d 557, 560 (2006) (explaining that the rules "permit pleading in the alternative and that theories may be pursued in the complaint even if plaintiff may not ultimately be able to prevail on both" (internal quotation marks omitted)); *Bandy*, 2017 NCBC LEXIS 66, at *11. Here, however, Plaintiffs' contention that they still possess the freedom to pursue alternative claims is incorrect.

174. NFI has already received partial summary judgment on the issue of whether a valid and enforceable agreement existed that provided for its loan to JDPW and gave it a right to recover certain collateral held by JDPW. Judge Manning's January 9, 2015 order found that no genuine issue of material fact existed as to NFI's second claim in its pre-consolidation lawsuit and concluded that, under the Assignment Agreement, NFI was entitled to immediate enforcement of its security interests in the CCSEA Collateral as a result of JDPW's default. (Partial Summ. J. Order 1–2.) The existence of an express contract governing NFI's loan to JPDW is no longer an alternative theory advanced by Plaintiffs but an undisputed fact for the Court's purposes here. *See Carr v. Great Lakes Carbon Corp.*, 49 N.C. App. 631, 633, 272 S.E.2d 374, 376 (1980) ("[W]hen the judge rules as a matter of law, not acting in his discretion, the ruling finally determines the rights of the parties unless reversed upon appellate review.").

175. Because it has been determined that NFI's $2.1 million loan was lent pursuant to an express agreement, NFI may not pursue a claim in quasi contract for benefits that loan may have conferred. Thus, contrary to Plaintiffs' assertions, NFI cannot maintain a claim against the Castle McCulloch Defendants for unjust enrichment, and summary judgment will be granted in the Castle McCulloch Defendants' favor on this claim. *See Delta Envtl. Consultants, Inc. v. Wysong & Miles Co.*, 132 N.C. App. 160, 165, 510 S.E.2d 690, 694 (1999) ("Here, the first and second contracts govern the relationship between the parties with regard to payment and services rendered. Thus, an action for breach of contract, rather than unjust enrichment, is the proper cause of action.").

176. For the same reasons stated above, the Court also concludes that summary judgment is appropriately granted in NSITE's favor on NFI's claim for unjust enrichment. *See N.C. Coastal Motor Line, Inc. v. Everette Truck Line, Inc.*, 77 N.C. App. 149, 151, 334 S.E.2d 499, 501 (1985) ("Rule 56 does not require that a party move for summary judgment in order to be entitled to it."); *Greenway v. N.C. Farm Bureau Mut. Ins. Co.*, 35 N.C. App. 308, 314–15, 241 S.E.2d 339, 343 (1978) (same); *see also* N.C. R. Civ. P. 56(c) ("[J]udgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that *any party* is entitled to a judgment as a matter of law." (emphasis added)).

6. Plaintiffs' Demand for Inventory and Inspection

177. The Castle McCulloch Defendants finally move for summary judgment on Count 34 of Plaintiffs' Amended Consolidated Complaint, which contains a demand for inventory and inspection. Plaintiffs demand the opportunity to inspect the Castle McCulloch Collateral and all other items in which Plaintiffs contend they have been assigned a security interest. (Am. Consolidated Compl. ¶ 382.)

178. For the reasons discussed above, the Court concludes that, to the extent Plaintiffs seek inspection of the Castle McCulloch Collateral or Loan Documents, or the Confession of Judgment, the Castle McCulloch Defendants' Motion for Summary Judgment should be granted. To the extent Plaintiffs seek inspection of the CCSEA Collateral, the Castle McCulloch Defendants' Motion is denied as moot.

C. Plaintiffs' Motion for Partial Summary Judgment

179. Plaintiffs move for partial summary judgment on Counts 14, 15, 16, 27, 28, and 30 of their Amended Consolidated Complaint.

180. As the Court has already concluded that summary judgment is appropriately granted in the Castle McCulloch Defendants' favor on Counts 14, 16, and 27, the Court denies Plaintiffs' motion with regard to those claims. The Court has also concluded that summary judgment is appropriately granted in the Castle McCulloch Defendants' favor on Counts 28 and 30 to the extent those claims seek relief with regard to the Castle McCulloch Collateral or the Confession of Judgment, and thus the Court denies Plaintiffs' motion as to Counts 28 and 30 to the same extent. Accordingly, the Court turns to examine Plaintiffs' request for partial

summary judgment on Count 15 as well as on Counts 28 and 30 to the extent they seek relief concerning the CCSEA Collateral.

181. Count 15 of Plaintiffs' Amended Consolidated Complaint petitions the Court for a judgment declaring that the CCSEA Collateral is judicially assigned to NFI "such that [NFI] has a valid and enforceable security interest in all of the collateral described in the Assignment of Security Instruments which entitles it to possession of the CCSEA Collateral due to Defendant JDPW Trust's default under the JDPW Trust Promissory Note." (Am. Consolidated Compl. ¶ 247.) In connection with this claim, Plaintiffs also note that "NFI has been granted a temporary restraining order regarding the CCSEA Collateral and has been awarded a judgment for possession of the CCSEA Collateral." (Am. Consolidated Compl. ¶ 246.) Plaintiffs assert that these orders are binding and "constitute the law of the case." (Am. Consolidated Compl. ¶ 246.)

182. Judge Manning's January 9, 2015 order granted NFI partial summary judgment on the second count of its original complaint, a claim requesting delivery and possession of the CCSEA Collateral. (Compl. ¶¶ 19–24 (Wake 14 CVS 9564).) Judge Manning awarded NFI possession of the CCSEA Collateral based on the terms of the Assignment Agreement, the same relief requested by Count 15. (Partial Summ. J. Order 2.) Specifically, Judge Manning's order stated "Plaintiff shall have and recover . . . possession of the NewBridge Bank Collateral"—the term used by that order to refer to the CCSEA Collateral—"and ownership of all of the rights, title, and interest formerly held by NewBridge Bank [in that collateral.]" (Partial Summ. J.

Order 2.)  The order further stated that NFI was "judicially assigned all of the rights, powers, and benefits conferred upon NewBridge Bank by the" CCSEA Loan Documents, and that NFI was "deemed to be a holder in due course of said documents, the owner of said documents, and ha[d] the right to enforce the provisions of said documents as the judicial assignee of NewBridge Bank." (Partial Summ. J. Order 3.)

183.  Judge Manning's ruling on NFI's motion for partial summary judgment thus granted NFI the relief it seeks in Count 15 of the Amended Consolidated Complaint. The binding nature of that order on this proceeding is not governed by the law of the case doctrine, but rather by the rule that one Superior Court judge may not ordinarily "modify, overrule, or change the judgment of another Superior Court judge previously made in the same action." *Smithwick v. Crutchfield*, 87 N.C. App. 374, 376, 361 S.E.2d 111, 113 (1987) (quoting *Calloway v. Ford Motor Co.*, 281 N.C. 496, 501, 189 S.E.2d 484, 488 (1972)).  Matters with regard to this claim are thus settled before this Court.  *See Carr*, 49 N.C. App. at 633, 272 S.E.2d at 376.

184.  Consequently, the Court denies Plaintiffs' Motion for Partial Summary Judgment as moot to the extent it requests summary judgment on Count 15.  For the same reasons, the Court denies Plaintiffs' Motion for Partial Summary Judgment as moot as to Counts 28 and 30 to the extent those claims seek relief with regard to the CCSEA Collateral.

D.    Plaintiffs and Nivison's Motion as to Doug Harris's Claims

185.  Plaintiffs and Arthur Nivison move for summary judgment in their favor on the counterclaims filed against NFI and the "third-party claims" filed against Old

Battleground and Arthur Nivison by Doug Harris, individually and as Trustee of JDPW, and JDPW.[16]

186. No party submitted a brief in response to Plaintiffs and Arthur Nivison's motion.[17] While this means that the motion is uncontested, it does not mean the Court may summarily grant it. The Court must still examine the merits of the movants' arguments, and the movants bear the burden of proving they are entitled to summary judgment. *Goodman v. Wenco Foods, Inc.*, 333 N.C. 1, 27, 423 S.E.2d 444, 457 (1992) (stressing that the movant bears the burden on a motion for summary judgment, "and if he fails to carry that burden, summary judgment is not proper, whether or not the nonmoving party responds").

1. Counterclaim for Tortious Interference with Contract Against NFI

187. The Court first examines Plaintiffs' argument that summary judgment is appropriate on Doug Harris and JDPW's first counterclaim, which is unlabeled but clearly attempts to make out a claim for tortious interference with contract against NFI. Particularly, Doug Harris and JDPW allege that they were harmed "as a direct and proximate result of [NFI's] intentional interference with a contractual relationship between Old Battleground . . . and JDPW Trust with Douglas Harris as a third party beneficiary." (Defs. Douglas S. Harris and JDPW Trust's Answer Am.

---

[16] For ease of reference, the Court refers to these claims as Doug Harris's claims.

[17] There was some discussion at oral argument as to whether, now that JDPW has been placed in receivership, Doug Harris could oppose this motion to the extent it seeks to dismiss claims brought on JDPW's behalf. The Court concludes that the answer to this question is irrelevant because the undisputed facts clearly show that summary judgment is appropriately granted in the movants' favor on all claims. The Court additionally notes that Doug Harris failed to file a response to Plaintiffs' motion in his individual capacity.

Consolidated Compl. and Am. Countercl. 25 [hereinafter "Am. Countercls."], ECF No. 221.)

188. A claim for tortious interference with contract has five elements:

(1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff.

*United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988). After a review of the record, the Court concludes summary judgment is appropriate on this claim due to Doug Harris and JDPW's insufficient proof of actual damages.

189. Doug Harris and JDPW's first counterclaim focuses on their contention that the original version of the Assignment Agreement is an enforceable contract between Old Battleground and JDPW. Doug Harris and JDPW appear to contend that NFI induced Old Battleground not to perform this contract by instead lending the $2.1 million itself or by causing Old Battleground to lend the money but "pretend" NFI was the lender. (*See* Am. Countercls. 24 ("Instead, [NFI] pretended that it had . . . lent the $2.1 million which directly contradicted a deed of trust recorded in Guilford County. [NFI] also pretended that it was in a contractual relationship with JDPW Trust which was not so and it also pretended that it had the reasonable expectation of getting additional security from JDPW Trust[.]").)

190. Even assuming these allegations are true, they do not show any injury to JDPW or Doug Harris. It is undisputed that NewBridge received the proceeds of the $2.1 million loan contemplated by JDPW's agreement with either NFI or Old

Battleground. Regardless of which Plaintiff was to extend the loan, the loan was made and used to pay NewBridge. It is unclear how Doug Harris or JDPW believe they were damaged by NFI lending this money in Old Battleground's place (or by Old Battleground lending the money but pretending NFI provided the funds). The only theory that can be surmised from the text of the counterclaim is that Doug Harris and JDPW believe they have suffered damages as a result of Plaintiffs' attempt to enforce the marked-up version of the Assignment Agreement.

191. On this point, Doug Harris and JDPW's first counterclaim asserts that both Doug Harris and JDPW have been injured as a result of NFI "caus[ing] Old Battleground not to release JDPW Trust from any further involvement in the default" of the $2.1 million loan. (Am. Countercls. 24.) Doug Harris and JDPW further characterize NFI's claims in this lawsuit as an attempt to "extort money [from various defendants] to which it is not entitled." (Am. Countercls. 25.) Both of these statements appear to be references to Plaintiffs' attempts to enforce the marked-up version of the Assignment Agreement, which omitted certain terms limiting JDPW's liability in the event of default. (Am. Consolidated Compl. Ex. TT.) Neither statement, however, nor the evidentiary record at summary judgment, reflect an actual injury to Doug Harris or JDPW.

192. On its own, the parties' disagreement over which version of the Assignment Agreement is enforceable does not equate to a legally cognizable injury to Doug Harris or JDPW. To the contrary, if a factfinder were to conclude, as Doug Harris contends, that Doug Harris did not agree to the modified Assignment Agreement on

JDPW's behalf, then that version of the agreement will be deemed unenforceable and its terms, including the omission of the limitation on JDPW's liability, will not apply. *See Snyder v. Freeman*, 300 N.C. 204, 218, 266 S.E.2d 593, 602 (1980) ("The essence of any contract is the mutual assent of both parties to the terms of the agreement so as to establish a meeting of the minds."). In that instance, the injury Doug Harris and JDPW appear to allege will not have occurred. If, on the other hand, a factfinder were to conclude that Doug Harris agreed to the version of the Assignment Agreement without a limitation on liability clause, then that version will be enforced according to its terms, and the lack of a provision limiting JDPW's liability cannot be considered a legally cognizable injury.

193. For these reasons, and in light of Doug Harris and JDPW's failure to put forward any other evidence of damages, the Court concludes that no genuine issue of material fact remains as to Doug Harris and JDPW's first counterclaim and that NFI is entitled to summary judgment dismissing this counterclaim as a matter of law. *See Hawkins v. Hawkins*, 101 N.C. App. 529, 532–33, 400 S.E.2d 472, 474–75 (1991) (noting that torts including fraud and interference with contractual relations require actual damages as an essential element).

2. Counterclaim for Unfair or Deceptive Trade Practices Against NFI

194. NFI next moves for summary judgment on a claim for unfair or deceptive trade practices included in Doug Harris and JDPW's original counterclaims but not repeated or incorporated into Doug Harris and JDPW's Amended Counterclaims. Because this counterclaim was not included in the now-operative pleading, the Court

concludes Doug Harris and JDPW no longer maintain a claim for unfair or deceptive trade practices against NFI in this action. *See Azige v. Holy Trinity Ethiopian Orthodox Tewahdo Church*, 249 N.C. App. 236, 239–40, 790 S.E.2d 570, 573 (2016) (recognizing the general rule that an amended pleading supersedes an original pleading); *see also Young v. City of Mt. Rainier*, 238 F.3d 567, 573 (4th Cir. 2001) ("[I]f an amended complaint omits claims raised in the original complaint, the plaintiff has waived those omitted claims."). The Court therefore denies NFI's motion as to this counterclaim as moot, and Doug Harris and JDPW shall not be permitted to advance a claim under section 75-1.1 against NFI at trial.

3. Counterclaim for Punitive Damages Against NFI

195. NFI finally moves for summary judgment on Doug Harris and JDPW's claim for punitive damages.

196. Because the Court has concluded that summary judgment should be granted in NFI's favor on Doug Harris and JDPW's counterclaim for tortious interference with contract—the only claim they assert against NFI potentially giving rise to punitive damages—the Court further concludes that NFI is entitled to summary judgment dismissing Doug Harris and JDPW's claim for punitive damages as a matter of law. *See Horne*, 228 N.C. App. at 150–51, 746 S.E.2d at 20.

4. Claim for Breach of Contract Against Old Battleground

197. Old Battleground moves for summary judgment on Doug Harris and JDPW's breach of contract claim against it. For the following reasons, the Court

concludes that Old Battleground is entitled to summary judgment on this claim as a matter of law.

198. To begin with, the Court notes that Doug Harris and JDPW's claims against Old Battleground and Arthur Nivison are not proper third-party claims. North Carolina Rule of Civil Procedure 14(a) provides that "a defendant, as a third-party plaintiff, may cause a summons and complaint to be served upon a person not a party to the action *who is or may be liable to him for all or part of the plaintiff's claim against him*." N.C. R. Civ. P. 14(a) (emphasis added). Doug Harris and JDPW's claims against Old Battleground and Arthur Nivison do not allege that either "third-party defendant" is liable to Doug Harris or JDPW for all or part of NFI's claims. Instead, Doug Harris and JDPW simply allege that they have been damaged by Old Battleground's or Arthur Nivison's acts. (Third Party Compl. ¶¶ 11–27 (14 CVS 9564), ECF No. 9.) The claims are thus not properly brought under Rule 14(a) and are properly dismissed on this basis.

199. Moving on, the Court further concludes that the breach of contract claim against Old Battleground fails on its merits. The elements of a breach of contract claim are "(1) [the] existence of a valid contract and (2) breach of the terms of that contract," *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000), and the record before the Court does not contain evidence of a breach.

200. Doug Harris and JDPW's claim for breach of contract is based on their contention that the original version of the Assignment Agreement is enforceable and required Old Battleground to provide JDPW with the $2.1 million loan that would be

used to satisfy certain debts owed to NewBridge.  (Third Party Compl. ¶ 13 (14 CVS 9564).)  Doug Harris and JDPW further contend that Old Battleground breached the Assignment Agreement when it did not provide the $2.1 million that was ultimately used to pay NewBridge.  (Third Party Compl. ¶ 13 (14 CVS 9564) ("Old Battleground did breach the contract and did not provide funding to JDPW Trust for the NewBridge purchase as it had promised.").)

201.  Doug Harris and JDPW's allegations supporting this claim are contradictory and difficult to untangle.  The undisputed evidence before the Court shows that the $2.1 million lent under the Assignment Agreement was paid to NewBridge and that NewBridge then assigned the CCSEA and Castle McCulloch Loan Documents to JDPW.  (*See* Am. Consolidated Compl. Exs. UU, VV, WW.)  It is not clear, however, where Doug Harris and JDPW allege this lent money came from, as they appear to contend that Old Battleground never paid it, (Third Party Compl. ¶¶ 13, 15 (14 CVS 9564)), but also allege that any paperwork indicating NFI provided the funds is false or fabricated, (Third Party Compl. ¶ 15 (14 CVS 9564)).  They further allege that a new contract has been "thrust upon" JDPW, (Third Party Compl. ¶ 14 (14 CVS 9564)), and conclude by asserting that Old Battleground's acts have resulted in over $2 million in damages to Doug Harris or JDPW, (Third Party Compl. ¶ 16 (14 CVS 9564)).

202.  These allegations appear similar to the theory on which Doug Harris and JDPW asserted their claim for tortious interference with contract against NFI, i.e., that Old Battleground breached its contract with JDPW because NFI ultimately

provided the loan to JDPW and because Plaintiffs are asserting that a different version of the Assignment Agreement with different terms controls the parties' deal. These allegations do not state a claim for breach of contract.

203. For one thing, the original version of the Assignment Agreement did not require Old Battleground to be the entity providing the $2.1 million to JDPW or NewBridge. The original version of the Agreement expressly states that JDPW's assignment of the mentioned security interests to NFI was "conditional upon the wiring of the $2,100,000.00 to NewBridge Bank by Old Battleground *or on Old Battleground's behalf*." (Corrected Ex. KK.) Thus, it was expressly contemplated that another entity, like NFI, might provide the funds required. The contract would not be breached simply because the money ultimately came from NFI, another entity that shared management with Old Battleground.[18]

204. Moreover, even if the original Assignment Agreement did not contain a provision expressly allowing for another entity to provide the $2.1 million used to pay NewBridge, the contract contained no provision preventing Old Battleground from assigning the contract or delegating its performance under the contract. *See Hurst v. West*, 49 N.C. App. 598, 604–06, 272 S.E.2d 378, 382–83 (1980) (explaining the general rule that a business contract may be assigned where the contract does not forbid it and performance is not based on personal skill or credit and that the assignee "under a general assignment of an executory bilateral contract becomes the delegatee of the assignor's duties"); *see also* Restatement (Second) of Contracts § 318(1) (Am.

---

[18] If some contract existed that required Old Battleground to be the source of the lent money, evidence of such a contract is not before the Court.

Law Inst. 1981) ("An obligor can properly delegate the performance of his duty to another unless the delegation is contrary to public policy or the terms of his promise."). Thus, Old Battleground was free to delegate its performance under the Assignment Agreement to NFI and that delegation would not amount to a breach of contract.

205. Finally, looking past the allegations about the source of the $2.1 million loan, Doug Harris and JDPW's assertion that another contract with less favorable terms has been "thrust upon JDPW" does not constitute a breach of contract claim on the current record. Doug Harris and JDPW allege that Old Battleground has "refus[ed] to go forward and comply with the terms of the original contract," (Third Party Compl. ¶ 15 (14 CVS 9564)), but do not allege any particular duty under the Assignment Agreement—besides the previously discussed duty to provide the $2.1 million loan—which Old Battleground has failed to perform. Doug Harris and JDPW cannot survive summary judgment on this claim by merely noting that Plaintiffs contend a different version of the Assignment Agreement with terms less favorable to JDPW is enforceable; Plaintiffs' arguing that JDPW does not have limited liability under the operable Assignment Agreement is not the same as Old Battleground's failing to perform a duty under that agreement. Thus, even if the original version of the Assignment Agreement is enforceable, Doug Harris and JDPW have pointed to no evidence that Old Battleground failed to perform under that agreement.

206. The Court therefore concludes that no genuine issue of material fact exists as to Doug Harris and JDPW's breach of contract claim against Old Battleground and that summary judgment dismissing this claim is appropriate as a matter of law.

### 5. Claim for Tortious Interference with Contract Against Nivison

207. Doug Harris and JDPW's fourth "third-party claim" alleges the existence of two contracts—one between Doug Harris and JDPW and certain CCSEA-related entities, the other between Doug Harris and JDPW and Dr. Epes—which bound others, instead of JDPW, to pay the $2.1 million back to Plaintiffs. (Third Party Compl. ¶ 18 (14 CVS 9564).) Doug Harris and JDPW further allege that Arthur Nivison knew of these contracts and intentionally induced these other parties not to perform without justification, resulting in damages to Doug Harris and JDPW. (Third Party Compl. ¶ 18 (14 CVS 9564).)

208. Arthur Nivison moves for summary judgment on this claim, arguing that the record before the Court contains no evidence supporting Doug Harris and JDPW's allegations. Based upon its review of the record, the Court agrees. The record does not contain evidence capable of sustaining a genuine issue of material fact in Doug Harris or JDPW's favor on their claim for tortious interference with contract against Arthur Nivison. The Court thus concludes that Arthur Nivison is entitled to summary judgment on this claim as a matter of law.

### 6. Claim for Civil Conspiracy Against Nivison

209. Doug Harris and JDPW also assert a claim for civil conspiracy against Arthur Nivison. To support this claim, they allege that Arthur Nivison acted in

concert with Dr. Epes and Mark McDaniel to conceal payments on Dr. Epes's and Mark McDaniel's personal guarantees of the $2.1 million loan to JDPW and the promissory notes Plaintiffs now hold. (Third Party Compl. ¶ 21 (14 CVS 9564).) Doug Harris and JDPW contend that all three conspirators engaged in these acts to allow Arthur Nivison's entities to sue JDPW and Doug Harris to recover a "double payment" while simultaneously allowing Dr. Epes, Mark McDaniel, and the CCSEA-related entities to be excused from paying some of their alleged debts to Plaintiffs or Arthur Nivison. (Third Party Compl. ¶ 22 (14 CVS 9564).) Doug Harris and JDPW allege that, in furtherance of this conspiracy, Arthur Nivison, Dr. Epes, and certain corporations the two control or controlled have intentionally not entered into follow-up agreements that would absolve JDPW of liability for the $2.1 million loan, despite being contractually bound to do so.

210. Arthur Nivison moves for summary judgment on Doug Harris and JDPW's claim for civil conspiracy, arguing that the record does not contain any evidence of the alleged scheme between himself, Dr. Epes, and Mark McDaniel. The Court agrees.

211. "There is no independent cause of action for civil conspiracy" under North Carolina law. *Toomer v. Garrett*, 155 N.C. App. 462, 483, 574 S.E.2d 76, 92 (2002) (citing *Shope v. Boyer*, 268 N.C. 401, 150 S.E.2d 771 (1966)). "Only where there is an underlying claim for unlawful conduct can a plaintiff state a claim for civil conspiracy by also alleging the agreement of two or more parties to carry out the conduct and injury resulting from that agreement." *Id.* (citing *Muse v. Morrison*, 234 N.C. 195, 66

S.E.2d 783 (1951)). A claim for civil conspiracy requires proof of "(1) an agreement between two or more individuals; (2) to do an unlawful act or to do a lawful act in an unlawful way; (3) resulting in injury to plaintiff inflicted by one or more of the conspirators; and (4) pursuant to a common scheme." *Piraino Bros., LLC v. Atl. Fin. Grp., Inc.*, 211 N.C. App. 343, 350, 712 S.E.2d 328, 333 (2011). Circumstantial evidence may be used to establish the existence of the alleged conspiracy, but "sufficient evidence of the agreement must exist 'to create more than a suspicion or conjecture in order to justify submission of the issue to a jury.'" *Boyd v. Drum*, 129 N.C. App. 586, 592, 501 S.E.2d 91, 96 (1998) (quoting *Dickens v. Puryear*, 302 N.C. 437, 456, 276 S.E.2d 325, 337 (1981)).

212. After reviewing the record, the Court concludes that it does not contain evidence supporting Doug Harris and JDPW's contention that the named parties entered into an agreement to wrongfully extort or otherwise obtain money from Doug Harris and JDPW or hide payments between the parties from the Court. The only evidence supporting Doug Harris and JDPW's allegations comes from Doug Harris himself, who contended in his deposition testimony that Plaintiffs' apportionment of payments on the notes Plaintiffs now hold was contrary to the terms of a separate contract—a contract that Doug Harris did not have with him at the deposition, that Arthur Nivison was not a party to, and the terms of which Doug Harris did not provide. (Harris Dep. 479:10–480:22 [hereinafter "Harris Dep. II], ECF Nos. 839–841.)[19] Doug Harris further testified that "McDaniel and Mr. Nivison conspired

_____

[19] This excerpt of Doug Harris's deposition was submitted to the Court as Exhibit E to Plaintiffs' February 28, 2017 summary judgment filings. The parties provided physical copies

together to pay out one note and not the other," (Harris Dep. II, at 479:14–16), but Harris failed, then or later, to point to any evidence supporting his allegation besides such statements.

213. As the record contains no evidence of the alleged civil conspiracy agreement beyond Doug Harris's suspicion and conjecture, the Court concludes that no genuine issue of fact remains as to Doug Harris and JDPW's civil conspiracy claim and that Arthur Nivison is entitled to summary judgment dismissing this claim as a matter of law. *Boyd*, 129 N.C. App. at 592, 501 S.E.2d at 96 (affirming directed verdict where "[Plaintiff's] testimony taken at a deposition . . . show[ed] that [plaintiff did] not have evidence of a conspiracy, although he fe[lt] there was one"); *Am. Air Filter Co. v. Price*, 2018 NCBC LEXIS 73, at *35 (N.C. Super. Ct. July 10, 2018) (granting summary judgment for defendants where plaintiff could offer no evidence to show an agreement to misappropriate trade secrets).

### 7. Claim for Punitive Damages Against Nivison

214. Arthur Nivison finally moves for summary judgment on Doug Harris and JDPW's claim for punitive damages against him. Because the Court has concluded that Arthur Nivison is entitled to summary judgment on Doug Harris and JDPW's other, substantive claims, the Court further concludes that no genuine issue of fact exists as to this final claim and that Arthur Nivison is entitled to summary judgment

---

of these filings to the Court. Although Exhibit E appears on the Court's electronic docket at ECF Nos. 839–841, only a portion of the deposition transcript can be electronically accessed, due either to Plaintiffs' error in filing or a problem with the Court's electronic case management system.

in his favor dismissing Doug Harris and JDPW's punitive damages claim as a matter of law.  *See Horne,* 228 N.C. App. at 150–51, 746 S.E.2d at 20.

E.     Doug Harris's Motion as to the Castle McCulloch Defendants' Crossclaims

215.   The Castle McCulloch Defendants each filed individual, amended responsive pleadings to Plaintiffs' Amended Consolidated Complaint.  These pleadings each contain an identical crossclaim against Doug Harris, individually and as trustee of JDPW, and JDPW.  (*See, e.g.*, Def. Castle McCulloch Inc.'s Am. Answer Am. Consolidated Compl. and Crossclaims in the Alternative 53 [hereinafter "Am. Answer and Crossclaims"], ECF No. 676.)[20]   Doug Harris moves for summary judgment on these crossclaims.

216.   By order dated February 24, 2017, the Castle McCulloch Defendants were allowed through and including March 3, 2017 to amend their responsive pleadings in this case to add a third-party complaint asserting claims against Dr. Epes and Mark McDaniel.  (Order Castle McCulloch Defs.' Mot. Amend Add Third-Party Compl. ¶ 12, ECF No. 823.)   The Castle McCulloch Defendants filed their second amended responsive pleadings—containing their Second Amended Answer to Plaintiffs' Amended Consolidated Complaint, their Crossclaims, and a Third-Party Complaint against Dr. Epes and Mark McDaniel—on March 2 and 3, 2017, several days after the deadline for filing summary judgment motions in this action, February 28, 2017.[21]

---

[20] Because the Castle McCulloch Defendants' pleadings are identical for the Court's purposes here, the Court cites only one of the pleadings.

[21] The Castle McCulloch Defendants' final amended pleadings are located on the Court's e-docket at ECF Nos. 852, 853, and 855.

217. Although an amended pleading ordinarily moots pending motions for summary judgment aimed at its predecessor, *see Colin v. Marconi Commerce Sys. Emps.' Ret. Plan*, 335 F. Supp. 2d 590, 614 (M.D.N.C. 2004), the Court will consider Doug Harris's motion as to the latest iteration of the Castle McCulloch Defendants' responsive pleadings because the crossclaim against Doug Harris appearing therein is identical to that in the previous pleadings, Doug Harris and the Castle McCulloch Defendants were both given an opportunity to fully brief the merits of the crossclaim throughout the briefing period for post-discovery dispositive motions, and both Doug Harris and the Castle McCulloch Defendants were able to argue the merits of the crossclaim at the April 26, 2018 hearing on the Motions for Summary Judgment, *see Gateway Mgmt. Servs. v. Carrbridge Berkshire Grp., Inc.*, 2018 NCBC LEXIS 45, at *8 (N.C. Super. Ct. May 9, 2018) (considering motion to dismiss original complaint against amended complaint where defendants and plaintiff addressed the sufficiency of the amended complaint in their briefs and at the hearing).

218. The crossclaim asserted against Doug Harris by each of the Castle McCulloch Defendants is not labeled, but its contents allege that if the Release Deed is invalid, which the Castle McCulloch Defendants deny, then the Castle McCulloch Defendants are entitled to recover from "Defendant Douglas S. Harris, individually and as [t]rustee of the JDPW Trust, as well as Defendant JDPW Trust . . . an amount equal to the value of all assets of [Castle McCulloch and Historic Castle McCulloch]" because Doug Harris, "individually and as [t]rustee of JDPW Trust, gave such release deed without authority to do so, while misrepresenting to [the Castle McCulloch

Defendants] that he had such authority, all to [the Castle McCulloch Defendants'] detriment." (Am. Answer and Crossclaims ¶ 401.) Doug Harris argues that this is an improper claim for negligent misrepresentation.

219. In response, the Castle McCulloch Defendants assert that their crossclaim is a valid claim for negligent misrepresentation, brought in the event the Release Deed is held invalid. (Castle McCulloch Defs.' Br. Opp'n Douglas S. Harris's Mot. Summ. J. as to Richard Harris, Historic Castle McCulloch, and Castle McCulloch, Inc. 3 [hereinafter "CM Opp'n Br. Doug Harris's Mot. Summ. J."], ECF No. 881 ("Nevertheless, in the event that the release of the Castle McCulloch Collateral is deemed invalid, Doug Harris and/or JDPW Trust may be liable to the Castle McCulloch Defendants for negligently misrepresenting that the Castle McCulloch Collateral Would be released.").)

220. Doug Harris argues that the Court should grant summary judgment in his favor on the Castle McCulloch Defendants' negligent misrepresentation crossclaim because the Castle McCulloch Defendants have not alleged a duty of care or the other necessary elements of a claim for negligent misrepresentation and do not allege the specific details of when Doug Harris's alleged misrepresentation was made. He further argues that the Castle McCulloch Defendants have not alleged that they justifiably relied on any misrepresentation and have not provided evidence to support their claim.

221. The Castle McCulloch Defendants respond by asserting that the Court should not yet consider the merits of their crossclaim because the crossclaim is

contingent upon the invalidity of the Release Deed. They argue that considering the crossclaim on Doug Harris's motion is premature because the validity of the Release Deed has not yet been resolved. However, in the event the Court does address their crossclaim now, the Castle McCulloch Defendants further argue that they have properly asserted and can show a sustainable claim for negligent misrepresentation.

222. The Castle McCulloch Defendants contend that they signed the Confession of Judgment with NewBridge and provided the $100,000 gold coin/cash payment to extend the Settlement Agreement's deadline due to Doug Harris's assurances that the Castle McCulloch Collateral would be released in the course of the ensuing transactions. The Castle McCulloch Defendants assert that they relied on these assurances and would not have taken either of these actions absent Doug Harris's representations. If the Release Deed is invalid, they conclude, Doug Harris made these representations without reasonable care. They stress, however, that consideration of this issue is not necessary if the Court dismisses Plaintiffs' claims seeking the Castle McCulloch Collateral.

223. Although the Court has determined that summary judgment is appropriately granted for the Castle McCulloch Defendants on Plaintiffs' claims seeking possession of the Castle McCulloch Collateral and the voiding of the Release Deed, the possibility remains in this case that the Release Deed transaction may be rescinded or voided—or that the release of the Castle McCulloch Collateral will be undone in some other way—due to the Receiver's claims against Doug Harris, particularly those brought on behalf of JDPW alleging a breach of trust. *See* N.C.

Gen. Stat. § 36C-10-1001(b)(9). Thus, contrary to the Castle McCulloch Defendants' contention, the resolution of Plaintiffs' claims for the Castle McCulloch Collateral does not resolve the Castle McCulloch Defendants' crossclaim for negligent misrepresentation, and the Court must still consider it on Doug Harris's motion. Furthermore, that the claim may be brought in the alternative does not prevent the Court from assessing it, and the sufficiency of the evidence supporting it, at summary judgment.

224. Negligent misrepresentation has been described by our appellate courts as follows:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions . . . is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Rountree v. Chowan County*, 252 N.C. App. 155, 160, 796 S.E.2d 827, 831 (2017) (quoting *Simms v. Prudential Life Ins. Co. of Am.*, 140 N.C. App. 529, 534, 537 S.E.2d 237, 241 (2000)). "The tort of negligent misrepresentation occurs when a party justifiably relies to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." *Dallaire v. Bank of Am., N.A.*, 367 N.C. 363, 369, 760 S.E.2d 263, 267 (2014). The claimant must have suffered an injury, *Deluca v. River Bluff Holdings II, LLC*, 2015 NCBC LEXIS 12, at *20 (N.C. Super. Ct. Jan. 28, 2015), and that injury must be the result of an actual representation made by the other party, *Loftin v. QA Invs. LLC*, 2015 NCBC LEXIS 44, at *24 (N.C. Super Ct. April 30, 2015) (noting negligent misrepresentation, unlike

fraud, cannot be based on a failure to disclose but must be based on an actual representation); *see Harrold v. Dowd*, 149 N.C. App. 777, 782–83, 561 S.E.2d 914, 918–19 (2002) (concluding claim for negligent misrepresentation failed because it could not be based upon allegations that defendants "failed to provide, failed to advise, or failed to investigate" (internal quotation marks omitted)).

225. Examining the record for evidence of an affirmative representation in this context, the Court finds none that supports the Castle McCulloch Defendants' crossclaim.

226. Assuming for the moment that the Castle McCulloch Defendants' decisions to sign the Confession of Judgment and provide $100,000 to further the Settlement Agreement constitute reliance to their detriment, the Castle McCulloch Defendants have failed to supply the Court with any evidence of the statement or information that they purportedly relied upon in undertaking either action, and an independent review of the record discloses none. Merely stating in pleadings or briefs that Doug Harris made misrepresentations cannot sustain the Castle McCulloch Defendants' crossclaim at summary judgment, but such statements are all the Castle McCulloch Defendants offer. The affidavit of Richard Harris, the only sworn testimony in the record from any of the Castle McCulloch Defendants, does not mention any representation by Doug Harris, negligent or otherwise.

227. In their briefing, the Castle McCulloch Defendants argue that Doug Harris owed them a duty of care in preparing the "documents involved in the release of the Castle McCulloch Collateral," (CM Opp'n Br. Doug Harris's Mot. Summ. J. 3), but the

only document dealing with the release of Castle McCulloch Collateral before the Court is the Release Deed, which was executed on March 15, 2013, months after the Castle McCulloch Defendants signed the Confession of Judgment and paid the $100,000. (Am. Consolidated Compl. Ex. YY.) The Castle McCulloch Defendants cannot claim their detrimental reliance was based upon a representation in this subsequent document, and they have pointed to no other documents containing an actionable representation.[22]

228. The Court also disagrees with the Castle McCulloch Defendants' contention that Doug Harris has not adequately supported his motion for summary judgment and that summary judgment on this issue would thus be improper. A party moving for summary judgment may meet his or her burden by "showing through discovery that the opposing party cannot produce evidence to support an essential element of his or her claim." *Thomasville v. Lease-Afex, Inc.*, 300 N.C. 651, 654, 268 S.E.2d 190, 193 (1980); *see also Rorrer*, 313 N.C. at 350, 329 S.E.2d at 363 (explaining that a movant at summary judgment has "the initial burden of showing that an essential element of [the claimant's] case [does] not exist as a matter of law *or* showing through discovery that [the claimant has] not produced evidence to support an essential element of her claim" (emphasis added)).

---

[22] The Court also notes that the Castle McCulloch Defendants cannot bring a crossclaim for negligent misrepresentation against Doug Harris solely because he promised to release the Castle McCulloch Collateral and then ultimately failed to do so. *See Supplee*, 239 N.C. App. at 233, 768 S.E.2d at 600 (holding that a failure perform a contractual duty does not give rise to a claim for negligent misrepresentation).

229. Following discovery, Doug Harris argued in briefing that the Castle McCulloch Defendants' crossclaim against him was not supported by the record, referencing the lack of any support for the crossclaim in Richard Harris's affidavit in particular. (*See* Douglas S. Harris's, Individually, and as Trustee of JDPW Trust, Reply Castle McCulloch's Br. Opp'n Mot. Summ. J. as to Richard Harris, Historic Castle McCulloch, LLC, and Castle McCulloch, Inc. 3, 6, ECF No. 911.) At the April 26, 2018 hearing on the Motions for Summary Judgment, Doug Harris further argued that the Castle McCulloch Defendants failed to correctly plead or support their crossclaim for negligent misrepresentation. (Hr'g Tr. 89:13–23 ("And as far as that's concerned, they don't really say what the negligent misrepresentation is. . . . Because if there's a negligent misrepresentation, what is it?").) Responding to these arguments with some proof of a negligent misrepresentation, even by way of an affidavit affirming that such a misrepresentation was made, would have been a very low bar for the Castle McCulloch Defendants to meet. Instead, when pressed by the Court at the April 26 hearing on whether they had brought forward evidence to avoid summary judgment, the Castle McCulloch Defendants simply contended that Doug Harris had not presented evidence to contradict their allegations or support his motion. (Hr'g Tr. 91:17–22.) In these circumstances, the Court concludes that Doug Harris has met his burden as the party moving for summary judgment and that the Castle McCulloch Defendants have failed to respond with a forecast of evidence showing that a genuine issue of material fact exists for trial.

230.  The Court thus concludes that Doug Harris is entitled to summary judgment as a matter of law on the Castle McCulloch Defendants' crossclaims against him.

231.  The Court further concludes that JDPW, whose liability is alleged solely by reference to Doug Harris's actions, is entitled to summary judgment as a matter of law on these crossclaims as well.  *See N.C. Coastal Motor Line, Inc.*, 77 N.C. App. at 151, 334 S.E.2d at 501; *Greenway*, 35 N.C. App. at 314–15, 241 S.E.2d at 343; *see also* N.C. R. Civ. P. 56(c).

F.      Doug Harris's Motion as to the Receiver's Crossclaims

232.  Doug Harris moves for summary judgment in his favor on all crossclaims brought against him by the Receiver, which are asserted on behalf of JDPW, CCSEA, DRE, or some combination of all three entities.

233.  Before examining Doug Harris's challenges to the merits of the Receiver's crossclaims, the Court first addresses an issue relating to its subject matter jurisdiction over claims asserted by the Receiver on DRE's behalf.

1.  DRE's Standing to Assert Claims of Dr. Epes

234.  This Court has an obligation to satisfy itself in each case and controversy that it has subject matter jurisdiction to hear the claims before it.  *See* N.C. R. Civ. P. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.").  "A court's lack of subject matter jurisdiction is not waivable and can be raised at any time[.]" *McDaniel v. Saintsing*, 817 S.E.2d 912, 914 (N.C. Ct. App. 2018).  The Court

may raise the issue of subject matter jurisdiction on its own initiative. *Conner Bros. Mach. Co. v. Rogers*, 177 N.C. App. 560, 561, 629 S.E.2d 344, 345 (2006).

235. "Standing is a necessary prerequisite to a court's proper exercise of subject matter jurisdiction." *Street v. Smart Corp.*, 157 N.C. App. 303, 305, 578 S.E.2d 695, 698 (2003) (quoting *Neuse River Found., Inc. v. Smithfield Foods, Inc.*, 155 N.C. App. 110, 113, 574 S.E.2d 48, 51 (2002)). "If a party does not have standing to bring a claim, a court has no subject matter jurisdiction to hear the claim." *Estate of Apple v. Commercial Courier Express, Inc.*, 168 N.C. App. 175, 177, 607 S.E.2d 14, 16 (2005).

236. In reviewing the Receiver's crossclaims, the Court concluded that it was obligated to raise the issue of DRE's standing to assert personal tort claims against Doug Harris based on alleged wrongs to Dr. Epes (the "DRE Crossclaims"). (*See* Order Suppl. Br. Subject Matter Jurisdiction ¶ 6, ECF No. 1040; Receiver Gerald A. Jeutter's Answer Cross-cls. Castle McCulloch Entitles and Cross-cls. Against Douglas Harris ¶¶ 434–504 [hereinafter "Receiver's Cross-cls."], ECF No. 1040.) "In particular," the Court noted that it had "questions about how the rule of law concerning the assignability of personal tort claims, including malpractice claims, expressed in *Revolutionary Concepts, Inc. v. Clements Walker PLLC*, 227 N.C. App. 102, 744 S.E.2d 130 (2013), and similar cases affect[ed] DRE's standing to pursue the DRE Crossclaims." (Order Suppl. Br. Subject Matter Jurisdiction ¶ 6.) The Court therefore requested that Doug Harris and the Receiver submit supplemental briefs focused solely on DRE's standing to assert the DRE Crossclaims in this action. (Order Suppl. Br. Subject Matter Jurisdiction ¶ 8.)

237. Having now reviewed both Doug Harris's and the Receiver's supplemental briefs, the Court concludes, in the exercise of the discretion afforded to it by Business Court Rule 7.4, that no further hearing is necessary on matters addressed within the briefing and that the issue of DRE's standing is ripe for resolution.

238. Doug Harris argues in his supplemental brief that the assignment of Dr. Epes's claims to DRE is improper under the holding of *Revolutionary Concepts, Inc.*, namely, that assignments of personal tort claims, including legal malpractice claims, are void as against public policy, and that DRE has no standing to assert its crossclaims against him.

239. The Receiver takes a contrary position, arguing in his supplemental brief that the rule voiding assignments of personal tort claims is a public policy exception to the general rule that causes of action may be assigned, an exception meant to prevent champerty. (Receiver's Br. Regarding DRE Standing 2, ECF No. 1044.) This exception, the Receiver contends, does not prevent a receiver from bringing personal tort claims belonging to a debtor, and should not be applied in this case where Dr. Epes's assignment of his claims to DRE, and DRE's subsequent assertion of those claims, has occurred under the Court's watch and for purposes of recovering assets to pay creditors. In support of his position, the Receiver cites the North Carolina Court of Appeals' decision in *Haarhuis v. Cheek*, 820 S.E.2d 844 (N.C. Ct. App. 2018). The Court finds the Receiver's argument persuasive.

240. "While, in general, causes of action may be assigned," *Inv'rs Title Ins. Co. v. Herzig*, 330 N.C. 681, 688, 413 S.E.2d 268, 271 (1992), courts of this State have long

recognized that allowing parties to assign personal tort claims "promotes champerty" by giving control of those claims to a party not related to the lawsuit, *Charlotte-Mecklenburg Hosp. Auth. v. First of Ga. Ins. Co.*, 340 N.C. 88, 91, 455 S.E.2d 655, 657 (1995); *see also Champerty*, Black's Law Dictionary (8th ed. 2004) ("[A]n agreement to divide litigation proceeds between the owner of the litigated claim and a party unrelated to the lawsuit who supports or helps enforce the claim."). To curtail this practice, North Carolina courts hold agreements assigning personal tort claims void on public policy grounds. *Charlotte-Mecklenburg Hosp. Auth.*, 340 N.C. at 91, 455 S.E.2d at 657. Many exceptions to this rule have developed, however, and thus a court should examine the facts of each case before concluding that an assignment is void due to its promotion of champerty. *See Haarhuis*, 820 S.E.2d at 850.

241. Our Court of Appeals recently examined the rule voiding assignments of personal tort claims in the context of a receivership in *Haarhuis*. In that case, the administrator of a deceased individual's estate sought recovery from a defendant who, while driving impaired, hit and killed the decedent. *Id.* at 847. A jury returned a verdict against the defendant for substantial damages, but the plaintiff was unable to locate property to recover on the judgment. *Id.* The plaintiff believed that the defendant had possible legal claims against her insurance company and law firm for their failure to settle and thus moved the Court to appoint a receiver to pursue those claims. *Id.* The trial court denied the motion and the plaintiff appealed. *Id.* at 848. On appeal, the defendant argued that the trial court properly denied the plaintiff's motion because the causes of action that the plaintiff requested be placed in

receivership were unassignable personal tort claims. *Id.* at 849. The Court of Appeals disagreed.

242. In rejecting the defendant's argument, the Court of Appeals explained that "the authority of a receiver to pursue a judgment-debtor's legal claims is not limited solely to those claims that are otherwise assignable." *Id.* at 850. To begin with, the court noted, "receivership is distinct from assignment." *Id.* Assignment of personal tort claims gives the assignee control of a claim, and thus promotes champerty, whereas placing a claim in receivership hands control of the claim to a receiver, who is a "disinterested person appointed [and supervised] by a court[.]" *Id.* (first citing *Charlotte-Mecklenburg Hosp. Auth.*, 340 N.C. at 91, 455 S.E.2d at 657; and then quoting *Receiver*, Black's Law Dictionary (8th ed. 2014)). "The purpose of a receiver of legal claims is in essence to act as a trustee," the court reasoned, "and a claim being placed in receivership is [thus], at most, analogous to an assignment of the *proceeds* of the claim, which are assignable." *Id.* (citing *Charlotte-Mecklenburg Hosp. Auth.*, 340 N.C. at 91, 455 S.E.2d at 657).

243. "Moreover," the court continued, "many exceptions" to the rule against the assignment of personal tort claims "have been recognized[,] and . . . it has come to be generally accepted that an agreement will not be held to be within the condemnation of the [rule] unless the interference is clearly officious and for the purpose of stirring up strife and continuing litigation." *Id.* (quoting *Wright v. Commercial Union Ins. Co.*, 63 N.C. App. 465, 469, 305 S.E.2d 190, 192–93 (1983)). The court concluded that this risk of officious interference was not present where a receiver brings a personal

tort claim "for the purpose of satisfying an outstanding judgment" against a debtor. *Id.* "If a receiver elects to pursue a cause of action held by a judgment-debtor and the judgment-debtor prevails thereon, the debtor receives the full benefit of the award," the court reasoned, as any recovery would "be promptly applied to [the debtor's] debts," and any excess would belong to the debtor. *Id.* at 851. As a result, none of the public policy concerns supporting the rule against assigning personal tort claims were presented by allowing the receiver to exercise control over the defendant's personal tort claims. *See id.*

244. The Court concludes that the situation presented here is sufficiently similar to *Haarhuis* to follow the Court of Appeals' reasoning in these circumstances. Like in *Haarhuis*, the DRE Crossclaims are not controlled by a third party engaged in champerty, but by a court-appointed receiver. (Epes Settlement Order 7.)

245. Admittedly, the fact pattern before the Court is unique in that the DRE Crossclaims were not placed directly into receivership but instead assigned to DRE by Dr. Epes as part of the court-approved settlement agreement between the Epeses and the CCSEA-related entities in receivership. (*See* Joint Mot. Approve Settlement Agreement and Release Ex. A-2, at 1.) Nonetheless, in approving the Receiver-Epes settlement agreement, the Court did not give control of Dr. Epes's causes of action to a third-party assignee unrelated to this lawsuit. Rather, the Court's purpose was to provide the Receiver with a means of exercising his independent judgment over those claims (subject to the Court's supervision) while minimizing conflicts with the Epeses. (Epes Settlement Order 3 (stating that the purpose of forming DRE was to transfer

"control of [Dr. Epes's] assets and resolution of the claims against those assets to the Receiver").) DRE was created specifically to acquire Dr. Epes's causes of action and assume his debts as a means of allowing the Receiver to collect assets, pay creditors, compromise disputed claims and obligations, and resolve outstanding claims, debts, and obligations owned by or owed by Dr. Epes. (*See* Joint Mot. Approve Settlement Agreement and Release Ex. C-2, at 4, ECF No. 53.) Dr. Epes's assignment of his personal tort claims to DRE was thus clearly not "officious and for the purpose of stirring up strife and continuing litigation," *Haarhuis*, 820 S.E.2d at 850, but was intended to avoid litigation and efficiently resolve claims, (Epes Settlement Order 4 (finding that "[a]n additional benefit of the settlement and this approach is to avoid the Epeses expending considerable resources defending claims when those resources could better be deployed toward resolving claims"). As a result, the Court concludes that the rule voiding assignments of personal tort claims is not applicable to Dr. Epes's assignment of such claims to DRE.

246. The Court is thus satisfied that the rule stated in *Revolutionary Concepts, Inc.* and similar cases does not void Dr. Epes's assignment of his causes of action to DRE and does not jeopardize DRE's standing to assert any of the DRE Crossclaims in this proceeding.

247. Doug Harris's supplemental brief also contains arguments related to the Receiver's crossclaims brought on behalf of JDPW and CCSEA. These arguments fall outside the narrow topic on which the Court requested supplemental briefing. To the extent these arguments challenge the Receiver's standing to assert claims on behalf

of JDPW or CCSEA, the Court has considered them and finds them meritless. To the extent Doug Harris's supplemental brief asserts other challenges to the Receiver's crossclaims, such arguments are outside the scope of allowed supplemental briefing, and the Court will not consider them at summary judgment.

### 2. Receiver's Crossclaim for Indemnity

248. Doug Harris first moves for summary judgment on the Receiver's crossclaim for indemnity. The Receiver brings this crossclaim against Doug Harris on behalf of JDPW, DRE, and CCSEA, pleading that to the extent those entities are liable for certain crossclaims against them by the Castle McCulloch Defendants, Doug Harris's wrongful conduct is the cause of that liability. (Receiver's Cross-cls. ¶ 474.) As a result, the Receiver asserts that Doug Harris is liable to JDPW, DRE, or CCSEA for anything found due and owing on the Castle McCulloch Defendants' crossclaims. (Receiver's Cross-cls. ¶¶ 474–75.)

249. Doug Harris argues that the Receiver's crossclaim for indemnity should be dismissed at summary judgment because it presents no theory, contract, or other facts creating a duty to indemnify, is too vague, and fails to state a claim. In response, the Receiver argues that Doug Harris's motion and briefs are generalized, nonspecific, and do not meet his burden as a movant under Rule 56.

250. After reviewing the parties' arguments and the record, particularly the Castle McCulloch Defendants' crossclaims on which the Receiver asserts a right to indemnification, the Court concludes that Doug Harris's burden has been met and

that the Receiver cannot forecast evidence supporting essential elements of an indemnity claim.

251. "A right to indemnity exists whenever one party is exposed to liability by the action of another who, in law or equity, should make good the loss of the other." *Carl v. State*, 192 N.C. App. 544, 557, 665 S.E.2d 787, 797 (2008) (quoting *McDonald v. Scarboro*, 91 N.C. App. 13, 22, 370 S.E.2d 680, 686 (1988)). "In North Carolina, a party's right[] to indemnity can rest on three bases: (1) an express contract; (2) a contract implied-in-fact; or (3) equitable concepts arising from the tort theory of indemnity, often referred to as a contract implied-in-law." *Kaleel Builders, Inc. v. Ashby*, 161 N.C. App. 34, 38, 587 S.E.2d 470, 474 (2003). The first of these is straight forward: parties may have a right to indemnity under the terms of a bargained-for contract. *Id.* The second, indemnity implied-in-fact, "stems from the existence of a binding contract between two parties that necessarily implies the right. The implication is derived from the relationship between the parties, circumstances of the parties' conduct, and that the creation of the indemnitor/indemnitee relationship is derivative of the contracting parties' intended agreement." *Id.* The third, indemnity implied-in-law, "arises from an underlying tort, where a passive tort-feasor pays the judgment owed by an active tort-feasor to the injured third party." *Id.* at 39, 587 S.E.2d at 474; *see also Hunsucker v. High Point Bending & Chair Co.*, 237 N.C. 559, 563–64, 75 S.E.2d 768, 771 (1953).

252. Examining first CCSEA's right to claim indemnification, the Court notes that the Castle McCulloch Defendants have each asserted a single crossclaim against

CCSEA for "suretyship, indemnity, and contribution." (Am. Answer and Crossclaims 56.)[23] This crossclaim is based on allegations that CCSEA guaranteed and agreed to indemnify the Castle McCulloch Defendants on the Castle McCulloch Note. (Am. Answer and Crossclaims ¶ 419.) Thus, there is no underlying tort for which the Castle McCulloch Defendants seek to hold CCSEA liable, and CCSEA does not have a right to implied-in-law indemnity from Doug Harris. *See Hunsucker*, 237 N.C. at 563–64, 75 S.E.2d at 771. Further, the Receiver does not allege, and the record contains no evidence of, an express agreement that Doug Harris would indemnify CCSEA for matters related to the Castle McCulloch Defendants' crossclaim. Finally, the Receiver does not plead, and the record does not show evidence of, "a binding contract between [Doug Harris and CCSEA] that necessarily implie[d]" a right to implied-in-fact indemnification. *See Kaleel Builders, Inc.*, 161 N.C. App. at 38–39, 587 S.E.2d at 474 ("[T]he creation of the indemnitor/indemnitee relationship is derivative of the contracting parties' intended agreement.") In sum, the pleadings and evidence before the Court at summary judgment do not show that CCSEA is entitled to indemnity from Doug Harris on any of the three grounds provided by North Carolina law. The Court therefore concludes that summary judgment is appropriately granted in Doug Harris's favor to the extent the Receiver's crossclaim for indemnity is asserted on behalf of CCSEA.

---

[23] The Court here cites the Castle McCulloch Defendants' pleadings filed August 30, 2016. The crossclaims asserted against CCSEA, JDPW, and DRE in the August 30, 2016 pleadings are identical to those asserted in the amended responsive pleadings filed by the Castle McCulloch Defendants on March 2 and 3, 2017.

253. The Receiver's crossclaim for indemnity on JDPW's behalf is also based on a single crossclaim by the Castle McCulloch Defendants, namely, the crossclaim for negligent misrepresentation against JDPW and Doug Harris. Because the Court has determined that summary judgment is properly entered in JDPW's favor on that crossclaim, JDPW no longer has a right to indemnification based on that crossclaim. *See Jennette Fruit & Produce Co. v. Seafare Corp.*, 75 N.C. App. 478, 483, 331 S.E.2d 305, 308 (1985). The Court therefore concludes that summary judgment is appropriately granted in Doug Harris's favor to the extent the Receiver's crossclaim for indemnity is asserted on behalf of JDPW.

254. The single crossclaim asserted against DRE by the Castle McCulloch Defendants' pleadings is a crossclaim for possession of certain collateral or the proceeds of that collateral. (Am. Answer and Crossclaims ¶¶ 423–28.) Thus, here, too, there is no underlying tort for which the Castle McCulloch Defendants seek to hold DRE liable, and DRE does not have a right to implied-in-law indemnity from Doug Harris. *See Hunsucker*, 237 N.C. at 563–64, 75 S.E.2d at 771. There is also no evidence in the record to show a contract for indemnity between DRE and Doug Harris or facts implying such a contract in fact.

255. Further, to the extent DRE's asserted right to indemnity is based on the third-party claims the Castle McCulloch Defendants assert against Dr. Epes in their post-summary-judgment Third-Party Complaint, those claims do not serve as a basis for indemnity either. For one thing, there is no evidence of an express contract or an implied in fact contract between Dr. Epes and Doug Harris that would create a basis

for DRE's indemnity claim. Further still, the claims asserted against Dr. Epes do not give rise to a right to implied-in-law indemnification.

256. The March 2 and 3, 2017 Third-Party Complaints filed by the Castle McCulloch Defendants assert two third-party claims against Dr. Epes: one for suretyship, indemnity, and contribution in the event Plaintiffs successfully enforce the Castle McCulloch Note, and the second for fraud. (*See, e.g.*, Def. Castle McCulloch Inc.'s Am. Answer Am. Consolidated Compl., Crossclaims in the Alternative, Third-Party Compl. ¶¶ 421–33 [hereinafter "Castle McCulloch Third-Party Compl."], ECF No. 853.) Neither of these claims give Dr. Epes a right to seek implied-in-law indemnity.

257. First, the claim against Dr. Epes for suretyship, indemnity, and contribution is not a tort and thus does not create a situation in which one alleged tortfeasor may seek indemnity from another, primarily responsible tortfeasor. *See Hunsucker*, 237 N.C. at 563–64, 75 S.E.2d at 771.

258. Second, the Court concludes that the claim for fraud brought against Dr. Epes does not give Dr. Epes the right, and therefore cannot give DRE the right, to seek indemnity from Doug Harris. "The general rule of the common law is that there is no right to indemnity as between joint tort-feasors." *Id.* at 563, 75 S.E.2d at 771. The ability of a passively negligent tortfeasor to seek indemnity from a primarily negligent tortfeasor, i.e., implied-in-law indemnity, is an exception to this rule. *See id.* at 563–64, 75 S.E.2d at 771; *Bost v. Metcalf*, 219 N.C. 607, 609, 14 S.E.2d 648, 651 (1941); *Taylor v. Jones Constr. Co.*, 195 N.C. 30, 32, 141 S.E. 492, 493 (1928). The

right to seek implied-in-law indemnity is "bottomed on acts of active and negative negligence of joint tort-feasors," *Bost*, 219 N.C. at 609, 14 S.E.2d at 651, and is justified by the rationale underlying "the entire law of indemnity," that is, that the passively negligent tortfeasor, having discharged the obligations of the actively negligent tortfeasor, is entitled to indemnity from the latter, *Hunsucker*, 237 N.C. at 563, 75 S.E.2d at 771. These considerations are not raised by the fraud claim against Dr. Epes.

259. The Castle McCulloch Defendants' claim for fraud against Dr. Epes alleges that in the event a transfer of certain paintings and chess sets from Dr. Epes to his wife is deemed valid, Dr. Epes was later intentionally deceitful when he signed an agreement purporting to transfer ownership of that same property to Richard Harris while representing that the property was his and his alone. (Castle McCulloch Third-Party Compl. ¶ 430, Ex. 3, at 2.) The Castle McCulloch Defendants do not allege that Dr. Epes is vicariously liable to them for the acts of another, but for his own acts. (Castle McCulloch Third-Party Compl. ¶¶ 430–33.) Thus, to succeed on this claim, the Castle McCulloch Defendants must prove each element of a claim for fraud, including that Dr. Epes possessed the requisite scienter for fraud. *See Carcano v. JBSS, LLC*, 200 N.C. App. 162, 177, 684 S.E.2d 41, 53 (2009) ("[T]he scienter required for fraud is not present without both knowledge and an intent to deceive, manipulate, or defraud." (internal quotation marks omitted)). If Dr. Epes is adjudged liable to any of the Castle McCulloch Defendants, it will not be because he was "exposed to liability by the action of another," *Carl*, 192 N.C. App. at 557, 665 S.E.2d at 797, but because

he was found to have engaged in intentional deceit himself. Consequently, the Castle McCulloch Defendants' fraud claim against Dr. Epes does not give Dr. Epes a right to indemnity from Doug Harris, and DRE does not have a basis for asserting such a right either. The Court therefore concludes that summary judgment is appropriately granted in Doug Harris's favor to the extent the Receiver's crossclaim for indemnity is asserted on behalf of DRE.

3. <u>Receiver's Crossclaims for Negligence, Breach of Fiduciary Duty, and Constructive Fraud on Behalf of JDPW</u>

260. The Receiver's second crossclaim against Doug Harris on behalf of JDPW, DRE, and CCSEA alleges that Doug Harris is liable to each entity for professional negligence due to his failure to use due care in representing JDPW, Dr. Epes, and CCSEA as a licensed attorney. (Receiver's Cross-cls. ¶¶ 472, 477–79.) Similarly, the Receiver's third crossclaim asserts that Doug Harris breached his fiduciary duties as an attorney to JDPW, Dr. Epes, and CCSEA. (Receiver's Cross-cls. ¶¶ 472, 481–82.) The third crossclaim further pleads that Doug Harris undertook these breaches of his fiduciary duties in whole or in part to benefit himself and that Doug Harris's conduct thus constitutes constructive fraud. (Receiver's Cross-cls. ¶ 483.)

261. Doug Harris moves for summary judgment on the Receiver's second and third crossclaims for party-specific reasons. The Court therefore begins by addressing Doug Harris's and the Receiver's arguments regarding these crossclaims to the extent they are asserted on JDPW's behalf.

262. With regard to JDPW, the Receiver specifically alleges that Doug Harris was negligent in his representation of JDPW and breached his fiduciary duties as an

attorney to JDPW by, among other things, failing to adequately disclose risks associated with releasing the Castle McCulloch Collateral; undertaking transactions, including the Settlement Agreement and the execution of the Release Deed, in which he had a personal interest; causing JDPW to enter into a transaction with guarantors he knew were insolvent; causing JDPW to incur debts it could not pay; and subjecting JDPW to risks in transactions in which it did not have material and actual economic interests sufficient to justify said risks.  (Receiver's Cross-cls. ¶ 472(e), (i), (v)–(y).)

263.  Doug Harris argues that summary judgment is appropriate in his favor on these crossclaims, to the extent they are premised on his role as an attorney for JDPW, because the claims sound in legal malpractice and are untimely under the applicable statute of limitations, N.C. Gen. Stat. § 1-15(c).

264.  Negligence or breach of contract claims arising out of the performance of or a failure to perform professional services are governed by section 1-15(c)'s time limits, *Sharp v. Teague*, 113 N.C. App. 589, 592, 439 S.E.2d 792, 794 (1994), as are claims for breach of fiduciary duty arising from the provision of professional services, *NationsBank v. Parker*, 140 N.C. App. 106, 113, 535 S.E.2d 597, 601 (2000) (citing *Heath v. Craighill, Rendleman, Ingle & Blythe*, 97 N.C. App. 236, 244, 388 S.E.2d 178, 183 (1990)).

265.  Section 1-15(c) provides a minimum statute of limitations of three years for actions arising out of the performance of or failure to perform professional services:

> Except where otherwise provided by statute, a cause of action for malpractice arising out of the performance of or failure to perform professional services shall be deemed to accrue at the time of the occurrence of the last act of the defendant giving rise to the cause of action . . . [p]rovided nothing herein shall

be construed to reduce the statute of limitation in any such case below three years.

N.C. Gen. Stat. 1-15(c). "When the [defendant's] last act . . . occurred is a factual issue" determined by the factfinder. *Chase Dev. Grp. v. Fisher, Clinard & Cornwell*, 211 N.C. App. 295, 305, 710 S.E.2d 218, 225 (2011).

266. Section 1-15(c) also allows parties to bring claims based upon harm that was not readily apparent at the time of the defendant's last act within one year of the date the claimant discovered, or reasonably should have discovered, the harm.

> Provided that whenever there is bodily injury to the person, economic or monetary loss, or a defect in or damage to property which originates under circumstances making the injury, loss, defect or damage not readily apparent to the claimant at the time of its origin, and the injury, loss, defect or damage is discovered or should reasonably be discovered by the claimant two or more years after the occurrence of the last act of the defendant giving rise to the cause of action, suit must be commenced within one year from the date discovery is made[.]

N.C. Gen. Stat. § 1-15(c). Whether a claimant's injury or loss was not readily apparent to the claimant at the time of its origin is treated as an issue of fact unless the record demonstrates that it may be resolved as a matter of law. *See Cheek v. Poole*, 98 N.C. App. 158, 165, 390 S.E.2d 455, 460 (1990).

267. Doug Harris first argues that the Receiver's second and third crossclaims on JDPW's behalf are untimely because the last act the Receiver points to as evidence of Doug Harris's professional negligence or breach of fiduciary duties as an attorney for JDPW is Doug Harris's March 15, 2013 execution of the Release Deed. Because the Receiver's crossclaims were not filed until October 3, 2016, more than three years

after this last act, Doug Harris contends any crossclaim for professional negligence or breach of fiduciary duty on JDPW's behalf is untimely under section 1-15(c).

268. The Receiver counters that the harm on which his second and third crossclaims on JDPW's behalf are based was not readily apparent to JDPW and could not reasonably have been discovered by JDPW until it was placed in receivership on April 28, 2016. Thus, because the Receiver's crossclaims were filed on October 3, 2016, the Receiver contends that his second and third crossclaims should be deemed timely under the "one-year-from-discovery" provision of section 1-15(c).

269. The Court begins by examining whether the harm alleged on JDPW's behalf occurred under circumstances that would have made that harm not readily apparent to JDPW, and thus whether JDPW qualifies for the one-year-from-discovery provision in section 1-15(c). Doug Harris's dual role as attorney and trustee for JDPW complicates this issue.

270. An express trust is "a fiduciary relationship with respect to property, subjecting the person by whom the property is held," i.e., the trustee, "to equitable duties to deal with the property for the benefit of another person," i.e., the beneficiary. *Bland v. Branch Banking & Tr. Co.*, 143 N.C. App. 282, 287, 547 S.E.2d 62, 66 (2001); *see also* Restatement (Second) of Trusts § 2 (Am. L. Inst. 1959) (defining a trust as "a fiduciary relationship with respect to property"). The common law of trusts supplements the North Carolina General Statutes, N.C. Gen. Stat. § 36C-1-106, and "[t]he common law . . . provides that any injury to the property placed in a trust may only be redressed by the trustee," *Slaughter v. Swicegood*, 162 N.C. App. 457, 464,

591 S.E.2d 577, 582 (2004). This rule is subject to certain exceptions, such as allowing a beneficiary to sue individually where a conflict of interest arises between the trustee and the beneficiary, *see Fortune v. First Union Nat'l Bank*, 323 N.C. 146, 149, 371 S.E.2d 483, 485 (1988), or where the trustee has improperly refused or neglected to bring an action against a third person, in which case the beneficiary may maintain a suit in equity against the trustee and the third person, *Slaughter*, 162 N.C. App. at 465–66, 591 S.E.2d at 583 (citing Restatement (Second) of Trusts § 282). Under normal circumstances, however, the law is clear that the trustee and the trustee alone has the ability to seek recourse for injury to a trust's property. *Id.* at 466–67; 591 S.E.2d at 583–84 (holding that individuals who were both settlors and beneficiaries of a trust did not have standing to assert a claim where the trustee did not refuse or neglect to bring an action to protect the trust).

271. The application of this common law rule here would mean the power to redress any injury to JDPW's property caused by Doug Harris as attorney lay in the hands of Doug Harris as trustee. The conflict of interest inherent in this combination of positions would make it "unlikely, if not impossible, that Doug Harris would investigate and pursue potential claims against himself for potential violations of his fiduciary duty to the Trust." (Order Approving Pls.' Mot. Appointment Receiver for JDPW Trust 5.) This fact pattern would also appear to create a situation in which JDPW's beneficiary would have standing to sue Doug Harris as JDPW's trustee, attorney, or both, *see Slaughter*, 162 N.C. App. at 465–66, 591 S.E.2d at 583; *Fortune*, 323 N.C. at 149, 371 S.E.2d at 485, but it is not apparent from the record that the

beneficiary of JDPW was aware of Doug Harris's decision to use JDPW in the Assignment Agreement and the Settlement Agreement. If the beneficiary was made aware of this basis for potential claims against Doug Harris, the record is equally silent as to when that happened.

272. On these facts, the Court concludes that a reasonable factfinder could determine that JDPW's loss occurred under circumstances making the loss not readily apparent to JDPW at the time of origin. Thus, this issue is not susceptible to resolution in Doug Harris's favor as a matter of law at summary judgment.

273. Doug Harris further asserts that even if JDPW's loss was not readily apparent, the Receiver's negligence and breach of fiduciary duty crossclaims are still untimely because the Receiver, and thus JDPW, should be considered to have been on notice of the basis for these claims since July 17, 2015, the date Plaintiffs filed the Amended Consolidated Complaint and pleaded certain facts about Doug Harris's conduct that now give rise to the Receiver's crossclaims. Thus, Doug Harris contends, because the Receiver knew about or reasonably should have known about Doug Harris's complained of conduct on July 17, 2015, JDPW should have brought its crossclaims by July 17, 2016 to take advantage of section 1-15(c)'s one-year-from-discovery provision. The Court disagrees.

274. The Court's April 28, 2016 order placing JDPW into receivership vested the Receiver with the full authority available to a receiver under North Carolina law acting for and under the direction of the Court to take control of and administer the assets of JDPW. (Order Approving Pls.' Mot. Appointment Receiver for JDPW Trust

8.) This authority specifically permitted the Receiver to exercise all powers through or in place of JDPW's trustee to the extent necessary to manage JDPW's affairs in the best interests of the trust's beneficiary and creditors. (Order Approving Pls.' Mot. Appointment Receiver for JDPW Trust 8.) The same order authorized the Receiver to take possession of JDPW's records, books, bank accounts, other financial accounts, leases, deposits, ledgers, and other materials relating to JDPW's operations. (Order Approving Pls.' Mot. Appointment Receiver for JDPW Trust 9–10.) April 28, 2016 was thus the first date the Receiver had access to all of JDPW's documents and had full authority to investigate JDPW's business. The Court concludes that a reasonable factfinder could determine that it was then that the Receiver or JDPW should reasonably have discovered the facts giving rise the current crossclaims against Doug Harris. Such a determination would render the October 3, 2016 filing of the Receiver's crossclaims timely.

275. Consequently, the Court cannot conclude on the current record, as a matter of law at summary judgment, that the Receiver discovered, or reasonably should have discovered, the loss to JDPW before the date he was appointed to oversee and administer the business of the trust,[24] and thus cannot conclude as a matter of law

---

[24] Further, while the Court declines to reach this issue as a matter of North Carolina law at this time, it is difficult to believe that under section 1-15(c)'s one-year-from-discovery provision a claim arising out of facts similar to those here—an attorney providing or failing to provide professional services to a trust for which he or she is also the sole trustee—could begin to run before any other individual discovered (or should reasonably have discovered) the facts giving rise to the claim and also possessed standing to pursue that claim. *Accord Dudley v. Allen*, No. 6205, 1971 U.S. Dist. LEXIS 11038, at *3–4 (W.D. Ken. Oct. 28, 1971) (concluding under Kentucky's statute of limitations for fraud, which contained a discovery provision, that alleged fraud by individuals who conspired with the board of directors of a company placed into receivership was not "discoverable" until the appointment of the

that the Receiver's crossclaims for negligence and breach of fiduciary duty brought on JDPW's behalf are barred by section 1-15(c)'s statute of limitations. The Court will therefore deny Doug Harris's motion to the extent it requests summary judgment on these crossclaims.

4. Receiver's Crossclaims for Negligence, Breach of Fiduciary Duty, and Constructive Fraud on behalf of CCSEA and DRE

276. The Court next addresses the Receiver's second and third crossclaims to the extent these claims are asserted on behalf of CCSEA and DRE. With regard to these entities, Doug Harris argues that the Receiver's second and third crossclaims should be dismissed because the claims are untimely under the four-year statute of repose contained in N.C. Gen. Stat. § 1-15(c).

277. As stated above, section 1-15(c)'s time limits apply to claims for negligence or breach of fiduciary duty arising out of the performance of or failure to perform professional services. *See NationsBank*, 140 N.C. App. at 113, 535 S.E.2d at 601; *Sharp*, 113 N.C. App. at 592, 439 S.E.2d at 794. Section 1-15(c)'s statute of repose provides "in no event shall an action be commenced more than four years from the last act of the defendant giving rise to the cause of action." N.C. Gen. Stat. § 1-15(c).

---

receiver, "inasmuch as no one would have brought suit prior to that time"); *cf. IIT, Int'l Inv. Tr. v. Cornfeld*, 619 F.2d 909, 930 (2d Cir. 1980) ("It would seem anomalous and unfair, however, to hold the liquidators to the knowledge of those in charge of [the trust] when the liquidators are complaining precisely of wrongs perpetrated by them. When the liquidators assumed office, they did so free of any imputation of knowledge of the previous faithless management[]."); *Fla. Dep't of Ins. v. Blackburn*, 209 B.R. 4, 12–13 (Bankr. M.D. Fla. May 20, 1997) (citing cases to support the proposition that "courts have also held that, for statutes of limitation purposes, the receiver takes its appointment free of any imputation of knowledge of the previous mismanagement").

The time period provided in the statute of repose is absolute. "A statute of repose creates an additional element of the claim itself which must be satisfied in order for the claim to be maintained." *KB Aircraft Acquisition, LLC v. Berry*, 249 N.C. App. 74, 85, 790 S.E.2d 559, 567 (2016) (quoting *Goodman v. Holmes & McLaurin*, 192 N.C. App. 467, 474, 665 S.E.2d 526, 531 (2008)). Thus, a plaintiff who fails to bring a claim within section 1-15(c)'s statute of repose period "literally has *no* cause of action." *Head*, 371 N.C. at 11, 812 S.E.2d at 838 (quoting *Hargett v. Holland*, 337 N.C. 651, 655, 447 S.E.2d 784, 787 (1994)).

278. Doug Harris contends that the Receiver's second and third crossclaims on behalf of CCSEA and DRE are untimely under section 1-15(c)'s four-year statute of repose because the record contains no evidence of any last act by Doug Harris giving rise to these crossclaims that occurred less than four years prior to the October 3, 2016 filing of the crossclaims. Particularly, Doug Harris denies acting as an attorney for CCSEA or Dr. Epes at any time after July 2012 except for certain representations undertaken in September 2012. In support of this assertion, he points to a document purporting to be a contract executed by Dr. Epes in July 2012 that acknowledged that Doug Harris had previously represented Dr. Epes and his entities but was no longer engaged in such a representation. (Mem. Law Supp. Douglas S. Harris's Mot. Summ. J. Gerald A. Jeutter's Cross-cls. Behalf JDPW Trust, CCSEA, and DRE Against Doug Harris Ex. A, at 2, ECF No. 845.) Doug Harris further argues that even if the Receiver's allegations are taken as true, the latest he could possibly have performed

a last act giving rise to the Receiver's crossclaims is still September 2012. Thus, Doug Harris argues, summary judgment in his favor is appropriate.

279. In response, the Receiver contends that the March 15, 2013 execution of the Release Deed should also be considered an act giving rise to CCSEA's and DRE's claims. Because this act occurred within the four years prior to the Receiver filing his crossclaims on behalf of CCSEA and DRE, the Receiver argues the crossclaims are timely.

280. More specifically, the Receiver argues that following the September 2012 transactions, JDPW was obligated on a promissory note to NFI for $2.1 million dollars and held approximately $1.7 million in debt belonging to the Castle McCulloch Defendants and roughly $1.6–1.7 million in debt belonging to CCSEA as a means of meeting that obligation.[25] The Receiver points out that Doug Harris admits that he took steps, including the execution of the March 15, 2013 Release Deed, to remove collateral belonging to the Castle McCulloch Defendants from this pool of assets available to JDPW.[26] (Harris Dep. I, at 866:19–868:23.) The Receiver contends that the remaining CCSEA-related assets JDPW held were not sufficient to cover its $2.1 million obligation to NFI and that JDPW held no, or few, other assets. Thus, the

---

[25] The total balance outstanding on all of the loans held by NewBridge in mid-2012 was $3,350,139.42. (Settlement Agreement 2.) When JDPW purchased the CCSEA and Castle McCulloch Loans in September 2012, the Castle McCulloch Loan's portion of the outstanding debt was exactly $1,692,430.39. (Am. Consolidated Compl. Ex. XX, ECF No. 192.)

[26] While Doug Harris also testified in his deposition that he retained for JDPW any interests or property related to NSITE and believed JDPW could still call upon NSITE for some amount of money, he also testified that he was aware that NSITE had no money. (Harris Dep. I, at 867:1–13.)

Receiver argues, Doug Harris's decision to assign away the Castle McCulloch Collateral and forgo collection on the Castle McCulloch Loan essentially guaranteed that JDPW would default on its loan from NFI and that NFI would turn to the CCSEA Collateral and additional pledged collateral from Dr. Epes to recover its money. The Receiver asserts that the execution of the Release Deed therefore constituted a conflicted transaction for Doug Harris which left CCSEA and Dr. Epes with increased liability for JDPW's debts and should be considered the last act giving rise to the crossclaims for negligence and breach of fiduciary duty brought on behalf of CCSEA and DRE. After a careful review of the record at summary judgment and controlling North Carolina case law, the Court disagrees.

281. To determine when a professional's last act occurred for purposes of section 1-15(c), courts "consider the contractual relationship between the parties and when the contracted-for services were completed." *Head*, 371 N.C. at 11–12, 812 S.E.2d at 838. When the professional is an attorney, "the contractual arrangement between attorney and client . . . determine[s] the extent of the attorney's dut[ies] to the client and the end of the attorney's professional obligation[s]." *Hargett*, 337 N.C. at 658, 447 S.E.2d at 789. The duties an attorney owes to a client as the result of a legal representation can vary depending upon the nature of the contractual agreement for the attorney's services. *Compare id.* at 656–58, 447 S.E.2d at 788–89 (holding attorney's contract for representation obligated him to prepare and supervise execution of will, and afterwards his professional duties to testator were at an end), *with Sunbow Indus., Inc. v. London*, 58 N.C. App. 751, 753, 294 S.E.2d 409, 410 (1982)

(holding attorney's contracted-for services imposed a duty to represent client during closing and a continuing duty to perfect client's security interest by filing a financing statement).

282. In assessing when a claim falling under section 1-15(c) begins to run, our courts have taken a restrictive view of what may be considered a last act giving rise to a cause of action. As one example, North Carolina courts have consistently held that a continuing course of representation does not function as a continuing last act such that section 1-15(c)'s time limits begin to run only once representation has ended; the focus is instead on the specific acts constituting the alleged negligence or breach of fiduciary duty. *See Carlisle v. Keith*, 169 N.C. App. 674, 683–84, 614 S.E.2d 542, 549 (2005) (explaining that the "continuing course of treatment doctrine" has been limited to medical malpractice cases and that the issue for the court in a legal malpractice action is when the last act occurred, not when an attorney's representation of a client ended). Further, when examining the contractual agreement between attorney and client to determine the extent of the attorney's professional duties and when a duty was breached, North Carolina courts have been reluctant to recognize "continuing" duties that extend beyond defined periods of representation. *See Hargett*, 337 N.C. at 655–57, 447 S.E.2d at 788–89 (holding that attorney's last act was not failing "to fulfill a continuing duty to prepare a will properly" but overseeing the execution of the will that was actually prepared). Indeed, continuing duties stemming from an attorney's representation of a client have only been recognized in very limited circumstances in which the duties were

imposed by the contractual agreement between the attorney and client. *See Sunbow Indus., Inc.*, 58 N.C. App. at 753, 294 S.E.2d at 410; *see also Hargett*, 337 N.C. at 657–58, 447 S.E.2d at 789 (explaining that the contractual arrangement between attorney and client in *Sunbow* allowed the attorney's continuous failure to perfect a security interest to amount to a last act giving rise to the claim).

283. Here, the Receiver's pleading contains multiple allegations that Doug Harris failed to properly advise CCSEA and Dr. Epes leading up to the September 21, 2012 transactions, (*see* Receiver's Cross-cls. ¶¶ 472(a)–(b), (g), (p), (q), (z)), represented multiple parties in the transactions despite conflicts of interest he failed to disclose, (*see* Receiver's Cross-cls. ¶¶ 472(d), (i), (l), (r), (aa)–(bb)), and otherwise failed to competently represent CCSEA and Dr. Epes with regard to the transactions, (*see* Receiver's Cross-cls. ¶¶ 472(g), (h), (k), (o), (q), (s), (v), (w), (y)). However, with the exception of the execution of the March 15, 2013 Release Deed, the Receiver does not allege or point to evidence showing a negligent act occurring on or after October 3, 2012 or an act after that date that would constitute a breach of Doug Harris's professional obligations arising out of his contracted-for services. Further, although the Receiver argued at the hearing on the Motions for Summary Judgment that evidence in the record demonstrates that Doug Harris continued to represent CCSEA or Dr. Epes in certain litigation until October 2012, the record does not support the Receiver's contention, and, in any event, continued representation does not establish a last act for section 1-15(c)'s purposes. *See Carlisle*, 169 N.C. App. at 683–84, 614

S.E.2d at 549; *Teague v. Isenhower*, 157 N.C. App. 333, 338, 579 S.E.2d 600, 604 (2003).

284. As to the execution of the Release Deed, the Receiver does not allege or argue that Doug Harris was providing professional services to either CCSEA or Dr. Epes as late as March 2013, and the record contains no evidence that Doug Harris was representing either party at that point in time. Thus, to make a case that the March 15, 2013 Release Deed served as a last act under section 1-15(c), the Receiver must show that the execution of the Release Deed constituted a violation of a continuing duty arising out of Doug Harris's previous contractual agreements with CCSEA and Dr. Epes. After a review of the record, the Court concludes that the Receiver has not produced evidence showing such a continuing duty was imposed by Doug Harris's previous representations.

285. The Receiver's argument that the execution of the Release Deed constitutes a last act of negligence or a last act breaching a fiduciary duty focuses on the notion that the Release Deed benefitted Doug Harris and/or his brother and left Doug Harris's former clients, CCSEA and Dr. Epes, "in a worse off position than they were" when JDPW held interests in the Castle McCulloch Collateral. (Hr'g Tr. 125:9–15.) Essentially, the Receiver argues that the Release Deed must amount to a last act giving rise to a cause of action for professional negligence or breach of fiduciary duty because in executing the Release Deed Doug Harris served the interests of a party adverse to CCSEA and Dr. Epes, to their detriment, after previously representing

both CCSEA and Dr. Epes. This argument, however, faces an obstacle raised by the limited North Carolina case law addressing such situations.

286. While North Carolina law recognizes that an attorney's concurrent and continuing "representation of two or more clients with adverse or conflicting interests [may] constitute[] such misconduct as to subject him to liability for malpractice," *Jenkins v. Wheeler*, 69 N.C. App. 140, 145, 316 S.E.2d 354, 358 (1984), the Court's research indicates that there is little authority in North Carolina addressing claims for legal malpractice based upon adverse acts occurring after the conclusion of an attorney-client relationship. The one case that appears to have confronted a relevant fact pattern, *State ex rel. Long v. Petree Stockton, LLP*, 129 N.C. App. 432, 499 S.E.2d 890 (1998), indicates that if such a claim is possible, "[a] cause of action is not established merely by showing that" the attorney "had access to confidential information or that" his or her subsequent "representation was adverse." *Id.* at 448, 499 S.E.2d at 800. Rather, "[t]he former client must establish . . . that the attorney possessed and misused the client's confidences [and] that the fiduciary breach was a proximate cause of the injury." *Id.*

287. Under the rule expressed in *Long*, the Receiver's allegations and evidence concerning the execution of the Release Deed do not support a cause of action against Doug Harris. The Receiver has not alleged or argued that Doug Harris misused information obtained in confidence from CCSEA or Dr. Epes in executing the Release Deed, and no facts in the record demonstrate such a misuse of former clients' confidences. Accordingly, the Court concludes that the March 15, 2013 execution of

the Release Deed cannot be considered an act giving rise to a claim for professional negligence or breach of fiduciary duty by CCSEA or DRE.

288. As a result of the above, the Court concludes that no genuine issue of material fact exists as to the timeliness of the Receiver's crossclaims brought on behalf of CCSEA and DRE for negligence and breach of fiduciary duty. The record contains no evidence of an act by Doug Harris giving rise to either claim within the four years preceding the date the Receiver filed his crossclaims, and thus these claims are barred by section 1-15(c)'s statute of repose. *See Hargett*, 337 N.C. at 655, 447 S.E.2d at 788.[27]

289. As previously noted, however, the Receiver's third crossclaim also contains an allegation that Doug Harris's conduct constituted constructive fraud. (Receiver's Cross-cls. ¶ 483.) Doug Harris, in moving for summary judgment, argued that the Receiver's "legal malpractice and breach of fiduciary duty claims" should be dismissed, (Douglas S. Harris's Reply Receiver's Resp. Harris Mot. Summ. J. Cross-cls. 8, ECF No. 913), but did not discuss or provide argument on the Receiver's crossclaim for constructive fraud. As the party moving for summary judgment, Doug Harris bears the burden of proving that no issue of material fact exists as to each of

---

[27] In his response brief, the Receiver also argues "that the Cross Claims were asserted in an amended answer in response to an amended complaint and therefore can relate back under Rule 15 . . . to the initial answer." (Receiver's Resp. Harris Mot. Summ. J. Cross-cls. 2, ECF No. 892.) For relation back under Rule 15(c), however, a claim asserted in an amended pleading is deemed "to have been interposed at the time the *claim* in the original pleading was interposed[.]" N.C. R. Civ. P. 15(c) (emphasis added). The Receiver's crossclaims against Doug Harris were asserted for the first time in the Receiver's October 3, 2016 answer to the Castle McCulloch Defendants' crossclaims. Thus, the crossclaims have no earlier "claim in [an] original pleading" to which they can relate back. As a result, the Receiver's relation back argument under Rule 15(c) is without merit.

the Receiver's causes of action. Because Doug Harris did not discuss or advance arguments concerning the Receiver's constructive fraud crossclaim, the Court concludes he has not met his burden as to that claim. Accordingly, the Receiver's crossclaim for constructive fraud shall proceed to trial. *See Jones v. N.Y. City Health & Hosp. Corp.*, No. 00 Civ. 7002 (CBM), 2003 U.S. Dist. LEXIS 9014, at \*2–3 (S.D.N.Y. May 29, 2003) (holding that although defendants moved for summary judgment with respect to all claims, they did not argue or discuss plaintiff's termination claim and thus failed to meet their burden at summary judgment with respect to that claim).

5. <u>Receiver's Crossclaim for Breach of Trustee's Duties and Constructive Fraud</u>

290. The fourth crossclaim contained in the Receiver's pleading alleges that Doug Harris breached his fiduciary duties as trustee of JDPW and did so to benefit himself, pointing again to Doug Harris's decisions to, among other things, involve JDPW in the Settlement Agreement and release the Castle McCulloch Deed of Trust (Receiver's Cross-cls. ¶¶ 472(i), (v)–(y), 485, 487.) The Receiver alleges that it was as a result of these acts that JDPW was exposed to certain legal liabilities and has now incurred the allowed claim of $2.1 million against it as part of its settlement agreement with Plaintiffs. (Receiver's Cross-cls. ¶¶ 485–86.)

291. Doug Harris moves for summary judgment on this crossclaim and argues that his acts cannot be considered the proximate cause of the alleged injury to JDPW. Doug Harris contends that this is so because it was the Receiver, not Doug Harris, who decided to settle with Plaintiffs and allow the $2.1 million claim against JDPW

once JDPW was placed in receivership. Thus, Doug Harris argues, JDPW's liability in this case is the result of the Receiver's negligence or intentional misconduct, not Doug Harris's actions.

292. The Receiver responds by first pointing out that Doug Harris cites no authority to support his proposition—that a court-approved settlement negotiated by a receiver can insulate a trustee from liability for his or her actions leading up to the appointment of the receiver. The Receiver also contends that Doug Harris's argument ignores the multiple transactions Doug Harris brought JDPW into despite clear conflicts of interest on his part.

293. Under North Carolina law, a trustee under any trust is a fiduciary and owes certain duties to the beneficiaries of that trust. N.C. Gen. Stat. § 32-2(a); *see, e.g.*, N.C. Gen. Stat. § 36C-8-802. A breach of these fiduciary duties is considered a breach of trust. N.C. Gen. Stat. § 36C-10-1001(a).

294. To prove a breach of fiduciary duty, a "plaintiff must show that: (1) defendant owed plaintiff a fiduciary duty; (2) defendant breached his fiduciary duty; and (3) the breach of fiduciary duty was a proximate cause of injury to plaintiff." *Miller v. Burlington Chem. Co.*, 2017 NCBC LEXIS 6, at *23 (N.C. Super. Ct. Jan. 27, 2017) (citing *Farndale Co. v. Gibellini*, 176 N.C. App. 60, 68, 628 S.E.2d 15, 20 (2006)). Where a claimant also shows that the breaching fiduciary exploited the fiduciary relationship to his or her advantage or benefit, the claimant will have a claim for constructive fraud. *Hewitt v. Hewitt*, 798 S.E.2d 796, 800 (N.C. Ct. App. 2017).

295. Proximate cause is defined as "a cause which in natural and continuous sequence, unbroken by any new and independent cause, produced the plaintiff's injuries, and without which the injuries would not have occurred." *Adams v. Mills*, 312 N.C. 181, 192, 322 S.E.2d 164, 172 (1984) (quoting *Hairston v. Alexander Tank & Equip. Co.*, 310 N.C. 227, 233, 311 S.E.2d 559, 565 (1984)). Questions concerning proximate cause are ordinarily best left to the jury. *Williams v. Carolina Power & Light Co.*, 296 N.C. 400, 403, 250 S.E.2d 255, 258 (1979). The Court should only decide issues of proximate cause in those cases where reasonable minds could not differ as to the foreseeability of injury. *Id.*

296. Although in Doug Harris's view JDPW's liability may be due solely to the Receiver's decision to settle Plaintiffs' claims against the trust, the Court cannot conclude as a matter of law that the Receiver's settlement with Plaintiffs was a "new and independent cause," *Adams*, 312 N.C. at 192, 322 S.E.2d at 172, of injury to JDPW when viewing the facts here in the light most favorable to the Receiver or JDPW. Further, evidence in the record tends to show other potential ways in which Doug Harris breached his duties to JDPW, separate and apart from the $2.1 million claim settlement. For example, Doug Harris testified that he caused JDPW to pay at least $25,000 in furtherance of the Settlement Agreement between NewBridge and the Settlement Debtors. (Harris Dep. I, at 382:9–383:12.) Doug Harris also testified about his attempts to remove the assets associated with the Castle McCulloch Defendants from JDPW's possession in order to provide relief to his brother and his brother's entities. (Harris Dep. I, at 867:20–868:23.) Both of these facts support the

Receiver's assertions that Doug Harris compromised the assets of JDPW and used the trust for transactions that personally benefitted himself.

297. For these reasons, the Court concludes that Doug Harris's request for summary judgment on the Receiver's fourth crossclaim should be denied.

6. Receiver's Crossclaim for Unfair or Deceptive Trade Practices

298. The Receiver, on behalf of CCSEA and DRE, alleges that Doug Harris, to the extent he denies the existence of an attorney-client relationship with CCSEA or Dr. Epes at any relevant time, is liable to CCSEA and DRE for unfair or deceptive trade practices under N.C Gen. Stat. § 75-1.1 as a result of acts he carried out as trustee of JDPW. The Receiver also asserts that Doug Harris must indemnify JDPW for any liability the trust suffers as a result of Doug Harris's unfair or deceptive acts.

299. Doug Harris moves for summary judgment in his favor on this crossclaim, arguing that the alleged acts giving rise to the crossclaim constitute the rendering of professional services and are thus exempt from a claim under the UDTPA. For the reasons already stated in connection with the Court's dismissal of Plaintiffs' claim for unfair or deceptive trade practices, the Court agrees.

300. Much like Plaintiffs' argument in support of their section 75-1.1 claim, the Receiver incorrectly assumes that if Doug Harris was not acting as an attorney for CCSEA or Dr. Epes then Doug Harris's conduct cannot fall under the learned profession exception. This argument ignores the settled rule that an attorney's rendering of legal services to another cannot provide a basis for an unfair or deceptive trade practices claim against the attorney or the attorney's client. *See Moch*, 251

N.C. App. at 208–09, 794 S.E.2d at 904; *Davis Lake Cmty. Ass'n*, 138 N.C. App. at 297, 530 S.E.2d at 869.

301. Whether an act constitutes the rendering of professional services, and thus whether a party's acts were outside the scope of the UDTPA's definition of commerce, is a question of law for the Court to decide. *Hardy*, 288 N.C. at 310, 218 S.E.2d at 346–47. Here, even if Doug Harris was not serving as CCSEA's or Dr. Epes's attorney during the negotiations for the Settlement Agreement and the Assignment Agreement, and in the time leading up to and following both transactions, the undisputed facts still show that Doug Harris was a duly licensed attorney who was representing JDPW and engaging in acts that are commonly considered within the purview of legal services. *Cf.* N.C. Gen. Stat. § 84-2.1(a) ("The phrase 'practice law' as used in this Chapter is defined to be performing any legal service for any other person . . . specifically including . . . assisting by advice, counsel, or otherwise in any legal work; and to advise or give opinion upon the legal rights of any person, firm or corporation[.]"); N.C. Gen. Stat. § 84-4 (making it unlawful for persons except active members of the State Bar to prepare legal documents for another person, firm, or corporation ); *Pledger*, 257 N.C. at 636, 127 S.E.2d at 339 ("Practice of law embraces the preparation of legal documents and contracts by which legal rights are secured."). That self-serving goals may have motivated those acts, or that Doug Harris's conduct may not have conformed to legal or ethical standards, are not proper factors for the Court's analysis. *See Wheeless*, 237 N.C. App. at 589–91, 768 S.E.2d at 123–24; *Alamance Family Practice, P.A.*, 2018 NCBC LEXIS 83, at *24.

302. Reviewing the undisputed facts at summary judgment, the Court concludes that no genuine issue of material fact exists as to this issue and that Doug Harris's acts upon which the Receiver bases his section 75-1.1 crossclaim were professional services rendered by a member of a learned profession. *See Moch*, 251 N.C. App. at 208–09, 794 S.E.2d at 904; *Reid*, 138 N.C. App. at 267–68, 531 S.E.2d at 236; *Davis Lake Cmty. Ass'n*, 138 N.C. App. at 297, 530 S.E.2d at 869. The Court will therefore grant Doug Harris's motion for summary judgment as to this crossclaim.

7. Receiver's Crossclaim for Equitable Relief

303. The Receiver's sixth crossclaim on behalf of JDPW, CCSEA, and DRE requests equitable relief from the Court to "return each [claimant], or any of them, as near as possible to the position they occupied before the breaches of duty by Doug Harris, including but not limited to rescission, restitution, an accounting, and voiding of illegal or inequitable transactions." (Receiver's Cross-cls. ¶ 496.)

304. Doug Harris argues that summary judgment should be granted in his favor against JDPW, CCSEA, and DRE on this crossclaim because each entity slept on its legal rights and should not be allowed to recover in equity when it neglected to bring its claims in a timely manner. As detailed above, however, the Receiver still maintains at least one crossclaim against Doug Harris on behalf of each entity. Thus, Doug Harris's first argument against the Receiver's request for equitable relief will not succeed.

305. Doug Harris next contends that equity should not be available to JDPW, CCSEA, or DRE because each entity has adequate remedies at law. The Court cannot

agree with this assertion based on the current record at this stage of these proceedings.

306. Generally, "[e]quity will not lend its aid in any case where the party seeking it has a full and complete remedy at law." *Daugherty v. Cherry Hosp.*, 195 N.C. App. 97, 102, 670 S.E.2d 915, 919 (2009) (quoting *Centre Dev. Co. v. County of Wilson*, 44 N.C. App. 469, 470, 261 S.E.2d 275, 276 (1980)). When examining the adequacy of a claimant's remedy at law, however, courts should be mindful that "an adequate remedy is not a partial remedy. It is a full and complete remedy, and one that is accommodated to the wrong which is to be redressed by it." *Moore v. Moore*, 297 N.C. 14, 16, 252 S.E.2d 735, 738 (1979) (quoting *Sumner v. Staton*, 151 N.C. 198, 201, 65 S.E. 902, 904 (1909)). Thus, to preclude the availability of equitable relief, the remedy available at law "must be as practical and as efficient to the ends of justice and its prompt administration as the remedy in equity." *Id.*

307. Whether monetary damages will provide a claimant an adequate remedy at law depends upon the facts of the case and the injury in question. *See Whalehead Props. v. Coastland Corp.*, 299 N.C. 270, 283, 261 S.E.2d 899, 907–08 (1980) (reversing denial of prayer for specific performance where "the trial court was without the necessary facts to determine whether damages would have provided defendants an adequate remedy at law"). One factor courts consider on this point is the "difficulty and uncertainty of collecting such damages after they are awarded." *Lasecki v. Lasecki*, 809 S.E.2d 296, 306 (N.C. Ct. App. 2017) (quoting *Whalehead Props.*, 299 N.C. at 283, 261 S.E.2d at 908).

308. The insolvency of multiple parties, and the resulting importance of their physical assets and other collateral, has been a common thread running throughout this case. Although the Receiver, acting for JDPW, CCSEA, and DRE, may succeed on certain crossclaims against Doug Harris and receive an award of monetary damages, the Court is not convinced, on the current record, that such relief will be full and complete or fully collectable. The Court thus concludes that Doug Harris has not shown at summary judgment that JDPW's, CCSEA's, or DRE's potential remedies at law will be adequate such that the Receiver should be denied the ability to seek equitable relief against him on their behalf. Doug Harris's request for summary judgment on this crossclaim is denied.

8. <u>Receiver's Crossclaim in Equity to Set Aside Release Deed and Assignment of Castle McCulloch Note</u>

309. The seventh crossclaim by the Receiver is brought on behalf of JDPW. This crossclaim asks the Court to void the Release Deed and the alleged assignment of the Castle McCulloch Note to the Castle McCulloch Defendants, alleging that Doug Harris breached his duties to JDPW as trustee in transferring or impairing these assets without receiving adequate compensation for JDPW. (Receiver's Cross-cls. ¶¶ 498–502.)

310. Despite moving for summary judgment on all crossclaims brought by the Receiver, Doug Harris does not present an argument for summary judgment on this crossclaim specifically. To the extent Doug Harris's argument against equitable relief on timeliness grounds applies to this crossclaim, that argument is unsuccessful for the reasons already mentioned. To the extent Doug Harris argues that an adequate

remedy exists at law for the complained of acts, the Court again concludes that Doug Harris has not met his burden of showing the adequacy of such a remedy at summary judgment. The Court also notes that the relief requested by this crossclaim is expressly available under N.C. Gen. Stat. § 36C-10-1001 to remedy a breach of trust. N.C. Gen. Stat. § 36C-10-1001(b)(9) ("To remedy a breach of trust that has occurred . . . the court may . . . [s]ubject to G.S. 36C-10-1012, void an act of the trustee, impose a lien or a constructive trust on trust property, or trace trust property wrongfully disposed of and recover the property or its proceeds[.]"). Doug Harris's motion will thus be denied as to this crossclaim.

9. Receiver's Crossclaim for "Other Causes of Action"

311. Doug Harris finally moves for summary judgment on the Receiver's eighth crossclaim brought on behalf of JDPW, CCSEA, and DRE, arguing that this last crossclaim is improper under the Rules of Civil Procedure and fails to state a claim.

312. The Receiver's eighth crossclaim is titled "Other Causes of Action." This crossclaim pleads that JDPW, CCSEA, and DRE, "[h]aving been directly and proximately damaged in excess of $25,000 as described above . . . seek recovery under all causes of action allowed by North Carolina or federal law based upon the facts, transactions and occurrences as alleged above and as proven at trial." (Receiver's Cross-cls. ¶ 503.) The next paragraph of the crossclaim goes on to state that JDPW, CCSEA, and DRE "seek recovery from Castle McCulloch for aiding and abetting the wrongs set forth above through the conduct of its attorney Douglas Harris" and alleges that this conduct also "constitutes unfair and deceptive trade practices and

otherwise entitles JDPW, CCSEA, and DRE to equitable relief." (Receiver's Cross-cls. ¶ 504.)

313. Summary judgment is appropriate where an essential element of a party's claim does not exist or cannot be proven at trial. *Dobson*, 352 N.C. at 83, 530 S.E.2d at 835. Where a party entirely fails to state a claim upon which relief can be granted, summary judgment is also appropriate, because in such cases "any issue of fact which exists would not be material." *Poston v. Morgan-Schultheiss, Inc.*, 46 N.C. App. 321, 323–24, 265 S.E.2d 615, 616 (1980).

314. Further, in order to properly plead a claim in North Carolina, at a bare minimum, a claimant must comply with Rule 8(a)(1) and state his or her claim "sufficient[ly] to enable the adverse party to understand the nature of the claim, to answer, and to prepare for trial." *Plasman v. Decca Furniture (USA), Inc.*, 811 S.E.2d 616, 621 (N.C. Ct. App. 2018) (quoting *Piro v. McKeever*, 245 N.C. App. 412, 415, 782 S.E.2d 367, 370 (2016)); *see* N.C. R. Civ. P. 8(a)(1). A claim that fails to comply with Rule 8(a)(1) may be dismissed as failing to state a claim upon which relief can be granted. *See Plasman*, 811 S.E.2d at 626 (holding that plaintiffs' failure to plead their claims properly under Rule 8(a)(1) warranted a dismissal pursuant to Rule 12(b)(6).

315. The Receiver's eighth crossclaim asserts nothing more than a general right to recover under "all other causes of action allowed by North Carolina or federal law[.]" (Receiver's Cross-cls. ¶ 503.) The crossclaim does not make out any legally cognizable claim against Doug Harris and is not sufficiently stated to allow an

adverse party in Doug Harris's position to understand the nature of the claim brought against him. The Court therefore concludes that this crossclaim fails to state a claim upon which relief can be granted to the extent it attempts to assert a claim against Doug Harris. As a result, Doug Harris's motion for summary judgment will be granted and this crossclaim is dismissed to the extent it asserts a claim against him.

IV.

CONCLUSION

316. **WHEREFORE**, the Court hereby **ORDERS** as follows:

    a. Doug Harris's Motion as to Plaintiffs' Claims is **GRANTED.** Plaintiffs' claims against Doug Harris for legal malpractice and misrepresentation, fraud, unfair or deceptive trade practices, and punitive damages are dismissed with prejudice.

    b. The Castle McCulloch Defendants' Motion is **GRANTED in part** and **DENIED in part** as follows:

        i. To the extent the Castle McCulloch Defendants' Motion requests summary judgment on Count 8 (Fraud) of Plaintiffs' Amended Consolidated Complaint, the Motion is **DENIED** as moot. However, the Court's ruling precludes NFI from contending at trial that it has asserted a fraud or vicarious liability claim against the Castle McCulloch Defendants.

        ii. To the extent the Castle McCulloch Defendants' Motion requests summary judgment on Count 14 (Possession of Confession of

Judgment: Constructive Trust) of Plaintiffs' Amended Consolidated Complaint, the Motion is **GRANTED**. Plaintiffs' Count 14 is dismissed with prejudice.

iii. To the extent the Castle McCulloch Defendants' Motion requests summary judgment on Count 16 (Declaratory Judgment: Castle McCulloch Collateral) of Plaintiffs' Amended Consolidated Complaint, the Motion is **GRANTED**. Plaintiffs' Count 16 is dismissed with prejudice.

iv. To the extent the Castle McCulloch Defendants' Motion requests summary judgment on Counts 26 (Motion for Temporary Restraining Order: Castle McCulloch Collateral) and 27 (Preliminary and Permanent Injunction: Castle McCulloch Collateral) of Plaintiffs' Amended Consolidated Complaint, the Motion is **GRANTED**. Plaintiffs' Counts 26 and 27 are dismissed with prejudice.

v. To the extent Plaintiffs' Count 28 (Equitable Subrogation: NewBridge Bank Collateral) seeks possession of the Castle McCulloch Collateral or the Confession of Judgment, the Castle McCulloch Defendants' Motion is **GRANTED**, and Plaintiffs' Count 28 is dismissed with prejudice. To the extent Count 28 seeks possession of the CCSEA Collateral, the Castle McCulloch Defendants' Motion is **DENIED** as moot.

vi.   To the extent Plaintiffs' Count 30 (Judicial Assignment) requests judicial assignment of the Confession of Judgment or the Castle McCulloch Collateral or Loan Documents, the Castle McCulloch Defendants' Motion is **GRANTED**, and Plaintiffs' Count 30 will be dismissed with prejudice.  To the extent Plaintiffs' Count 30 seeks judicial assignment of the CCSEA Collateral, the Castle McCulloch Defendants' Motion is **DENIED** as moot.

vii.  To the extent the Castle McCulloch Defendants' Motion requests summary judgment on Count 13 (Possession of Castle McCulloch Collateral: Breach of Contract and Constructive Trust) of Plaintiffs' Amended Consolidated Complaint, the Motion is **GRANTED**.  Plaintiffs' Count 13 is dismissed with prejudice

viii. To the extent the Castle McCulloch Defendants' Motion requests summary judgment on Plaintiffs' Count 33 (Unjust Enrichment), the Motion is **GRANTED**.  Plaintiffs' Count 33 against the Castle McCulloch Defendants and NSITE is dismissed with prejudice.

ix.   To the extent Plaintiffs' Count 34 (Demand for Inventory and Inspection) seeks inventory and inspection of the Castle McCulloch Collateral or Loan Documents, or the Confession of Judgment, the Castle McCulloch Defendants' Motion for Summary Judgment is **GRANTED**, and Plaintiffs' Count 34 is dismissed with prejudice.  To the extent Plaintiffs' Count 34 seeks

inventory and inspection of the CCSEA Collateral, the Castle McCulloch Defendants' Motion is **DENIED** as moot.

c. To the extent Plaintiffs' Motion for Partial Summary Judgment requests summary judgment on Counts 14, 16, and 27, as well as on Counts 28 and 30 to the extent those claims seek relief with regard to the Castle McCulloch Collateral or the Confession of Judgment, Plaintiffs' Motion is **DENIED**. To the extent Plaintiffs' Motion for Partial Summary Judgment requests summary judgment on Count 15, as well as on Counts 28 and 30 to the extent those claims seek relief with regard to the CCSEA Collateral, Plaintiffs' Motion is **DENIED** as moot.

d. Plaintiffs and Nivison's Motion as to Doug Harris's Claims is **GRANTED in part** and **DENIED in part** as follows:

   i. To the extent Plaintiffs and Nivison's Motion requests summary judgment on Doug Harris and JDPW's claim for tortious interference with contract against NFI, the Motion is **GRANTED**. Doug Harris and JDPW's claim for tortious interference with contract against NFI is dismissed with prejudice.

   ii. To the extent Plaintiffs and Nivison's Motion requests summary judgment on Doug Harris and JDPW's claim for unfair or deceptive trade practices, the Motion is **DENIED** as moot. However, Doug Harris and JDPW shall not be permitted to

advance a claim against Plaintiffs or Nivison under section 75-1.1 at trial.

iii. To the extent Plaintiffs and Nivison's Motion requests summary judgment on Doug Harris and JDPW's claim for punitive damages against NFI, the Motion is **GRANTED**. Doug Harris and JDPW's claim for punitive damages against NFI is dismissed with prejudice.

iv. To the extent Plaintiffs and Nivison's Motion requests summary judgment on Doug Harris and JDPW's claim for breach of contract against Old Battleground, the Motion is **GRANTED**. Doug Harris and JDPW's claim for breach of contract against Old Battleground is dismissed with prejudice.

v. To the extent Plaintiffs and Nivison's Motion requests summary judgment on Doug Harris and JDPW's claim for tortious interference with contract against Arthur Nivison, the Motion is **GRANTED**. Doug Harris and JDPW's claim for tortious interference with contract against Arthur Nivison is dismissed with prejudice.

vi. To the extent Plaintiffs and Nivison's Motion requests summary judgment on Doug Harris and JDPW's claim for civil conspiracy against Arthur Nivison, the Motion is **GRANTED**. Doug Harris

and JDPW's claim for civil conspiracy against Arthur Nivison is dismissed with prejudice.

    vii. To the extent Plaintiffs and Nivison's Motion requests summary judgment on Doug Harris and JDPW's claim for punitive damages against Arthur Nivison, the Motion is **GRANTED**. Doug Harris and JDPW's claim for punitive damages against Arthur Nivison is dismissed with prejudice.

e. Doug Harris's Motion as to the Castle McCulloch Defendants' Crossclaims is **GRANTED**. The eleventh defense and crossclaim against Doug Harris and JDPW contained in each of the Castle McCulloch Defendant's Second Amended Answer, Crossclaims, and Third-Party Complaint is dismissed with prejudice.

f. Doug Harris's Motion as to the Receiver's Crossclaims is **GRANTED in part** and **DENIED in part** as follows:

    i. To the extent Doug Harris's Motion as to the Receiver's Crossclaims requests summary judgment on the Receiver's crossclaim for indemnity, the Motion is **GRANTED**. The Receiver's crossclaim for indemnity against Doug Harris is dismissed with prejudice.

    ii. To the extent Doug Harris's Motion as to the Receiver's Crossclaims requests summary judgment on the Receiver's

crossclaims brought on JDPW's behalf for negligence, breach of fiduciary duty, and constructive fraud, the Motion is **DENIED**.

iii. To the extent Doug Harris's Motion as to the Receiver's Crossclaims requests summary judgment on the Receiver's crossclaims for negligence and breach of fiduciary duty brought on behalf of CCSEA and DRE, the Motion is **GRANTED**, and those crossclaims against Doug Harris are dismissed with prejudice. To the extent Doug Harris requests summary judgment on the Receiver's crossclaim for constructive fraud brought on behalf of CCSEA and DRE, the Motion is **DENIED**.

iv. To the extent Doug Harris's Motion as to the Receiver's Crossclaims requests summary judgment on the Receiver's crossclaim for breach of trustee's duties and constructive fraud, the Motion is **DENIED**.

v. To the extent Doug Harris's Motion as to the Receiver's Crossclaims requests summary judgment on the Receiver's crossclaim for unfair or deceptive trade practices, the Motion is **GRANTED**. The Receiver's crossclaim against Doug Harris for unfair or deceptive trade practices is dismissed with prejudice.

vi. To the extent Doug Harris's Motion as to the Receiver's Crossclaims requests summary judgment on the Receiver's

crossclaim for equitable relief for JDPW, CCSEA, and DRE, the Motion is **DENIED**.

vii. To the extent Doug Harris's Motion as to the Receiver's Crossclaims requests summary judgment on the Receiver's crossclaim in equity to set aside the Release Deed and the assignment of the Castle McCulloch Note, the Motion is **DENIED**.

viii. To the extent Doug Harris's Motion as to the Receiver's Crossclaims requests summary judgment on the Receiver's eighth crossclaim, the Motion is **GRANTED**. To the extent the Receiver's eighth crossclaim asserts a claim against Doug Harris, that crossclaim is dismissed with prejudice.

**SO ORDERED**, this the 7th day of May, 2019.

/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Chief Business Court Judge